**<u>Exhibit 1</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

CIVIL ACTION NO. 6:11-cv-6310

---

MPC FRANCHISE, LLC, and
MP CLEARY, INC.,
                       Plaintiffs,
        vs.

BRENT TARNTINO,
                 Defendant.

---

BRENT TARNTINO and PUDGIE'S
PIZZA CORPORATION - HORSEHEADS, INC.,
                  Counterclaim Plaintiffs,
        vs.

MPC FRANCHISE, LLC, and
MP CLEARY, INC.,
                  Counterclaim Defendants.

---

This is the Examination Before Trial of

BRENT TARNTINO

held on the 17th day of April, 2012

held at the law offices of Cooper, Pautz &
Weiermiller, LLP, 2854 Westinghouse Road,
Horseheads, New York  14845, commencing at
12:00 p.m.

REPORTED BY:  NANCY H. SWARTZ
Shorthand Reporter
Notary Public

NHS COURT REPORTING
(607)215-2201

A P P E A R A N C E S

FISHER ZUCKER, LLC
    21 South 21st Street
    Philadelphia, PA   19103
    (215) 825-3100
    Jzucker@fisherzucker.com
    Attorneys for Plaintiffs MPC
    Franchise, LLC and MP Cleary, Inc.
    BY:  JEFFREY ZUCKER, ESQ.


BOND, SCHOENECK & KING
    One Lincoln Center
    Syracuse, New York   13202-1355
    (315)218-8515
    gmcguire@bsk.com
    Attorneys for Brent Tarntino
    BY:  GEORGE R. MCGUIRE, ESQ.
         BLAINE T. BETTINGER, PH.D., ESQ.


S T I P U L A T I O N S


    It is stipulated by and between the

parties hereto that the filing of the

deposition is waived; that the deposition

may be signed before any Notary Public;

and that all objections except as to the

form of the question are reserved to the

time of the trial.

1   I N D E X :

2

3   W I T N E S S :   Brent Tarntino

4

5   Examination By                          Pages

6

7   Mr. Zucker                              4-61

8

9   Affidavit page                          62

10  Certificate page                        63

11

12

13

14

15  E X H I B I T S :

16

17  Number              Description              Page

18

19  BT-1                Map                      43

20  BT-2                Letter to Pudgie's owners   58

21

22

23

24

25

1      B R E N T   T A R N T I N O,

2           having been called as a witness,

3           having been duly sworn, was examined

4           and testified as follows:

5

6                    EXAMINATION

7    BY MR. ZUCKER:

8        Q    Mr. Tarntino, my name is Jeff Zucker.  We

9    just met.  I'm here to take your deposition in

10   the case that's currently pending in Federal

11   Court.  My clients brought a complaint and then

12   you and your company brought a counterclaim.  So

13   we're going to discuss issues regarding that

14   case.  All right?

15       A    (Witness nods head).

16       Q    You have to keep all your responses

17   verbal so the court reporter can take them down.

18   You know, sometimes in a conversation you might

19   want to answer, you think where my question is

20   going, you might want to answer but what you

21   should do in this deposition is wait until I get

22   my question out.  That way your lawyer, if he

23   wants to object, he can get his objection in and

24   then you can answer.  It's easier for the court

25   reporter to take down the responses if you talk

1     A    Yes.

2     Q    Yes, before that day.  In your trademark

3  application you took a declaration, you signed a

4  declaration, do you remember that?

5     A    Yes.

6     Q    And one of the items that you signed off

7  on in the declaration was that to the best of

8  your knowledge no other person or entity was

9  using that Pudgie's trademark?

10    A    Yes.

11    Q    Do you recall that?

12    A    Yes.

13    Q    If you knew that TruFoods was using the

14 Pudgie's trademark before July 2nd, the date you

15 signed the declaration, why did you sign the

16 declaration stating that no one else was using

17 that trademark?

18    A    Because I was filling the application out

19 for pizza, pasta and subs.  And the Pudgie's mark

20 that is registered is under restaurants and his

21 entity, that I found out through website and

22 research, was chicken.

23    Q    So you're reading the declaration to

24 restrict it just to the goods and services you

25 were registering?

1      A     Yes.

2      Q     Did you have a lawyer help you with the

3  registration application?

4      A     Yes.

5      Q     What was his name?

6      A     Aaron Alsheimer.

7      Q     And what law firm is he with?

8      A     Sayles & Evans.

9      Q     Is that in Horseheads?

10      A     Elmira.

11      Q     Elmira.  What parts of the application

12  did you personally complete and what parts did he

13  complete?

14      A     I believe he completed the entire

15  application.

16      Q     And what was your role in his completing

17  the application?

18      A     He received all of the information in the

19  application from me.

20      Q     And did you sit together in his office

21  and go through that?

22      A     Sometimes.

23      Q     And what about on July 2nd, 2010, the

24  date that the application was actually submitted

25  to the U.S. Patent and Trademark Office, were you

1    And you admitted that paragraph, right?

2        A    Yes.

3        Q    It doesn't reference that your sister or

4    you or Edward operates the business, correct?

5        A    It does not.

6        Q    It references that the corporation,

7    Pudgie's Pizza Corporation - Horseheads, Inc.

8    operates the business, right?

9        A    Yes.

10       Q    And you admitted that, correct?

11       A    Yes.

12       Q    In paragraph 22 of the complaint we

13   allege that, quote:  In his trademark

14   application, that's referring to you, Tarntino

15   claims that he first began using the mark in

16   commerce in 1980.  Do you see that?

17       A    22?

18       Q    Uh huh.

19       A    Yes.

20       Q    Okay.  Is that an accurate statement?

21       A    I believe that to be accurate.

22       Q    And how old were you in 1980?

23       A    It's a very difficult question to answer.

24       Q    You can't answer the question how old you

25   were in 1980?

1    A    I cannot.

2    Q    Why is that?

3    A    I'd have to do the math.

4    Q    Go ahead.

5    A    You want every day?

6    Q    No, I'm asking how old you were in 1980?

7    A    Okay.

8    Q    What year were you born in?

9    A    1972.

10    Q    So in 1980 you were eight years old.

11  I'll do the math for you.

12    A    I was seven.  I'll do the math for you.

13    Q    Okay.  If you want to say seven, that's

14  fine.  So tell me at seven years old how you were

15  using the mark in commerce, the mark Pudgie's?

16    A    I was not.

17    Q    Now, in your trademark application you

18  say that you were.  Are you aware of that?

19    A    Yes.

20    Q    And today you're saying that's not true,

21  right?

22    A    My mother was using -- I guess I don't

23  understand the question.

24    Q    Okay.  You filed a trademark application

25  in July 2010 with the help of your lawyer, right?

1    A    Yes.

2    Q    You, meaning Brent Tarntino, the person

3  sitting here?

4    A    Yes.

5    Q    Under that trademark application you

6  swore under penalty of perjury that you, Brent

7  Tarntino, were using the mark as early as 1980,

8  right?

9    A    Yes.

10    Q    In 1980 you say you were seven years old,

11  right?

12    A    Yes.

13    Q    And you just admitted you weren't doing

14  anything to use the mark in commerce in 1980?

15    A    I was not using the mark in commerce in

16  1980.

17    Q    What have you done to correct the

18  statement in your trademark application?

19              MR. MCGUIRE:   Object to the form.

20    A    Nothing.

21    Q    Do you plan to correct the statement?

22    A    No.

23    Q    And why's that?

24    A    Because in 1980 I was not directly using

25  the mark but my mother was, so I was indirectly

1   using the mark in 1980.  When she died, I

2   inherited those years, in my opinion, therefore,

3   I was indirectly using the mark in 1980 and

4   continue to do so today.

5        Q    So you believe that when your mom died in

6   2007 you inherited what?

7        A    Her years.

8        Q    Her years of what?

9        A    Owning the business.

10        Q    Okay.  But you just told me that when she

11   operated the business, she operated it as a

12   franchisee, right?

13        A    Yes.

14        Q    And as a franchisee, she was licensing

15   the mark from someone else, right?

16        A    Yes.

17        Q    So what did you inherit?

18        A    The operation of Pudgie's and the use

19   since 1980.

20        Q    But if she was operating it as a

21   licensee, as a franchisee, explain to me what you

22   think you inherited?

23        A    My mother owned Pudgie's Pizza in

24   Horseheads in 1980.

25        Q    Right.

1       A      I'm trying to think of the answer.   If

2   you can give me a moment, I would appreciate it.

3       Q      Oh yeah, sure.

4       A      I believe so.

5       Q      If it wasn't Mr. McGuire, would it be

6   someone from his office or a totally different

7   attorney from a different office?

8       A      Totally different attorney.

9       Q      Now, the specimen that you submitted, you

10  submitted the specimen to show your use of the

11  trademark Pudgie's in commerce, is that correct?

12      A      That's correct.

13      Q      And how is that specimen, that picture,

14  how did it -- explain to me how it showed your

15  use, Brent Tarntino's use of the trademark

16  Pudgie's in commerce?

17      A      I don't understand the question.

18      Q      The purpose of the specimen that you

19  submitted was to show Brent Tarntino's use of the

20  trademark Pudgie's in commerce, correct?

21      A      If I remember correctly, yes.

22      Q      Explain to me how that specimen you

23  submitted shows that Brent Tarntino was using the

24  Pudgie's trademark in commerce?

25      A      If I remember correctly, I sent a pizza

1  box in from the shelf in my existing Pudgie's
2  location that I was working at every single day,
3  I grabbed it off of the shelf.  I took a picture
4  of it.  I sent it in to my attorney's office and
5  then I put the pizza box back on the shelf that I
6  was personally working at, that I personally
7  owned.
8       Q    And, again, the Pudgie's Pizza shop in
9  Horseheads where you were working, that's what
10 you're referring to?
11      A    Yes.
12      Q    And that shop was owned by the Pudgie's
13 Pizza Corporation - Horseheads, Inc., is that
14 correct?
15      A    That I own, yes.
16      Q    Right.  But it was operated, just so we
17 have a clear record, by the corporation, correct?
18      A    I own the corporation, correct.
19      Q    Well, I understand that you, your sister
20 and your brother owned it, right?
21      A    Right.  Me, my sister and my brother
22 owned the corporation, correct.
23      Q    Paragraph 25 of the complaint states
24 that:  Tarntino declared under penalty of perjury
25 and pursuant to 18 USC Section 1001, that he was

1    Q    -- inaccurate in paragraph 25?

2          MR. MCGUIRE:   Object to form.

3    A    I still don't understand.

4    Q    Okay.   We can move on.   That's a fine

5    answer.

6          In paragraph 26 the plaintiffs allege that

7    you declare under penalty of perjury that the

8    statements in the trademark application were true.

9    And your answer, you deny that.

10         Are you denying that the statements that

11   you made were true?

12   A    Absolutely not.   Everything that I said

13   in my United States Patent and Trademark Office

14   application, under my belief, was 100 percent

15   accurate.

16   Q    Okay.

17   A    And I never intended to defraud or lie to

18   anybody.

19   Q    Well, why are you saying here in

20   paragraph 26 that you deny that?

21   A    I have no answer for that.   But I can

22   assure you that I've never lied or defrauded

23   anybody.

24   Q    But this is your answer that you

25   submitted.

1    it is now.  I believe all my answers to be

2    accurate.  If they're not accurate, my ultimate

3    goal is to keep the mark Pudgie's, which I

4    believe I will be, to be used with pizza, pasta

5    and subs, submarine sandwiches, excuse me.  And I

6    would certainly ask them to allow me to amend

7    mistakes that are made that are not based on the

8    granting of the mark.

9        Q    Okay.  That's fine.  In the ninth

10   affirmative defense, that's the last one on page

11   seven, you say that plaintiffs -- that's my

12   clients the Clearys and their companies:

13   Plaintiffs claims are barred in whole or in part

14   by the doctrine of unclean hands.

15            Can you explain factually what you're

16   saying here?

17       A    Sure.  I believe that the chicken guy, I

18   don't even know who he is, it's so funny to me,

19   the chicken guy --

20       Q    Help me out.  I don't know who you're

21   talking about.

22       A    I don't either.  I don't know who he is.

23   But his entity registered under the United States

24   Patent and Trademark Office is restaurants --

25       Q    Are you talking about TruFoods?

1    A    TruFoods.  Whoever he is.  So the

2  TruFoods guy can't grant marks.  And to me it

3  sounds like, and I've never seen any of this

4  information, nobody has ever showed me anything,

5  but from what they're saying, is that they

6  received permission or, I guess I don't know the

7  real word, some sort of contract with the chicken

8  guy to sell pizza, pasta and subs.  And to me

9  that's not -- that's impossible.  There's nothing

10  that says the chicken guy can grant marks.  I

11  looked through all of the USPTO stuff and it

12  never says the chicken guy can give anybody

13  rights.

14    Q    Okay.

15    A    So I don't understand how these guys are

16  running around saying we have the rights to

17  pizza, pasta and subs.  Show me.  There's no, I

18  looked, there's -- show me pizza, pasta and

19  submarine sandwiches and this can go away.

20    Q    And in your sentence, these guys are

21  running around doing this, are you talking about

22  the Clearys or are you talking about the TruFoods

23  guys?

24    A    The Clearys.  The Clearys are claiming

25  the chicken guy gave them pizza, pasta and

1    Q    So that's your time gets wasted?

2    A    My time is, oh, wasted?

3    Q    And would there be any --

4    A    Hours.  I should record them.

5    Q    And would there be any other damages -- I

6  understand that you have to spend time doing this

7  explaining.  Is there any other kind of damages

8  you're suffering as a result of the MP Cleary

9  group coming into Elmira Heights?

10    A    As far as -- very difficult to show.  I

11  believe there has been but if I was going to have

12  to show, you know, let's just take two people,

13  like the Elmira Heights Police Department.  I can

14  show that they've been going to the Elmira

15  Heights Police Department because me and Rob

16  Cleary have a mutual friend there.  And then

17  Horseheads also goes to the Elmira Heights Police

18  Department.

19         Prior to that North Main or College

20  Avenue would never, ever one time, and he's been

21  there for 15 years, can he ever remember them

22  ever going there.  So every time MP Cleary would

23  deliver there, that order previously would have

24  been a Horseheads order.

25         And I probably have 15 to 20 of those,

1   you know, friends of mine that live in Elmira

2   Heights or those situations that I could actually

3   write out and provide those names.

4        Q    Well, why would your friends not use your

5   store?

6        A    I just explained it to you.  Me -- like,

7   the Elmira Police Department, me and Rob have a

8   mutual friend.  Okay.  I don't pick his friends

9   and he doesn't pick my friends.

10       Q    No, I understand that one example.

11       A    Right.  Well, that would be the example

12  for all 15.

13       Q    Oh.  Okay.

14       A    Like, I would use another specific name,

15  Wally Gonzalez, one of my best friends, just did

16  a complete remodel at your client, Rob Cleary's

17  house.  Mutual friends.  He lives in the Village

18  of Elmira Heights.  So now that Rob is coming up

19  there, he probably would be splitting between the

20  two of us, where before it would just be

21  Horseheads.

22       Q    Okay.

23       A    And I would have other examples of those.

24  So where we have mutual friends, I can show you

25  that if they ever have, they never did before,

1    you know.

2         That specific person is the one that

3    brought in their first flyer that ever said ever

4    the words Elmira Heights on it to me.  Wally

5    Gonzalez.  He said, dude, how bad are you gettin'

6    screwed?  And he heard me call Rob the second I

7    seen it.  I couldn't believe it.  I couldn't

8    believe it that I was backstabbed the way I was.

9         Q    When you submitted or were working on

10   your trademark application, either you or your

11   lawyer, did either you or your lawyer do a

12   search, did you search to see if there were any

13   other users of the Pudgie's trademark?

14        A    Yes.

15        Q    Who did that?

16        A    I did.

17        Q    And how did you do that search?

18        A    Through the USPTO website.

19        Q    Did you do any other kind of searching?

20        A    No.

21        Q    Like, what's referred to as a common law

22   search?

23             MR. MCGUIRE:  Just for clarification,

24        can you explain the common law so he could

25        understand that?