IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MPC FRANCHISE, LLC, and<br>MP CLEARY, INC.,<br><br>       Plaintiffs<br>v.<br><br>BRENT TARNTINO.<br><br>       Defendant. | CIVIL ACTION NO. 11-cv-6310 |

| | |
|---|---|
| BRENT TARNTINO and PUDGIE'S PIZZA,<br>CORPORATION – HORSEHEADS, INC.,<br><br>       Counterclaim Plaintiffs<br>v.<br><br>MPC FRANCHISE, LLC, and<br>MP CLEARY, INC.,<br><br>       Counterclaim Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS'
CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiffs and Counterclaim Defendants MPC Franchise, LLC ("MPCF") and MP Cleary,
Inc. ("MPCI") respectfully submit this memorandum of law in opposition to Defendant Brent
Tarntino ("Tarntino") and Counterclaim Plaintiffs Brent Tarntino and Pudgie's Pizza
Corporation – Horseheads, Inc.'s ("PPC Horseheads") Motion for Summary Judgment and in
support of their Cross Motion for Partial Summary Judgment.

## II.   **BACKGROUND**

In its five count counterclaim, Defendant and Counterclaim Plaintiff seek an order enjoining Plaintiffs from delivering food into Elmira Heights, New York.  Plaintiffs' motion for summary judgment should be denied because Defendant and Counterclaim Plaintiff did not have exclusive rights to Elmira Heights, New York.  Rather, Plaintiffs, Defendant and Counterclaim Plaintiff and a third Pudgie's pizza, pasta, chicken and submarine sandwich restaurant have been delivering to Elmira Heights for at least ten years.

In their complaint and in their cross motion for summary judgment, Plaintiffs seek to cancel Defendant's trademark registration because it was procured fraudulently and because customers will likely be confused between Plaintiffs' mark and Defendant's mark.  In addition, Plaintiffs seek summary judgment in the form of a declaration that TruFoods, the owner of the trademark and the entity that Plaintiffs license the mark from, is the true owner of the mark, and that Defendant is not the true owner of the mark.

Plaintiff MPCI owns a popular restaurant in the Elmira, New York area called Pudgie's Pizza which sells pizza, pasta, chicken and submarine sandwiches ("Plaintiff's Pudgie's"). Plaintiff MPCF is a franchise company that sells franchises to people so that they may operate pizza, pasta, chicken and sub restaurants using the "Pudgie's" trademark.  There are three Pudgie's Pizza franchised restaurants in other cities.  Both MPCI and MPCF are owned by brothers David and Robert Cleary.  MPCI and MPCF derive the right to use the Pudgie's trademark (the "Mark") and to license the Mark to others, from a third party, TruFoods, LLC ("TruFoods").  TruFoods has been using the Mark for restaurants in the New York City area beginning in 1982 and registered the Mark with the United States Patent and Trademark Office in 2002.  The Clearys and Defendant Brent Tarntino are first cousins.  Tarntino is a one-third

owner of an independently owned Pudgie's Pizza restaurant located in Horseheads, New York, which is north of Elmira ("Defendant's Pudgie's").

Defendant's Pudgie's has been selling pizza, pasta, chicken and subs at its restaurant in Horseheads, New York since 1973. Another Pudgie's Pizza restaurant existed in the Elmira Heights area, but this restaurant closed in the early 1990's ("Pudgie's Elmira Heights"). Since the closing of Pudgie's Elmira Heights, Defendant's Pudgie's and Plaintiff's Pudgie's have delivered to Elmira Heights. Another Pudgie's ("Pudgie's Northside"), which is independently owned and not a party to this litigation, has also delivered to Elmira Heights since the early 1990's. Plaintiff's Pudgie's, Defendant's Pudgie's, and Pudgie's Northside all have similar menus and serve both pizza and chicken.

In 2010, after the relationship between the cousins started to deteriorate, Tarntino registered the mark "Pudgie's" with the United States Patent and Trademark Office ("USPTO"). As required in the application, Tarntino stated under penalty of perjury that he believed he was the only person with a right to use the Mark in commerce. He also stated that he first used the Mark as early as 1980. The facts clearly show, and there is no genuine issue of fact to the contrary, that he knew these statements were false when he made them. He was aware that his cousins, MPCF's franchisees, and other relatives were using and had rights to the Mark. In addition, a cursory search through the USPTO database would have revealed that TruFoods already owned the Mark for restaurant services, so Tarntino knew that his use was non-exclusive. Further, the facts clearly show that Tarntino knew TruFoods had been using the Mark for restaurant services before he did.

Unfortunately, in reliance on Tarntino's knowing and intentional misrepresentations, the USPTO granted him a registration for the Mark. TruFoods and Tarntino now both have

registrations for the Mark; TruFoods' registration is for "Restaurant and carry out restaurant services" and Tarntino's registration is for "Pizza parlors; Restaurant services featuring pizza, pasta and subs." TruFoods' category is broader and completely encompasses the goods and services claimed by Tarntino in his registration.

Plaintiffs sued Tarntino on June 21, 2011 for a declaratory judgment that TruFoods had senior rights in the Mark (Count I), for a cancellation of Tarntino's trademark registration (Count II), and for trademark infringement and unfair competition (Count III).  Tarntino and Counterclaim Plaintiff Pudgie's Pizza Corporation – Horseheads, Inc. (the entity which owns Defendant's Pudgie's and of which Tarntino is a one-third owner) counterclaimed for, among other things, trademark infringement and declaratory judgment of non-infringement. Specifically, Plaintiffs seek to cancel Tarntino's registration and Defendant and Counterclaim Plaintiffs seek an injunction enjoining Plaintiffs from continuing to deliver food to Elmira Heights.

Defendant and Counterclaim Plaintiffs filed a Motion for Summary Judgment on May 30, 2012, on all of Plaintiffs' claims and for their own counterclaims.  Plaintiffs now file their Opposition to this Motion for Summary Judgment and file their own Cross Motion for Partial Summary Judgment on Count I (declaration that TruFoods, not Tarntino, owns the "Pudgie's" Mark) and Count II (to cancel Tarntino's trademark registration).

The Lanham Act (the federal trademark statute, 15 U.S.C. §1051 et seq.) provides that a party can sue for cancellation of another's trademark registration if: (1) the registration was obtained fraudulently; or (2) there is another party who has been using a mark in commerce before the other party and the other party's use confuses or deceives the public. 15 U.S.C. §1064 and §1052. Tarntino's registration should be cancelled for both reasons. Tarntino obtained his

4

registration of the Mark <u>fraudulently</u> because he knew that he was not the exclusive user of the Mark, because he knew others with rights in the Mark had been using the Mark continuously in commerce to provide similar services, and because he knew that he had not been individually using the Mark in commerce since 1980.   TruFoods, Plaintiffs, and Plaintiffs' franchisees were all using the Mark in commerce at the time Tarntino filed his trademark application.   TruFoods and Plaintiffs have been using the Mark previously, and that prior use is likely to cause confusion in the public's mind, because customers cannot tell if the two Pudgie's are affiliated with each other or whether they are independent businesses.

Additionally, Tarntino should not be granted summary judgment on his counterclaim where he seeks to enjoin Plaintiffs from delivering food to Elmira Heights.   Defendant's Pudgie's has not been exclusively delivering there.   It is already sharing the market with Pudgie's Northside, and because Plaintiffs have been serving the area since the early 1990's, and can prove that they have delivered to this area since at least as early as 2002 by providing delivery records.   Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' cross motion, cancel Tarntino's registration and declare that only TruFoods owns the Mark. Plaintiff also respectfully request that the Court deny Defendant's motion because Plaintiff's Pudgie's, Defendant's Pudgies and Pudgie's Northside have all been delivering to Elmira Heights for years.   Therefore, no party has exclusive rights to Elmira Heights and all parties may deliver food to Elmira Heights.

## III.   FACTS

### A.  The Early Years of the Pudgie's Pizza Restaurant Franchise System.

The first Pudgie's pizza restaurant was opened in Elmira, NY in 1963 by Charles "Pudgie" Cleary and other members of the Cleary family. (David Cleary Dep. p. 29, ln. 12 –22,

A0008).  This location is currently known as Pudgie's Northside and is independently owned and operated by a person who is not a party to this suit. (Tarntino Dep. p. 52, ln. 20-25, A0038).  A second location is owned by the Plaintiffs in this suit, and was opened in 1963 by Michael P. Cleary, Sr. and his brothers Charles and Francis Cleary. (See Store Opening Dates, A0042). David and Robert Cleary, the owners of the Plaintiff's Pudgie's, are Michael P. Cleary, Sr.'s sons.

The Clearys began to expand using a franchise system by forming Pudgie's Pizza Franchising Corporation ("PPFC") to begin offering and selling Pudgie's pizza franchises. (David Cleary Dep. p. 26, ln. 10-21, A0007).  PPFC registered the Pudgie's Mark with the USPTO in 1978. (Defendant's Answer, ¶ 78, Docket 8).   In the early 1990's, there were somewhere between 28 and 32 franchised and company owned Pudgie's restaurants.  (David Cleary Dep. p. 27, ln. 5 –11, A0007).

One of these franchises was opened by Bernadette Tarntino on July 15, 1973, in Horseheads, NY, which is north of Elmira ("Defendant's Pudgie's").  (Franchise Agreement, p. 1, A00043).  Bernadette Cleary was Defendant Tarntino's mother and David and Robert Cleary's aunt.  Bernadette Tarntino died on February 15, 2007.  (See Franchise Agreement, p. 1, A0043). Defendant's Pudgie's is currently owned and operated by Counterclaim Plaintiff PPC Horseheads. (Tarntino Dep. p. 11, ln. 9-23, A0028).

Another Pudgie's Pizza restaurant was opened in Elmira Heights, NY in 1970 ("Pudgie's Elmira Heights"), but this Pudgie's went out of business in the early 1990's.  The manner in which the other Pudgie's in the immediate area would eventually share the business in Elmira Heights would become a point of contention and forms the basis of the Defendant's counterclaims. (See Store Opening Dates, A0042; David Cleary Dep. p. 61, ln. 6 –10, A0016).

**B. PPFC's Registration of the Mark is Abandoned, PPFC is Dissolved, and the Existing Pudgie's All Become Independent Restaurants.**

PPFC's registration of the Mark with the USPTO was cancelled for abandonment in 1985 when PPFC inadvertently failed to file a declaration. (Defendant's Answer, ¶ 79, Docket 8). In 1990, Michael P. Cleary, Sr. formed MPCI to operate Plaintiff's Pudgie's. (MPCI Corporate Documents, A0061-A0063). Since PPFC's registration for the Mark had been cancelled, no entity had a federal registration for the Mark at this time. In 1990, Michael P. Cleary, Sr. died. (David Cleary Dep. p. 25, ln. 6-8; p. 26, ln. 8-11, A0007). PPFC was dissolved in the early 1990's. (Id. p. 26, ln. 18 – 21, A0007). Thereafter, all Pudgie's franchises became independent restaurants. (Id. p. 26, ln. 2-3, A0007). Bernadette Tarntino's Pudgie's Franchise Agreement terminated on July 15, 1993. (Tarntino Dep. p. 50, ln. 3-9). Only then did her restaurant begin to use the Mark in commerce on its own behalf rather than as a franchisee.

**C. Arthur Treacher's Registers the Pudgie's Mark**

In 1982, another company, Arthur Treacher's, Inc. ("Arthur Treacher's") started using the Pudgie's name in connection with Pudgie's Famous Chicken restaurants in the New York City metropolitan area. (Arthur Treacher's Trademark Registration, A0064). Arthur Treacher's applied for and on April 30, 2002 was granted a trademark registration by the USPTO for the Mark for "Restaurant and carry out restaurant services." (Id.) Arthur Treacher's assigned its interest in the Mark to PAT Franchise Systems, Inc. ("PAT") when PAT acquired Arthur Treacher's in 2002. (See Trademark Assignment Abstract of Title, A0065). In 2008, PAT assigned its entire interest in the Mark to TruFoods, LLC, which still owns national rights to the Mark today. (Id.)

### D. MPCI Licenses Its Own Mark Back From TruFoods and Starts Its Own Franchise Company.

On July 19, 2004, MPCI entered into a license agreement with PAT which granted MPCI a non-exclusive, perpetual, royalty free, nationwide license to use and license others the right to use the Mark. (License Agreement between PAT and MPCI, A006-A0071). MPCI paid PAT a one-time license fee of $37,500. (Id. at ¶ 4, A0067). According to the License Agreement, in the event that PAT decided not to pursue litigation which affects MPCI, MPCI had the right to commence the litigation at its own expense. (Id. at ¶ 8, A0068).

On October 22, 2009, David and Robert Cleary formed MPCF to begin franchising Pudgie's Pizza restaurants. (See MPCF Articles of Organization, A0072-A0073. MPCI granted MPCF a perpetual, royalty-free nationwide license to use and sublicense others the right to use the Mark in connection with restaurants that offer pizza, pasta, chicken, subs, and related menu items. (Sub-License and License Agreement between MPCI and MPCF, A0074-A0078). Since then, MPCF has sold three franchises – one in Clarksville, Maryland, one in Binghamton, New York, and one in Waverly, New York. (David Cleary Dep. p. 14, ln. 19 –23, A0004).

### E. The Relationship Between Plaintiffs and Tarntino Deteriorates

After Pudgie's Elmira Heights went out of business in the early 1990's, Pudgie's Northside, Plaintiff's Pudgie's, and Defendant's Pudgie's all began to deliver into Elmira Heights, which is located between the three restaurants. (David Cleary Dep. p. 61, ln. 14-16, A0016; See maps of Elmira, NY, A0079-A0080). Pudgie's Northside and Defendant's Pudgie's listed Elmira Heights as a delivery area in advertisements and allegedly had an informal agreement to share the territory between them. (Tarntino Declaration, ¶¶ 5-7, A0086). While Plaintiff's Pudgie's did not list Elmira Heights as a delivery area in its advertisements until 2011, it will demonstrate through delivery records that beginning at least in 2002 and continuing to

date, Plaintiff's Pudgie's received from and delivered many orders to Elmira Heights. (Sales and Delivery Records 2002-present, A0088-A0177). In 2011, Plaintiff's Pudgie's started listing Elmira Heights as an area they delivered to in its advertisements because the relationship between the Clearys and Tarntino began to deteriorate, and the parties no longer placed joint advertisements. (See examples of advertisements A0178-A0179).

### F. Tarntino's Sham Registration of the Mark.

On July 2, 2010, Tarntino filed an application for the Pudgie's Mark in his own name with the USPTO for "Pizza parlors; Restaurant services featuring pizza, pasta and subs." (Tarntino Trademark Registration Application, A0180-A0186). This category is encompassed by and fits within the category of goods and services in TruFoods' 2002 registration, which was for "Restaurant and carry out restaurant services." (Arthur Treacher's Trademark Registration, A0064).

Tarntino wanted to register the Mark for individually because he wanted to start his own Pudgie's franchise using the Mark. (Tarntino Dep. p. 17, ln.10-12, A0030). He is currently trying to have his brother and sister, who each own one-third of the stock of PPC Horseheads, purchase his one-third share. (Id. at p. 19, ln.19-25, A0030). There is no evidence in the record that the buyout has occurred, so there exists a genuine issue of material fact as to who owns the rights to whatever rights Bernadette Tarntino owned in the Mark. Tarntino testified that he has not actually worked at the Defendant's Pudgie's since approximately late December 2011 or early January 2012. (Id. at p. 16, ln. 2-16, A0029).

Tarntino made a number of false claims in his trademark application declaration (See Tarntino Trademark Application, A0180-A0186). The declaration states as follows:

> The undersigned, being hereby warned that willful false statements
> and the like so made are punishable by fine or imprisonment, or

9

both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

(emphasis added).

Tarntino swore under penalty of perjury that he is the owner of the mark and that to the best of his knowledge and belief, no other person has the right to use the Mark in commerce. (A0185).

First, the record shows that, as of the date of Tarntino's trademark application, he was aware that TruFoods had registered the Mark and therefore had the right to use the Mark. Tarntino specifically admitted that he became aware of TruFoods registration and right to use the Mark before he filed his own trademark application:

| Q | You submitted your trademark application on July 2nd, 2010? |
|---|---|
| A | Okay. |
| Q | Do you recall whether you knew about TruFoods' ownership of the registration for the Pudgie's mark before you submitted your application or after? |
| A. | Before. |
| Q. | You learned before? |
| A. | Yes. |

(Tarntino Dep. p. 35, ln. 8-14, A0034). TruFoods' registration of and right to use the Mark also provided constructive notice of its right to use of the Mark in commerce. During his deposition,

Tarntino strongly implied that he thought that TruFoods had only registered the Mark for chicken restaurants. (Tarntino Dep. p. 38, ln. 15 - p. 39, ln. 13, A0035). In fact, TruFoods' registration clearly contains the encompassing and general language of "restaurant and carry out restaurant services", which certainly includes pizza, pasta and sub restaurants. (TruFoods Trademark Registration, A0064).

Second, Tarntino knew that nearby Pudgie's Northside had rights to use and was currently using the Mark in commerce. (Tarntino Declaration, ¶ 7, A0086).

Third, Tarntino knew that MPCF's three franchises outside of the Elmira area had rights to use and were currently using the Mark in commerce. (David Cleary Dep. p. 14, ln. 19 –23, A0004). This is because shortly after registering the Mark for himself, Tarntino sent all MPCF franchisees a letter in which he claimed to be the "true" owner of the Mark (Tarntino's March 30, 2011 letter, A0196), and the record shows that he telephoned MPCF's Maryland franchisee to relate the same. (See March 28, 2011 email from the Maryland franchisee to Plaintiffs, A0197). In addition, Tarntino grew up in the Pudgie's system and worked there all his life, so he was well aware that his relatives and others had rights to use the Mark. (Tarntino Dep. p. 14, ln. 24 – p. 15, ln. 10, A0034). In short, there is no genuine question of fact that when Tarntino filed his trademark application, Tarntino knowingly misstated that he believed that no other person or entity else had the right to use the Mark in commerce.

Tarntino also misstated in his trademark application that he had prior use of the Mark and that he first began using the Mark in commerce "At least as early as 01/01/1980" – notably before TruFoods' date of first use in 1982. (See Tarntino Application, p. 2, A0181). When, at his deposition, counsel asked Tarntino how old he was in 1980, Tarntino was unable or unwilling to answer. (Tarntino Dep. p. 21, ln. 22 - p.22, ln. 1, A0031). When confronted with the

indubitable fact that he was only seven years old in 1980 (he was born in 1972 and testified he was seven in 1980) and thus could not possibly have used the Mark himself, Tarntino surmised that he had "inherited" his mother Bernadette Tarntino's rights and that she had first used the Mark in 1980. (Tarntino Dep. p. 23, ln. 24 – p. 25, ln. 4., A0031). There is no genuine issue of fact that Tarntino, at age seven and attending second grade, was not using the Mark in interstate commerce as he declared under penalty of perjury in his trademark application.

The undisputed fact is that Tarntino's mother, Bernadette Tarntino, started using the Mark as a franchisee in her operation of Defendant's Pudgie's in 1973 when she entered into a franchise agreement with PPFC. (See 1983 Franchise Agreement, first page, A0043; Tarntino Dep. p. 24, ln. 10-16, A0031). Until her renewal franchise agreement expired on July 15, 1993, as Tarntino testified, Tarntino's mother was using the Mark only as a licensee which does not count as her own (or his own) "first use" for a valid USPTO registration. As discussed more fully below, a licensee does not gain any rights to a mark. Those rights belong exclusively to the owner, the licensor. Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5th Cir. 1962). Accordingly, the earliest possible date which Tarntino's mother Bernadette could claim for her first use of the Mark was the date the franchise agreement terminated – July 15, 1993, because a licensed franchisee gains no rights and shares no goodwill in a trademark. Indeed, Tarntino included a specimen of the Mark on a pizza box evidencing what he alleged was his use of the Mark, but the specimen itself states on its very face "® Pudgie's Pizza Franchising Corporation 1972" – which further demonstrates that there is no genuine issue of fact that his mother started off using the Mark only as a franchisee licensee. (See Tarntino Registration Application, A0186).

Additionally, PPC Horseheads or Brent Tarntino and his two siblings (it is not clear from the Defendant's filing and thus there is a genuine issue regarding this material fact – ownership),

and not Brent Tarntino the individual, are the only persons or entity that could have possibly inherited any rights in the Mark from Bernadette Tarntino's estate because PPC Horseheads succeeded Bernadette Tarntino in owning and operating Defendant's Pudgie's restaurant and there is nothing to indicate that Bernadette Tarntino bestowed any intellectual property rights upon Brent Tarntino exclusively upon her death.   Tarntino equally shares ownership in PPC Horseheads with his two siblings (Tarntino Dep. p. 13, ln. 19 – p. 14, ln. 2, A0029), and has put forth no evidence that he owns all the rights to the Mark individually, i.e. that his siblings ever assigned their rights in the Mark to him. Therefore, there is no factual support for and there is a genuine issue of a material fact regarding Tarntino's claim that he <u>individually</u> inherited his mother's years of trademark usage.   Moreover, there is no evidence and thus a genuine issue of material fact (the date of his first use of the disputed trademark) as to why Tarntino used the completely arbitrary date of "as early as" 1980 as his first use of the Mark.

### G. Armed With His Own Registration, Tarntino Makes Demands Upon MPCF's Three Franchised Pudgie's Pizza Restaurants and Publically Claims To Be the Owner of the Mark.

Shortly after obtaining his registration of the Mark, Tarntino sent a letter to all MPCF franchisees advising them that: (1) he was the true owner of the Mark; (2) he was entitled to nationwide priority with respect to the Mark; and (3) the franchisees were not entitled to use the Mark outside of their current geographical area without first obtaining his permission.   He neglected to ask these franchisees to send him their royalties, however. (<u>See</u> March 30, 2011, letter to MPCF franchisees, A0196).   Additionally, at least one of the franchisees received a phone call relating the same information. (<u>See</u> March 28, 2011 email from the Maryland franchisee to Plaintiffs, A0197).   Tarntino also boasted on his Facebook page that he was the valid owner of the Mark. (<u>See</u> Tarntino's Facebook screen shots, A0198-A0199).

In response to these affronts and the confusion they created and in an effort to avoid unnecessary litigation, Plaintiffs served Tarntino with a cease and desist letter in which Plaintiffs identified the defects with Tarntino's trademark application and registration and demanded that Tarntino immediately: (1) cancel his trademark registration with the USPTO; (2) cease and desist all claims of exclusive ownership of the Mark; and (3) inform MPCF's franchisees that he is not the lawful exclusive owner of the Mark and that Plaintiffs are the lawful licensee of the Mark. (April 7, 2011 cease and desist letter, A0200-A0203).  Tarntino neither responded to the letter nor complied with its demands.

## IV.   PROCEDURAL BACKGROUND

On June 21, 2012, Plaintiffs filed their Complaint setting forth three counts: (1) a declaratory judgment that TruFoods and not Tarntino is the owner of the Pudgie's Mark (Count I); (2) cancellation of Tarntino's trademark registration due to fraud under 15 U.S.C. §1064(3) (Count II); and (3) trademark infringement and unfair competition under 15 U.S.C. §1125(a) (Count III).  (See Complaint ¶¶ 35-53, Docket 1).

On August 29, 2011, Tarntino and Counterclaim Plaintiff PPC Horseheads filed an Answer and also asserted Counterclaims for: (1) federal trademark infringement; (2) federal unfair competition; (3) common law trademark infringement and unfair competition; (4) declaratory judgment of non-infringement; and (5) injury to business reputation under N.Y. Gen. Bus. Law § 360-1.  (Defendants' Answer and Counterclaims, Docket 8).

Defendant Tarntino seeks an injunction enjoining Plaintiffs delivering food into Elmira Heights, because he allegedly has common law rights there. (Id., p.17, Docket 8).   Plaintiffs have submitted evidence with this opposition of deliveries to Elmira Heights going back at least ten years. (Plaintiffs' Customer List, A0088-A0179).

14

Plaintiffs filed their Answer to these counterclaims on October 19, 2011 (Docket 13). Plaintiffs filed a Motion to Amend their Compliant on May 10, 2012 to amend Count II to plead confusion and non-priority of use (in addition to fraud), under the other prongs of 15 U.S.C. §1064 as additional bases for cancellation of Tarntino's registration of the Mark.   (First Amended Complaint, Docket 27).   A hearing on Plaintiff's motion to amend is scheduled for July 27, 2012.   Defendants filed the present Motion for Summary Judgment on May 30, 2012. (Docket 32).   The Court will not decide whether to allow the First Amended Complaint until after this Opposition and Cross Motion is due, but in the interests of judicial economy, and because in his opposition to Plaintiff's motion to amend Tarntino argued that amendment was unnecessary because the complaint was pled broadly enough to include <u>all</u> grounds for cancellation, Plaintiffs now cross move for partial summary judgment on Counts I and II of their Complaint and seek cancelation for fraud <u>and</u> other grounds under the Lanham Act.   Plaintiffs do <u>not</u> move for summary judgment on Count III (trademark infringement and unfair competition).

## V.   <u>LEGAL ARGUMENT</u>

### A.   Legal Standard for Summary Judgment

Summary judgment is proper when there is "no genuine disputes to any material fact and the movant is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56(a).   The non-moving party must present, with all reasonable inferences resolved in the non-moving party's favor, a foundation for facts which is sufficient to support the denial of the motion for summary judgment.   <u>Arthur A. Collins, Inc. v. Northern Telecom, Inc.</u>, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000).   General disputes of material fact that may significantly affect the outcome of the matter preclude the entry of summary judgment.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

## B. Plaintiffs Have Standing for All Counts Based on Contract and Statute

Defendant Tarntino first argues that "Plaintiffs lack standing to ask this Court to decide whether a non-party to this action [TruFoods] has exclusive rights in a trademark." (Def's Motion for Summary Judgment, p. 2, Docket 32). Defendant's statement is misleading. Defendants cite no support for their claim, because there is no support for this position. In fact, the statutes and Plaintiffs' licensing agreement with TruFoods both provide that Plaintiffs do have standing to bring their claims.

First, as discussed above, in their licensing agreement MPCI and TruFoods agreed that MPCI could pursue litigation that affected MPCI's interests through its affiliation with TruFoods if TruFoods did not want to pursue such litigation itself. (Licensing Agreement between TruFoods and MPCI at ¶ 8, A0068).

Second, the Lanham Act states that any party who believes that he is or will be damaged by another's use of a trademark has standing to bring a civil suit:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A)   is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
> >
> > shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(c) (emphasis added).

In the context of a petition to cancel a trademark registration, the Lanham Act also specifically provides standing to those who believe they will be harmed, as discussed

16

immediately below. See 15 U.S.C. § 1064. MPCI and MPCF reasonably believe that they are or will be damaged by Defendant's registration, because Defendant has already attempted to use his registration to exercise rights over Plaintiffs' franchisees and usurp rights from MPCF. (See Tarntino letter to MPCF's franchisees, A0196). Accordingly, Plaintiffs have standing to bring their claims in this matter and Defendant's contention that they lack standing (Defendant's Motion for Summary Judgment, p. 2; p.11) is intentionally delusory and false, and it was improper for Defendant to suggest otherwise. This is the first of two examples, to be noted, of Defendant's lack of candor.

### C. Summary Judgment Should Be Granted to Plaintiffs on Count II of Their Complaint for Cancellation of Tarntino's Registration

The Court should grant summary judgment on Plaintiffs' claim for cancellation of Tarntino's Registration (Count II). As a preliminary matter, the Lanham Act empowers the courts to cancel a registration:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119. In order to cancel a registration of a mark, a plaintiff must show: (1) that it has standing to petition to cancel because it is likely to be damaged by the registration; and (2) that there are valid grounds why the registration should not continue. Coach House Restaurant v. Coach & Six Restaurants, 934 F.2d 1551, 1557 (11th Cir. 1991).

### a. Grounds for Cancellation Under the Lanham Act.

The Lanham Act states the grounds for cancellation of another's trademark:

> A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark on the principal register established by this chapter. . .
>
> **(3)** At any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional, or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter . . .

15 U.S.C. § 1064 (emphasis added).  The Lanham Act further provides:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it--
>
> **(d)** Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive …

15 U.S.C. § 1052 (emphasis added).   Therefore, together these two sections state a trademark registration to be cancelled by an injured party if the trademark (1) was obtained fraudulently; or (2) if there is another party with a mark in commerce who has prior use and this fact causes confusion, mistake or deception in the public's mind.  If Plaintiffs can prove either, they succeed in getting the registration cancelled.  Given the undisputed facts, Plaintiffs can prove both fraud and prior use which creates confusion, and summary judgment should be granted for the cancellation of Tarntino's trademark registration.

> **b.  § 1064(3) FRAUD - Tarntino Lied in His Registration When He Stated That He Was the Only Person or Entity With the Right to Use the Mark in Commerce.**
>
> > **i.  Tarntino Lied About Being the Only One With the Right to Use the Mark in Commerce.**

18

Tarntino fraudulently obtained a trademark registration for the Mark by making false statements to the USPTO as fully discussed in the factual background above. (Tarntino Trademark Application, A0180-A0186).    False representations can be the product of affirmatively misleading statements, of only partially correct statements, or failure to disclose a material fact. <u>Alfred Dunhill Ltd. v. Interstate Cigar Co., Inc.</u>, 364 F.Supp. 366, 372 <u>reversed on other grounds</u>, 499 F.2d 232 (2d Cir. 1974).

<u>First</u>, Tarntino misrepresented that he believed that no other person or entity had the right to use the Mark in commerce for restaurant services, when in fact he knew of numerous parties that were using the Mark, including: (1) TruFoods; (2) MPCI, as licensees of the Mark from TruFoods; (3) MPCF's franchisees; (4) Pudgie's Northside; and finally (5) Defendant's Pudgie's itself, which is not owned by Tarntino individually but rather by PPC Horseheads.    (Decl. of Brent Tarntino, A0085).  Rather than being the exclusive user of the Mark, Tarntino knew that he was actually only a one-third owner of one of many Pudgie's at the time of his registration of the Mark. (Tarntino Dep. p. 17, ln. 10-12, A0030).

### ii.  Tarntino's Unbelievable Response.

In response to this serious claim, Tarntino disingenuously put forth the extremely strained story that even if he was in fact wrong, he believed in good faith that he was the exclusive owner of the Mark for restaurants selling pizza, pasta and subs rather than TruFoods who owned the Mark only for chicken restaurants. (Tarntino Dep. p. 38, ln. 15 - p. 39, ln.13, A0035).   There are <u>at least</u> four problems with this excuse: (1) TruFoods' trademark registration is not for chicken restaurants only but for "restaurant and carryout restaurant services" generally.   (TruFoods Trademark Registration, A0035).  Therefore, TruFoods (and its licensees) can serve any kind of food whatsoever and be covered under the Mark; (2) Tarntino's registration category

19

emcompasses TruFoods' category (cf. "Restaurant and carry out restaurant services" and "Pizza parlors: Restaurant services featuring pizza, pasta and subs"); (3) Defendant's Pudgie's restaurants (like all Pudgie's) also serves chicken (Tarntino Dep., p. 34, ln. 7-9, A0034), so Tarntino is infringing upon TruFoods at least in regards to their sales of chicken under this logic; and finally because (4) where a previously registered trademark like TruFoods is for a certain basic class like restaurant services, the law provides a presumption that it applies to all kinds of restaurants.  See In Re Keller, Heumann and Thompson Co., 81 F.2d 399, 401 (1936), cert. denied, 298 U.S. 656 (1936) (holding that on application for registration of trademark consisting of word previously registered as trademark for shoes, the presumption is that mark is applied to all types of shoes, including men's shoes).

In fact, even if TruFoods had registered the Mark specifically for chicken restaurants, which it did not, registration of a trademark protects not only the registrant's use of the mark on goods for which the mark was registered but also its use on goods within the natural area of the expansion of the registrant's business - in other words, the licensing of the Mark to restaurants like Plaintiffs which sell other entrees.  See Sam S. Goldstein Industries, Inc. v. General Electric Co., 264 F.Supp. 403, 406 (S.D.N.Y. 1967).   Regardless, Tarntino was still lying when he stated that he had exclusive rights to use the Mark in commerce, because Pudgie's Northside and Defendant's Pudgie's (which is two-thirds owned by other individuals) and MPCF's franchisees to whom he wrote letters and others were using the Mark.

### iii.  Tarntino Lied About the Date of First Use.

Tarntino fraudulently obtained his registration of the Mark for a second independent reason: he lied about the date of his first use of the Mark in commerce.  On his registration (which is in his name individually), Tarntino stated that he first used the Mark in commerce "at

least as early as" January 1, 1980. (Tarntino Registration, A0181). This rather arbitrary date just happens to precede the 1982 first use date TruFoods listed on its 2002 registration for the Mark (Archer Treacher's Registration, A0064). As discussed above, Tarntino testified that he was only seven years old at the time and was therefore attending second grade, and not using a trademark in interstate commerce. But he was not the first person still in business selling products bearing the Pudgie's name even at the Defendant's Pudgie's location – presumably Tarntino's mother (actually the corporation she owned which ran the restaurant, rather than she individually) who started that store had that honor.

### iv.  Tarntino's Second Unbelievable Response.

In response, Tarntino put forth a strained theory which, even if it were true, would still not save him: Tarntino claimed that he inherited his mother's first use of the Mark when she died. (Tarntino Dep. p. 23, ln. 24 – p.25, ln. 4, A0031). Even if he did inherit rights of first use from his mother at the time of her death in 2007, he did that with his siblings – all three shared in their mother's estate. (Id., p. 13, ln. 19 – p. 14, ln. 2, A0029). Therefore, the statement that he individually was the first user is still a lie. And Tarntino has put forward no evidence that his siblings assigned him any such rights so as to make him the sole owner of first use rights to the Mark, so there exists a genuine issue of fact as to who, if anyone, owns whatever rights Bernadette Tarntino may have owned, if any.

### v.  Defendant's Pudgie's Actual First Use Occurred on July 15, 1993 at the Earliest.

Even if this strained theory were acceptable, which it most certainly is not, Tarntino would still fail to prove that no genuine issue of fact exists regarding whether he (or his mother, or her company) was the first user of the Mark in commerce. As discussed above, Bernadette Tarntino started using the Mark under license from PPFC (See Horsehead's Franchise

Agreement, A0043-A0060), and a licensee of a trademark Ms. Tarntino had only the right to limited use of the trademark and control, right and title to the trademark remain in the licensor. See Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403, 409 (5th Cir. 1962). In addition, the Franchise Agreement itself states that the Pudgie's Mark "belong[s] exclusively to [Pudgie's Pizza Franchise Corp.]..." Franchise Agreement at ¶ 26, A00054. The licensee of a trademark acquires no rights in the name, by appropriation and use, as against the licensor. Golden City Restaurant, Inc. v. Pike, 246 F.2d 684, 685 (C.A.D.C. 1957) In addition, "a license to use a mark does not pass title to the trademark because it is a transfer of limited rights, less than the whole interest which might have been transferred." Acme Valve & Fittings Co. v. Wayne, 386 F.Supp.1162, 1165 (S.D.Tex.1974).

Bernadette Tarntino's renewal franchisee agreement from 1983 is conclusive proof that she used the Mark only as a franchisee and licensee. (Franchise Agreement, A0043-A0060) That the pizza box specimen used in Tarntino's registration, which has evidently been in continuous use since before 1993, states on its very face "® Pudgie's Pizza Franchising Corporation 1972", is more proof that Bernadette Tarntino was using the Mark as a franchisee and not in her own right. (See Tarntino's Trademark Application, p. 2, A0182). Any rights of use which Bernadette obtained could only have started on July 15, 1993, the date Tarntino testified that the Franchise Agreement terminated. TruFoods began using the Mark in 1982, eleven years prior to the termination of the Franchise Agreement.

### vi. Defendant's Pudgie's Has at Most Potentioal Common Law Trademark Rights to the Mark in Horseheads, NY Only.

As a result, any common law trademark use rights Tarntino's mother or her corporation might have developed in the Mark beginning in 1993 are limited to the market area of the restaurant in Horseheads, New York. See Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc.,

831 F.2d 1177, 1181 (1st Cir. 1987) (holding a senior user's federal registration of a mark has

the effect of freezing a junior user's market area; Architemps, Inc. v. Architemps, Ltd., 704

F.Supp. 39, 40 (S.D.N.Y. 1988) (same)

> **vii.   Based On the Undisputed Facts, There is No Genuine Issue of Fact as to, and No Jury Could Find, That All of Tarntino's Material Misstatements in His Application Were "Innocent."**

While it is true that just because an applicant is mistaken about facts he represents in his

trademark application, he is not <u>necessarily</u> guilty of fraud, See Donald F. Duncan, Inc. v. Royal

Tops Mfg. Co., 381 F.2d 879, 884 (7th Cir. 1967) (holding that just because applicant was

mistaken about material facts in application, he did not act fraudulently or in bad faith), the

Lanham Act imposes a duty upon the applicant for registration to not <u>knowingly</u> make any

misleading or inaccurate statements in affidavits or inaccurate statements in his application.

Schwinn Bicycle Co. V. Murray Ohio Mfg. Co., 339 F.Supp. 973, 983 (M.D. Tenn. 1971),

affirmed 470 F.2d 975 (6th Cir. 1972).   An applicant's statements to the USPTO <u>must</u> reflect

"uncompromising candor." Orient Express Trading Co. Ltd. v. Federated Dep't Store, Inc., 842

F.2d 650, 653 (2d Cir. 1988).   To establish fraud in the registration of a trademark, the moving

party must show that the registrant knowingly made a false statement of material fact that would

have constituted grounds for denial of the registration if the truth had been known.   American

Auto. Ass'n (Inc.) v. AAA Ins. Agency, Inc. 618 F.Supp. 787, 796-797 (W.D.Tex 1985)

Tarntino cannot claim that he was innocently mistaken in his belief that TruFoods'

registration of the Mark was only for chicken restaurants.   TruFoods' registration is clearly for

<u>all</u> restaurant services.   Nor can Tarntino claim that he was innocently mistaken about whether

others had valid ongoing rights in Mark.   He grew up in this business and was well aware of his

relatives and others' rights in the Mark.   Also, the effect of federal registration of a trademark is

to impose constructive notice on everyone, so that the user of the mark or a confusingly similar mark cannot justify its conduct by a claim of innocence, good faith, or lack of knowledge.  See Davidoff Extension S.A. v. Davidoff Comercio E Industria Ltda., 747 F. Supp. 122, 127-128 (D. Puerto Rico 1990).  The deliberate omission in a trademark application of another's right to use the same mark is a material omission justifying cancellation of that mark.  Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1210-11 (11th Cir. 2008).  To constitute fraud on the USPTO, the statement must be: (1) false; (2) a material representation; and (3) made knowingly.  Torres v. Cantine Torresella S.R.LN., 808 F.2d 46, 48 (Fed. Cir. 1986)

Tarntino argues that "there is no evidence that ownership rights in PUDGIE'S for pizza parlors and chicken restaurants are mutually exclusive, and Plaintiffs have no evidence that Tarntino knew of this conflict and intentionally misled the U.S. Trademark Office into believing that the marks did not conflict."  (Defendant's Motion for Summary Judgment, p. 7, Docket 32).  But anyone can see that TruFoods' registration for "Resturant and carry out services" is more general and completely encompasses Tarntino's registration for "Pizza parlors; Restaurant services featuring pizza, pasta, and subs."  Tarntino also knew that he was only seven years old in 1980 (his claimed date of first use), knew that  Bernadette Tarntino was merely a franchisee until 1993, and knew that others had the right to use the Mark at the time Tarntino filed his trademark application.  There is no genuine issue of fact regarding these items.

Tarntino also insists that Plaintiffs cannot prove the entire factual basis needed for fraud by clear and convincing evidence, but after going through the elements, the undisputed facts support each element: (1) Tarntino made false representations to the USPTO; (2) which were material to the registerability of the Mark; (3) which he knew were false when made; and (4)

which were made with the intent to deceive the USPTO into granting him the registration. See In re Bose Corp., 580 F.3d 1240, 1244-45 (Fed. Cir. 2009).

Tarntino lastly states that "none of the allegedly incorrect representations made by Tarntino constitute fraud" (Defendant's Motion for Summary Judgment, p. 4, Docket 32), and cites cases where courts refused to find fraud when one material fact was misstated on a trademark application. Defendant also points out that the registrant need only to subjectively believe his statements are true when he made them; it does not matter whether they are actually true. Although the undisputed facts show that each of Tarntino's misstatements was in itself fraudulent, it is also true that no jury could believe all of Tarntino's material misstatements were innocent. Nor could a jury believe Tarntino's excuses for these two misstatements was also innocent – namely, Tarntino mistakenly believed that he individually used the Mark in commerce in 1980 because he individually inherited rights in the Mark from his mother, and also mistakenly believed that TruFoods' registration was only for chicken restaurants. Further, the fact that both of Tarntino's material statements were incorrect (and both of his excuses unfounded) call into question his credibility. For these reasons, the Court should find that he committed fraud as a matter of law and grant summary judgment in Plaintiffs' favor on Count II of the Complaint. In City of New York v. Tavern on the Green, 427 B.R. 233 (S.D.N.Y. 2010), for example, the Court cancelled a debtor's trade name on summary judgment, because the debtor had obtained it fraudulently from the USPTO by lying about his date of first use.

## c.  SECTION 1052 – PRIOR USE WHICH CAUSES CONFUSION

For the reasons stated immediately above, Tarntino was not the first user in commerce of the Mark, and Plaintiffs have just argued that Tarntino's trademark registration should be cancelled based on his fraudulent statement that he was the first user. Aside from any

determination regarding fraud which involves a finding of intent, the Lanham Act empowers the Court to cancel a trademark "previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive". 15 U.S.C. § 1052(d).   Pursuant to Section 1052(d), Tarntino's registration of the Mark should not have been accepted by the USPTO in the first place and should now be cancelled because TruFoods was a prior user.

"Where claimants dispute the right to use a particular trademark, the general rule is that priority of appropriation and use determines which litigant will prevail in its use." Fusco Group v. Loss Consultants International, 462 F. Supp. 2d 321, 327 (N.D.N.Y.) (quoting Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F.Supp. 866, 875 (E.D.N.Y.)).   For example, in Mystique, Inc. v. 138 International, Inc., the Court granted summary judgment for trademark cancellation based on prior use and confusion (rather than for fraud).   601 F.Supp.2d 1320, 1326 (S.D. Fl. 2009).   A company was using the Mystique mark for woman's shoes when a competitor who was a junior user, registered the mark.   When the prior senior user tried to register the mark, the registration was refused on the basis of the junior mark's registration.   However, the senior user succeeded in getting the mark cancelled on its motion for summary judgment.   Id.   Similarly, the Court here should cancel the registration of Tarntino, who is the junior user.   See also Continental Scale Corp. v. Weight Watchers Intern., Inc., 517 F.2d 1378, 1381 (Cust. & Pat. App. 1975) (the Court of Customs and Patent Appeals held that defendant's trademark registration would be cancelled in light of the established prior use of another of the same product based on prior use and confusion).

i. **Tarntino's Registration of the Mark Causes Confusion Pursuant to the Polaroid Factors**

Tarntino's registration of the Mark causes confusion, mistake, and tends to deceive the public. Courts often begin the inquiry into the elements bearing on the likelihood of confusion, mistake or deception by considering whichever may be relevant in the non-exclusive list of factors set forth by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.1961): (a) the strength of the plaintiff's mark; (b) the degree of similarity between the plaintiff's and the defendant's marks; (c) the proximity of the products; (d) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (e) the sophistication of the buyers; (f) the quality of the defendant's product; (g) actual confusion; and (h) good or bad faith. See also Time, Inc. v. Petersen Publ'g Co. LLC, 173 F.3d 113, 117 (2d Cir. 1999).

All applicable elements of the above inquiry are met by Tarntino's registration such that there is no genuine issue of fact as to whether Tarntino's concurrent use of the Mark will cause confusion, mistake and deception. First, the parties' marks are exactly the same, other than a different font. Second, the services the parties provide are geographically very proximate to each other and this proximity causes a likelihood of confusion. Third, it is already the case that the parties have bridged the gap using the mark on products close to the other's area of commerce. In fact their services already overlap in Elmira Heights. Fourth, the buyers of the partiers' products are not particularly sophisticated (inexpensive carry- out food as compared to fine dining). Fifth, Tarntino has clearly shown bad faith by registering a trademark he already knew was registered by another and that many others had the right to use and then tried to unlawfully exercise rights over Plaintiffs' franchisees. Sixth, there is actual confusion particularly on the part of the Plaintiffs' franchisees who were told by Tarntino that he was the real owner of the

27

Mark and that they could not expand their market area without first gaining Tarnino's permission.  No actual confusion need even be proved, it being only necessary to show that there is a likelihood of confusion.  <u>Goldring, Inc. v. Towncliffe Inc.</u>, 234 F.2d 265-267 (Cus. & Pat. App., 1956) ("This court has held that to justify cancellation of a registration because of confusing similarity between trademarks, no actual confusion need be proved, it being only necessary to show that there is likelihood of confusion").   The other two <u>Polaroid</u> factors regarding the quality of Defendant's product and the strength of Plaintiffs' mark are inapplicable, because both sides have the same Mark and the same menu. (Pudgie's menus, A0081-A0084)

### D.   Summary Judgment Should Be Granted To Plaintiffs On Count I of Their Complaint for a Declaration that TruFoods' Registration Of the Mark is Valid

Summary judgment should be granted on Plaintiffs' Count I claim for a declaration that TruFoods' registration of the Mark is valid and entitles it and Plaintiffs to use and license others to use the Mark.  <u>First, Tarntino's Registration is invalid</u>.  Tarntino argues that his registration of the Mark is prima facie evidence of his ownership of rights in the Mark and that Plaintiffs cannot meet their burden of overcoming this presumption. (Tarntino Motion for Summary Judgment, p. 2 (Docket 32)   Plaintiffs have conclusively met this burden by demonstrating that Tarntino's registration was obtained through misrepresentations and that Tarntino's registration tends to cause confusion, mistake and deception in light of the prior use of the Mark by Plaintiffs and TruFoods.  Plaintiffs need only rebut the presumption by a preponderance of the evidence.  <u>Dan Robbins & Associates, Inc. v. Questor Corp.</u>  599 F.2d 1009, 1013-1014 (Cust. & Pat. App., 1979).

<u>Second, TruFoods' registration is valid.</u>  Neither Tarntino nor anyone else disputes that TruFoods registration is valid for the category of services it clearly states on its face.  Further, nobody disputes that Plaintiffs have a valid licensing agreement with TruFoods.

**E.    Counterclaim Defendants Tarntino and PPC Horseheads Should Not Be Granted Summary Judgment on Any of Their Counterclaims.**

Counterclaim Plaintiffs move for summary judgment on all of their counterclaims and seek a judgment enjoining Plaintiffs from delivering food into Elmira Heights, an area in between the restaurants of the two opposing parties.  Their motion should be denied because Counterclaim Plaintiffs do not have exclusive rights to use the Mark in Elmira Heights.  First, Counterclaim Plaintiffs admit to sharing the Elmira Heights area with Pudgie's Northside.  It is axiomatic that Counterclaim Plaintiffs could not gain exclusive rights in a market where they never had exclusive use.

Second, and more importantly, Counterclaim Plaintiffs' assertion that Plaintiffs did not begin serving the Elmira Heights area until 2011 is patently false, and at the bare minimum constitutes a factual dispute that must be resolved at trial.  Plaintiffs have been delivering into Elmira Heights since at least as early as the closing of the Pudgie's Elmira Heights restaurant in the early 1990's (which is the same time that Defendant's Pudgie's and Pudgie's Northside began delivering to Elmira Heights).  (David Cleary Dep. p. 61, ln. 14-16, A0016, Robert Cleary e-mail to Tarntino, A0224).  Before considering any further evidence, the Court should note that this makes sense from a logical perspective – when the centrally-located Pudgie's Elmira Heights restaurant shut down, the three surrounding Pudgie's Pizza restaurants all began sharing the territory previously served by the now-closed restaurant.

Counterclaim Plaintiffs' reliance solely on the wording of advertisements and an unchanged and ignored website post to prove exclusive use conveniently ignores the most obvious indicator of use – delivery records.  Plaintiffs were able to use their point-of-sale system to generate reports dating back to 2002 (the limitations of Plaintiffs' point-of-sale system prevents the production of delivery records going back until the early 1990's) showing hundreds

of deliveries into Elmira Heights. (Sales and Delivery Records from 2002-present, A0088-A0125). Additionally, Plaintiffs have produced the specific deliveries of two repeat customers from Elmira Heights who have placed over 100 combined orders with Plaintiff's Pudgie's since 2007. (Repeat Customer Sales and Delivery Records from 2007-present, A0126-A0177).

While these delivery records alone constitute sufficient proof to overcome a motion for summary judgment, Counterclaim Plaintiffs' claim of exclusivity in Elmira Heights is flawed for two additional reasons.

First, while Counterclaim Plaintiffs point out that they have listed Elmira Heights as a delivery area in advertisements, they ignore the fact that Defendant's Pudgie's has also issued advertisements that do not include Elmira Heights as a delivery area, as well as other advertisements that admit that Counterclaim Plaintiffs only deliver to "limited areas" in Elmira Heights. (Defendant's Pudgie's Advertisements, A0225-A0227). The inconsistent listing of delivery areas by Counterclaim Plaintiffs themselves further highlights why it would be improper to rely on the wording contained in these advertisements as a definitive indicator of exclusive use.

Second, the terms of the franchise agreement under which Defendant's Pudgie's operated from its opening in 1973 until July 15, 1993 defines the intended exclusive territory for this restaurant. Paragraph 1 of the Franchise Agreement clearly states, "PUDGIE'S further grants to LICENSEE the Village of Horseheads as an exclusive territory." (Defendant's Pudgie's Franchise Agreement, p. 2, A0044).

Finally, the Court should consider that Plaintiffs attempted to resolve this boundary dispute amicably in 2010 when Tarntino first confronted Plaintiffs concerning the Elmira Heights delivery area. (See Robert Cleary e-mail to Tarntino, A0224). In this e-mail, Robert

Cleary states that "three Pudgie's have been delivering to parts of the [H]eights for years," which proves that even prior to this litigation, Plaintiffs believed that all three Pudgie's restaurants had an understanding that Elmira Heights would be a shared, non-exclusive delivery area. Id. The e-mail further notes that Robert Cleary offered to meet with Tarntino and his sister and draw up boundaries so that there would be no confusion, which would have continued the peaceful coexistence of the three Pudgie's restaurants. Id. However, Tarntino declined, and instead fraudulently procured a trademark registration for the Mark, which directly led to this costly and needless litigation.

Accordingly, the Court should deny Defendant's and Counterclaim Plaintiffs' motion for summary judgment and not enjoin Plaintiffs from delivering food into Elmira Heights, because Defendant and Counterclaim Plaintiff never had exclusive rights to do business in that area.

## VI.   CONCLUSION

For all the above reasons, Plaintiffs respectfully request this Court to grant their Partial Opposition to Defendants' Motion for Summary Judgment and to grant their Cross Motion for Partial Summary Judgment.

Respectfully submitted,

Dated: June 27, 2012.

/s/ Paul L. Leclair
Paul L. Leclair
LECLAIR KORONA GIORDANO COLE LLP
150 State Street, Suite 300
Rochester, New York 14614
(585) 327-4100
pleclair@leclairkorona.com

- and -

/s/ Jeffrey Zucker
Jeffrey Zucker (pro hac vice)
FISHER ZUCKER LLC
21 South 21st Street
Philadelphia, PA 19103
(215) 825-3100
jzucker@fisherzucker.com
*Attorneys for Plaintiffs*