**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2       FOR THE WESTERN DISTRICT OF NEW YORK

 3          CIVIL ACTION NO. 6:11-cv-6310

 4    _____

 5    MPC FRANCHISE, LLC, and
      MP CLEARY, INC.,
 6                        Plaintiffs,
                vs.
 7
      BRENT TARNTINO,
 8                        Defendant.
      _____
 9
      BRENT TARNTINO and PUDGIE'S
10    PIZZA CORPORATION - HORSEHEADS, INC.,
                   Counterclaim Plaintiffs,
11              vs.

12    MPC FRANCHISE, LLC, and
      MP CLEARY, INC.,
13                   Counterclaim Defendants.

14    _____

15        This is the Examination Before Trial of

16                  DAVID Cleary

17        held on the 17th day of April, 2012

18        held at the law offices of Cooper, Pautz &

19        Weiermiller, LLP, 2854 Westinghouse Road,

20        Horseheads, New York  14845, commencing

21        at 2:40 p.m.

22

23        REPORTED BY:  NANCY H. SWARTZ
                         Shorthand Reporter
24                       Notary Public

25            NHS COURT REPORTING
                  607-215-2201
```

**Page 2**

```
 1            A P P E A R A N C E S

 2    FISHER ZUCKER, LLC
 3        21 South 21st Street
          Philadelphia, PA  19103
 4        (215) 825-3100
          Jzucker@fisherzucker.com
 5        Attorneys for Plaintiffs MPC
          Franchise, LLC and MP Cleary, Inc.
 6        BY: JEFFREY ZUCKER, ESQ.

 7

 8    BOND, SCHOENECK & KING
          One Lincoln Center
 9        Syracuse, New York  13202-1355
          (315)218-8515
10        gmcguire@bsk.com
          Attorneys for Brent Tarntino
11        BY: GEORGE R. MCGUIRE, ESQ.
              BLAINE T. BETTINGER, PH.D., ESQ.

12

13        S T I P U L A T I O N S

14

15        It is stipulated by and between the
16    parties hereto that the filing of the
17    deposition is waived; that the deposition
18    may be signed before any Notary Public;
19    and that all objections except as to the
20    form of the question are reserved to the
21    time of the trial.

22

23

24

25
```

**Page 3**

```
 1    I N D E X :

 2    W I T N E S S: David Cleary

 3

 4    Examination By                    Pages
 5    Mr. McGuire                       4-98

 6

 7    Affidavit page                    99
 8    Reporter's certificate page       100

 9

10

11    E X H I B I T S :
12    Number       Description          Page

13

14    DC-1      Notice of deposition of    5
              David Cleary

15

      DC-2      Notice of deposition of    5
16            MPC Franchise

17    DC-3      Notice of deposition of    5
              MP Cleary, Inc.

18

      DC-4      Plaintiffs and Counterclaim   22
19            Defendants Responses to
              Defendants and Counterclaim
20            Plaintiffs First Set of
              Interrogatories

21

      DC-5      Trademark license agreement   30
22

      DC-6      Trademark and service mark    44
23            sublicense and license agreement

24    DC-7      18-page exhibit comprising    57
              various advertisements of Pudgie's
25            Pizza Southside between the years
              2002 and 2011
```

**Page 4**

```
 1    E X H I B I T S (Cont.):
 2    Number       Description          Page
 3
 4    DC-8      Nine-Page exhibit of       61
              various ads of Pudgie's
 5            Southside from 2011 through 2012

 6    DC-9      Copy of screen shots of the    67
              Southside Pudgie's website
 7            from August 2nd, 2003 through
              January 2nd, 2008
 8
      DC-10     Two-page exhibit of Facebook   75
 9            pages of Brent Tarntino and
              Horseheads Pudgie's
10
      DC-11     E-mail from Daniel J. Miller   79
11
      DC-12     Three-page 10/7/05 letter to   84
12            Bernadette Tarntino on behalf
              of MP Cleary, Inc.
13
14    DC-13     Copy of complaint          85

15    DC-14     Three-page letter from       91
              Blaine Fisher to Ed Owlett
16            on behalf of MP Cleary, Inc.

17    DC-15     31-page exhibit of advertising 93
              pieces of Horseheads Pudgie's
18
      DC-16     12-page exhibit comprising    96
19            screen shots of Horseheads
              Pudgie's web page
20

21

22

23
24
25
```

A0001

5

1    (EXHIBIT NUMBERS DC-1 THROUGH DC-3
2    WERE MARKED FOR IDENTIFICATION.)
3
4    D A V I D   C L E A R Y,
5    having been called as a witness,
6    having been duly sworn, was examined
7    and testified as follows:
8
9    EXAMINATION
10   BY MR. MCGUIRE:
11   Q   Good afternoon, David. My name is George
12   McGuire. We met once before in Rochester. I
13   represent Brent Tarntino and Pudgie's Pizza -
14   Horseheads, Inc. in this action.
15   Before we get started, just some
16   preliminary matters. Have you ever been deposed
17   before?
18   A   Yes.
19   Q   How many times?
20   A   Once. I sat in on another deposition
21   though.
22   Q   You actually were deposed once?
23   A   Uh huh.
24   Q   How long ago was that?
25   A   Ten plus years ago.

6

1    Q   You remember the basic ground rules then.
2    I'll ask the questions, you wait until I'm
3    completely done asking the question and you
4    answer verbally. No non-oral cues so that the
5    court reporter can take down your answer.
6    A   Sure.
7    Q   And then it gets very confusing if we
8    both speak at the same time.
9    If you don't understand any of the
10   questions that I ask, please tell me. Say I
11   don't understand the question and I'll do my best
12   to rephrase it. It's my job to ask the questions
13   so if I'm not doing a good enough job asking
14   clear questions, you let me know. I don't want
15   you answering questions you don't understand so
16   please feel free to tell me you don't understand
17   it.
18   A   Sure.
19   Q   If you need any breaks during the course
20   of the deposition, feel free, just not while a
21   question is pending. Wait until you answer a
22   question and then if you need to take a break,
23   use the restroom, get a drink, for whatever
24   reason, feel free.
25   I'm going to hand you what's been marked

7

1    as Exhibit DC-1 in the deposition here today.
2    This is a copy of your individual notice of
3    deposition. Have you seen this document before?
4    A   Yes.
5    Q   And it's pursuant to that notice of
6    deposition that you're here today, correct?
7    A   Yes.
8    Q   I'm going to hand you what's been marked
9    as DC-2. This is a copy of the notice of
10   deposition of the corporate entity MPC Franchise,
11   LLC under what we call Federal Rule of Civil
12   Procedure Rule 30(b)6. Have you seen this
13   document before?
14   A   Yes.
15   Q   It's my understanding that you'll be
16   answering questions on behalf of MPC Franchise,
17   LLC today. Do you understand that?
18   A   Yes.
19   Q   If we turn the page to where it says
20   Schedule A on Exhibit DC-2, you'll see that
21   there's definitions and instructions there. And
22   then starting on the following page is a list of
23   enumerated matters. Do you see those?
24   A   Yes.
25   Q   And if we flip through, there's a total

8

1    of 51 matters listed on the notice of deposition?
2    A   Yes.
3    Q   Have you reviewed that entire list?
4    A   Yes.
5    Q   And you're comfortable answering
6    questions on behalf of MPC Franchise, LLC on all
7    of those topics?
8    A   Yes. I should review them again, I
9    guess.
10   Q   Yeah, take your time.
11   A   Yeah. Yes.
12   Q   When was the first time you saw this
13   document?
14   A   I don't remember.
15   Q   Before today?
16   A   Yes.
17   Q   And you reviewed the matters before
18   today?
19   A   I must have.
20   Q   I'm going to hand you what's been marked
21   Exhibit DC-3. And DC-3 is a notice of deposition
22   under 30(b)6 of MP Cleary, Inc. Do you see that?
23   The title of it?
24   A   Where's that?
25   Q   I'm sorry.

A0002

9

1    A   Oh, right here.  Yes.

2    Q   And then similar to the last exhibit, if

3  you look in the middle of the document, you'll

4  see a list of matters.  Again enumerated 1

5  through 51 -- or 50, I'm sorry.  1 through 50.

6    A   Okay.

7    Q   And have you reviewed that list of

8  matters?

9    A   Yes.

10    Q   And you're comfortable answering

11  questions on behalf of MP Cleary, Inc. on

12  questions that will relate to those topics?

13    A   Yes.

14    Q   And you're prepared to do so today?

15    A   Hope so.

16    Q   What did you do to prepare for today's

17  deposition?

18    A   Nothing really.

19    Q   Did you meet with anyone in particular to

20  talk about the deposition?

21    A   My lawyer and my brother.

22    Q   When did you meet with your lawyer?

23    A   We met him today.

24    Q   Did you meet with him prior to today to

25  go over the deposition?

10

1    A   No.

2    Q   When did you meet with your brother to go

3  over the deposition?

4    A   Probably the day we received it or soon

5  thereafter.

6    Q   And what did you talk about with your

7  brother?

8    A   I don't remember.

9    Q   How long ago was that conversation?

10    A   I don't remember.  Probably when we

11  received this or these forms.

12    Q   Sometime around March 26th, thereabouts?

13    A   Could be.  Sure.

14    Q   And just prior to today, say in the last

15  week, have you done anything in particular to

16  prepare for today's deposition?

17    A   No.

18    Q   I have a couple of questions that are not

19  part of the 30(b)6 so I'm only asking you in your

20  individual capacity because they don't relate to

21  the topics that I've included on the two 30(b)6

22  notices.  And it's a long time ago so you may or

23  may not have a recollection of them.

24    A   Sure.

25    Q   Now, your father Michael, is that his

11

1  name?

2    A   Yes.

3    Q   And he passed away sometime ago, correct?

4    A   Yeah, he was killed in an automobile

5  accident in 1990.

6    Q   1990?

7    A   January.

8    Q   And your mom's name is Rosa, correct?

9    A   Correct.

10    Q   And Rosa served as the executrix of

11  Michael's estate?

12    A   Correct.

13    Q   Do you recall if Rosa -- strike that.

14      Your dad Michael owned the shares of stock

15  in a company called Pudgie's Pizza Franchising,

16  Inc., is that correct?

17    A   Yes.

18    Q   And did Rosa, as the executrix of the

19  estate of Michael, sell all of the estate's

20  shares of Pudgie's Pizza Franchising, Inc.,

21  Pudgie's Pizza and Sub Shops, Inc. and Cleary

22  Brothers Realty, Inc. to Francis Cleary on April

23  19th, 1991?

24    A   I don't know.

25    Q   You don't have a recollection of it?

12

1    A   No.

2    Q   So you also don't know whether Rosa

3  transferred the trademark rights associated with

4  Pudgie's Pizza to Francis back in 1991?

5    A   No, I don't know.

6    Q   Where's your current residence?

7    A   Pine City, New York.

8    Q   Pine City?

9    A   Uh huh.

10    Q   Can you tell me briefly about your

11  education?

12    A   Sure.  Graduated from high school locally

13  and did a month or two at a community college.

14    Q   What year did you graduate high school?

15    A   '89.

16    Q   Tell me a little bit about your work

17  experience since you graduated high school.

18  Where have you worked?

19    A   For my late father at Pudgie's Pizza.

20    Q   So you've always worked in the Pudgie's

21  Pizza business since high school?

22    A   Yes.

23    Q   Haven't held any other jobs?

24    A   No.

25    Q   Has it always been the Southside

A0003

13

1 Pudgie's?
2 **A   No.  I worked at various Pudgie's,**
3 **company owned and non-company owned.**
4 Q   Where were those located?
5 **A   I've worked at numerous stores from New**
6 **York to Pennsylvania.  Specifically I worked**
7 **Elmira Northside, Elmira Southside, Elmira**
8 **Heights, the old Elmira Heights.  I worked at**
9 **Horseheads Pudgie's helping out.  I mean, if a**
10 **store needed help, I was sent there to help them.**
11 Q   You're currently employed by MP Cleary,
12 Inc.?
13 **A   Yes.**
14 Q   Are you also employed by MPC Franchise,
15 LLC?
16 **A   Yes.**
17 Q   What is your current title with respect
18 to both of those entities?
19 **A   I'm president of MP Cleary Incorporated.**
20 **I'm a member/owner of MPC Franchise.**
21 Q   Do you have a title like president or
22 vice president or anything like that of the
23 franchise company?
24 **A   I'm not sure.**
25 Q   What's the nature of the business of MP

14

1 Cleary, Inc., what does it do?
2 **A   Food service.**
3 Q   Does it operate restaurants?
4 **A   Pizzerias, yes.**
5 Q   How many pizzerias does it operate?
6 **A   Two.**
7 Q   And where are they located?
8 **A   350 South Main Street, Elmira, New York**
9 **and 1164 South Main Street, Mansfield,**
10 **Pennsylvania.**
11 Q   Is the one on South Main Street in Elmira
12 what's commonly referred to as Elmira Southside?
13 **A   Yes.**
14 Q   Or the Pudgie's Elmira Southside?
15 **A   Southside Pudgie's, yes.**
16 Q   And what's the nature of MPC -- I'm
17 sorry.  MPC Franchise, LLC?
18 **A   We sell franchises.**
19 Q   How many franchisees currently exist?
20 **A   Three.**
21 Q   And where are they located?
22 **A   Waverly, New York, Binghamton, New York,**
23 **Clarksville, Maryland.**
24 Q   Where's the one in Binghamton, New York?
25 **A   I believe it's Robinson Street.**

15

1 Q   Who owns the one in Binghamton, New York?
2 **A   Eric Michalko is our franchisee.**
3 Q   Who owns the one in Waverly,
4 Pennsylvania?
5 **A   Waverly, New York.**
6 Q   Oh, New York, I'm sorry.
7 **A   Yes.  Is Carrie Brown.**
8 Q   And the one in Clarksville, Maryland?
9 **A   It's Dan and Jim Miller.**
10 Q   Has MPC Franchise, LLC, does it have a
11 Uniform Franchise Offering Circular?
12 **A   Yes.**
13 Q   And is that UFOC registered with the
14 Federal Trade Commission?
15 **A   Yes.**
16 Q   Is it registered with the attorney
17 general in New York?
18 **A   I'm not sure.  I believe you have to be**
19 **in New York State.**
20      MR. MCGUIRE:  We did make a request
21 for a copy of that.  I believe you objected
22 to the production of that?
23      MR. ZUCKER:  Which one?
24      MR. MCGUIRE:  The UFOC.
25      MR. ZUCKER:  They call it an FTD now.

16

1      MR. MCGUIRE:  Okay.
2      MR. ZUCKER:  You want the New York or
3 do you want the non-registration state one
4 or do you want the New York one?
5      MR. MCGUIRE:  I'd like the ones that
6 are registered.  But in the request for
7 documents I asked for all copies of
8 Franchise Offering Circulars and other
9 documents associated with it.
10      MR. ZUCKER:  We objected because I
11 don't understand how that's relevant to
12 Brent's counterclaim or to the plaintiff's
13 claims against Brent to cancel the
14 trademark.  But if you can just tell me
15 how, then we can work it out right now.
16      MR. MCGUIRE:  There could be
17 information contained in there that relate
18 to the advertising, the nature of the
19 advertising, the expenditures, the manner
20 in which the advertising is done.  It's
21 about as relevant as a document could
22 possibly get in the context of a trademark
23 suit.  It's hard to understand how you
24 argue that it's not relevant.
25      Plus, discovery is not about

A0004

17

1  relevancy.  I mean, not everything that's
2  going to be requested will ultimately be
3  determined as relevant.
4      MR. ZUCKER:  Yeah, it's got to be
5  reasonably calculated.
6      MR. MCGUIRE:  And reasonably
7  calculated.  And certainly here's no
8  argument here that a UFOC on the exact mark
9  that the whole case is about.
10     MR. ZUCKER:  I'll give some thought
11 to it.  If it's fair, then I'll turn it
12 over.
13     MR. MCGUIRE:  All right.
14     MR. ZUCKER:  I'll make a note of
15 that.
16     (DOCUMENT REQUEST.)
17
18     CONTINUING EXAMINATION
19 BY MR. MCGUIRE:
20     Q  What are your current duties with respect
21 to MP Cleary, Inc.?
22     A  **As president I oversee accounts payable,**
23 **insurances, a lot of day-to-day operations.**
24     Q  And what are your duties as an
25 owner/member of the franchising company?

18

1      A  **The same.  I oversee the day-to-day**
2  **operations.**
3      Q  What kind of corporation is MP Cleary,
4  Inc.?  Is it an S corporation or a C corporation?
5      A  **C-Corp.**
6      Q  It is a C-Corp?
7      A  **Yes.**
8      Q  Who are the shareholders?
9      A  **Myself, Robert and Rosa.**
10     Q  What are your percentage ownership
11 interests?
12     A  **Myself is 49 percent, Robert is 49**
13 **percent and Rosa is two percent.**
14     Q  Is there an operating agreement
15 associated with the company?
16     A  **I'm not sure.**
17     Q  Is there a shareholder agreement?
18     A  **I would think so.**
19     Q  But you're not familiar with either of
20 those two documents then, I take it?
21     A  **Not off the top of my head.**
22     Q  Who are the members of MPC Franchise,
23 LLC?
24     A  **Myself and Robert.  That's it.**
25     Q  What are your percentages of ownerships?

19

1      A  **Fifty-fifty.**
2      Q  Is there a membership agreement
3  associated with the LLC?
4      A  **I believe so.**
5      Q  Is there an operating agreement?
6      A  **I believe so.**
7      Q  Are you familiar with them?
8      A  **Heard of them.**
9      Q  I kind of want to go through the timeline
10 of Pudgie's Pizza.  Is it correct that it was
11 sometime around April 1963 that the Pudgie's mark
12 was first used by Pudgie's Pizza Franchise
13 Incorporation?
14     A  **No.**
15     Q  When was it?
16     A  **The franchising company?**
17     Q  Pudgie's Pizza Franchise Corporation.
18 We're not talking about MP Cleary Franchising.
19     A  **I'm sorry.  What are you asking me?**
20     Q  Was the Pudgie's mark first used in April
21 1963, thereabouts?  Let's say 1963.
22     A  **The Pudgie's mark was, yes.**
23     Q  And that was done by Pudgie's Pizza
24 Franchising Corporation?
25     A  **No.**

20

1      Q  Okay.  Who was it done by?
2      A  **I'm not sure.**
3      Q  You don't know?
4      A  **No.**
5      Q  Okay.  And the Horseheads Pudgie's opened
6  on Franklin Street in Horseheads in the 1972 to
7  the 1973 timeframe, is that correct?
8      A  **I'm not sure.**
9      Q  Don't know.  Okay.  You're familiar with
10 TruFoods?
11     A  **Yes.**
12     Q  And TruFoods, the predecessor of TruFoods
13 first used the name Pudgie's with respect to a
14 chicken restaurant in 1982, is that correct?
15     A  **I don't know.**
16     Q  You don't know.  Okay.  MP Cleary, Inc.
17 was formed in 1990, is that correct?
18     A  **No.**
19     Q  Okay.  When was it formed?
20     A  **I was sent to Southside Pudgie's when my**
21 **father took it over in November of 1989.  I'm not**
22 **sure when the corporation was actually formed.**
23     Q  Who formed MP Cleary, Inc.?
24     A  **My father.**
25     Q  Was he a shareholder in MP Cleary, Inc.?

21

1    A   I don't know.
2    Q   Currently you own 49 percent of MP
3   Cleary, Inc., correct?
4    A   Correct.
5    Q   How did you get that 49 percent ownership
6   interest?
7    A   From my mother, Rosa.
8    Q   Rosa gifted you or gave you or sold you
9   49 percent of the company, is that correct?
10    A   Correct.
11    Q   So she must have owned at least 51
12   percent since she still holds two percent.  Did
13   she own 100 percent of MP Cleary, Inc. when she
14   transferred 49 percent of it to you?
15    A   Yes.
16    Q   Okay.  When did she transfer that stock
17   to you?
18    A   I don't know.  When we did our
19   transitional planning.
20    Q   When about was the transitional planning
21   done?
22    A   I don't know.
23    Q   2008?
24    A   Probably the last five years or so.
25    Q   Okay.  So sometime after 2007?

22

1    A   I don't know.
2    Q   So prior to, let's say 2007 then, Rosa
3   owned 100 percent of MP Cleary, Inc.?
4    A   She owned 100 percent of MP Cleary, Inc.,
5   yes.
6    Q   What year did your father pass away?
7    A   1990.
8    Q   Prior to his passing, MP Cleary, Inc. had
9   already been formed?
10    A   I believe so.
11         MR. MCGUIRE:  One of the topics was
12    the formation of MP Cleary, Inc.  He
13    obviously doesn't know much about it.  We
14    reserve the right to -- we'll ask Rob about
15    it.
16         MR. ZUCKER:  Yeah, sure.  No problem.
17
18         (EXHIBIT NUMBER DC-4 WAS MARKED FOR
19    IDENTIFICATION.)
20
21    Q   Mr. Cleary, you've been handed what's
22   been marked as DC-4 in your deposition.  This is
23   a copy of the Plaintiffs and Counterclaim
24   Defendants Responses to Defendants and
25   Counterclaim Plaintiffs First Set of

23

1   Interrogatories.  It's an eight-page document.
2   If you take a second to look at it.
3    A   Okay.
4    Q   On the eighth page, if you take a scan of
5   that, that's called verification page.  Is that
6   your signature at the bottom?
7    A   Yes, it is.
8    Q   So you declared under penalty of perjury
9   that the answers written in the responses to the
10   interrogatories were true and correct when you
11   executed the document on April 5th, 2012?
12    A   Yes.
13    Q   If you look at interrogatory number one
14   which is on page four of the document.
15    A   Okay.
16    Q   And the interrogatory asked for the
17   identification of the date and any documents
18   relating to, supporting or evidencing the date
19   that you first started using the Pudgie's mark.
20   The answer to that was MP Cleary, Inc. began
21   using the Pudgie's mark when it was incorporated
22   in 1990.
23         Does that refresh your recollection as to
24   when MP Cleary, Inc. was formed?
25    A   I believe it, you know -- yes.  Again, my

24

1   father took over that store in 1989.  November,
2   actually.  And I believe then it was -- that's
3   when he took over the store, it was late in the
4   year so maybe it wasn't formed until 1990.  Could
5   be.
6    Q   And then it also states that plaintiff
7   MPC Franchise, LLC began using the Pudgie's mark
8   when it obtained the license to use the mark on
9   January 5th, 2009.
10         Do you know when MPC Franchise, LLC was
11   formed?
12    A   No.
13    Q   You don't have a recollection of that?
14    A   No.
15    Q   Who owned the Southside store?  If it's
16   the Southside store.  Let me go back.  Strike
17   that.
18         Is it the Southside store that you're
19   referencing that your father took over in
20   November of 1989?
21    A   Yes.
22    Q   Who owned the Southside store prior to
23   November of 1989?
24    A   It was a company-owned store.
25    Q   Which company owned it?

25

1    A   Pudgie's Pizza and Subs -- no.  I believe
2   it was Pudgie's Pizza and Subs, Inc.,
3   Incorporated.
4    Q   What became of Pudgie's Pizza and Subs
5   Incorporated?  If you know.
6    A   After my father's death my uncle
7   dissolved it.  He dissolved it sometime in the
8   '90s.
9    Q   Which uncle?
10   A   Francis.
11   Q   Is it possible that MP Cleary, Inc.
12   wasn't formed until after your father's passing?
13   A   I'm not sure.
14   Q   Okay.
15   A   I believe -- well, I don't know.
16   Q   No problem.  In 1990 or November of 1989,
17  what provided Pudgie's Southside with the right
18  to use the Pudgie's mark at that location?
19   A   Can you say that again?
20   Q   What was the basis, what provided the
21  basis for Southside Pudgie's to use the Pudgie's
22  mark in November of 1989 and then going forward?
23   A   Well, our late father was founding
24  president of Pudgie's Pizza.  He dissolved his
25  company-owned stores.  He took -- he took over

26

1   Southside Pudgie's and Francis took over North
2   Main and Elmira Heights.  At that time they went
3   from company owned to independently owned.
4    Q   What happened to Horseheads at that time?
5    A   Nothing.  It was still a franchisee.
6    Q   Okay.  Franchisee of whom?
7    A   Pudgie's Pizza and Franchising Corp.
8    Q   When did Pudgie's Pizza Franchising Corp
9   cease to exist?
10   A   I believe Franny dissolved all of his and
11  my father's corporations in the '90s.
12   Q   What happened after the dissolution of
13  Pudgie's Pizza Franchising Corp with respect to
14  any restaurants that were operating under a
15  franchise granted by that particular franchise
16  owner?
17   A   I don't understand what you're asking.
18   Q   The franchisor ceased to exist after its
19  dissolution sometime in the 1990s?
20   A   The franchisors?
21   Q   Correct.  Pudgie's Pizza Franchising Corp
22  was the franchisor, correct?
23   A   Right.
24   Q   Okay.  And it ceased to exist after its
25  dissolution?

27

1    A   Uh huh.
2    Q   What happened to those stores that were
3   operating under a franchise at the point of its
4   dissolution?
5    A   They continued to do business.  Some went
6   out of business.  There was, I think 28 or 32
7   locations at the time.
8    Q   So there were 28 or 32 that were
9   franchised?
10   A   Well, system wide, company owned and
11  franchisees.
12   Q   How many were company owned?
13   A   I'm not sure system wide.
14   Q   Approximately how many were franchised,
15  if you know?
16   A   I don't know how many were franchises
17  versus company owned.
18   Q   There were at least one, Horseheads,
19  right?
20   A   Franchisee?
21   Q   Yes.
22   A   Yes.
23   Q   After Pudgie's Pizza Franchising Corp
24  dissolved, was there another franchisor that took
25  its place?

28

1    A   I don't believe so.
2    Q   So the ones that were operating as a
3   franchisee under a franchise granted by Pudgie's
4   Pizza Franchising Corp, after that company
5   dissolved, they were simply continuing to operate
6   independently at that point in time?
7    A   Yes.
8    Q   And Pudgie's Pizza Horseheads, the one on
9   Franklin Street, that's under a franchise
10  agreement for some period of time and then
11  independently operated after the franchise was
12  terminated or the franchise order was dissolved.
13  That's still the same location today as it was
14  back then, isn't that correct?
15   A   Yes.
16   Q   MP Cleary, Inc. is not a successor to
17  Pudgie's Pizza Franchising Corporation, correct?
18   A   Correct.  As far as I know.
19   Q   Are there any agreements or contracts
20  between MP Cleary, Inc. and Bernadette Tarntino?
21   A   No.
22   Q   Are there any agreements between MP
23  Cleary, Inc. and Brent Tarntino?
24   A   No.
25   Q   Are there any agreements between MP

29

1  Cleary, Inc. and Pudgie's Pizza Corporation -
2  Horseheads, Inc.?
3     A   Say that one more time.
4     Q   Are there any agreements between MP
5  Cleary, Inc. and Pudgie's Pizza
6  Corporation-Horseheads, Inc.?
7     A   Oh, the Horseheads store, no.
8     Q   Are there any agreements between MPC
9  Franchise, LLC and Pudgie's Pizza
10 Corporation-Horseheads, Inc.?
11    A   No.
12    Q   When did your father open the first
13 Pudgie's Pizza?
14    A   The first Pudgie's Pizza was opened in
15 1963. I believe my father was in the Navy when
16 it first opened.
17    Q   Who opened that first one while your dad
18 was serving in the Navy?
19    A   I believe it was his brother Pudgie
20 Charles Cleary and other family members.
21    Q   And there's been a Pudgie's Pizza
22 operating continuously since 1963?
23    A   Yes.
24    Q   And your family, Michael your dad, Rosa,
25 your mom and you and Rob have always been

30

1  associated with at least one of those restaurants
2  continuously since then?
3     A   Certainly.
4        MR. MCGUIRE:  Can you mark this?
5
6        (EXHIBIT NUMBER DC-5 WAS MARKED FOR
7     IDENTIFICATION.)
8
9     Q   David, you've been handed what's been
10 marked as Exhibit DC-5 in your deposition.  This
11 is a copy of a trademark license agreement
12 between PAT Franchise Systems, Inc. and MP
13 Cleary, Inc.  Do you see that?
14    A   Yes.
15    Q   And is this document familiar to you?
16    A   Yes.
17    Q   And on the last page of the document, I'm
18 sorry, the second to last page.  Is that your
19 signature?
20    A   Yes.
21    Q   Under MP Cleary, Inc.?
22    A   Uh huh.  Yes.
23    Q   And it was executed on July 19th, 2004,
24 is that correct?
25    A   Yes.

31

1     Q   Why did MP Cleary, Inc. enter into this
2  trademark license agreement with PAT Franchise
3  Systems, Inc.?
4     A   To reuse and grow with the name Pudgie's.
5     Q   And was it solely to grow with the name
6  Pudgie's or was there another reason?  Did you
7  need this license agreement to continue operating
8  Southside Pudgie's, for example?
9     A   I wanted to be sure we were covered, so I
10 don't know if we needed it or not.
11    Q   So you may not have needed it but you did
12 it anyway?
13    A   Certainly.
14    Q   What were the circumstances that gave
15 rise to this trademark license agreement?  In
16 other words, was MP Cleary, Inc. approached by
17 PAT Franchise Systems, Inc.?
18    A   No, I believe we approached them.
19    Q   Okay.  How did you learn about them?
20    A   I'm trying to remember.  It's a while
21 ago.  How did we learn about, that's your
22 question?
23    Q   Yes.
24    A   At one point in the early '90s -- at one
25 point in the early '90s my mother hired an

32

1  attorney to protect our stores' rights.  And I
2  believe it was through then that we had realized
3  Franny had dissolved everything.  And sometime in
4  the '90s we went to go see an attorney and
5  realized that someone else had acquired our
6  registration mark.
7     Q   And that was PAT Franchise Systems, Inc.?
8     A   Back then I don't even know if it was
9  that.
10    Q   And it says in the very first, we'll call
11 it recital under the word background, that PAT
12 owns and operates restaurants, carry-out and food
13 service businesses that principally offer chicken
14 products throughout the United States.
15       Were you aware that they were offering --
16 operating chicken restaurants under the Pudgie's
17 name when you approached them?
18    A   Sure.
19    Q   Did you think they were also operating
20 pizza restaurants or pizza parlors?
21    A   No.
22    Q   Were you aware that they were not
23 offering pizza or they were operating pizza
24 restaurants?
25    A   Say that again.

A0008

33

1    **Q**   Did you have knowledge that they were not
2  operating pizza restaurants?
3    **A   I remember that they were primarily known**
4  **for Pudgie's chicken.**
5    **Q**   Okay.  And under the license provision in
6  paragraph one PAT granted MP Cleary, Inc. a
7  non-exclusive perpetual and transferrable license
8  to use and display the Pudgie's mark in
9  connection with MP Cleary's existing and future
10 restaurants or other food service businesses.
11     Is that an accurate reflection of the
12 license grant?
13    **A   Yeah.**
14    **Q**   And MP Cleary's existing restaurants as
15 of July 19th, 2004, comprised of what, how many
16 restaurants and where were they and what did they
17 do?
18    **A   I don't know.  In 2004?  MP Cleary had**
19 **two locations that were company owned.**
20     **Does that answer your question?**
21    **Q**   Okay.  And were they both pizza parlors,
22 pizza restaurants?
23    **A   Uh huh.**
24    **Q**   In your opinion is there a difference
25 between operating a chicken restaurant and a

34

1  pizza restaurant?
2    **A   Is there a difference operating two types**
3  **of restaurants?**
4    **Q**   One that's principally serving chicken
5  products and one that's principally serving pizza
6  products?
7    **A   There's a lot of similarities.  Their**
8  **main item was chicken.  Our main item was pizza.**
9  **We offer chicken.**
10    **Q**   And would you say they're similar
11 restaurants or would you consider them to be
12 different restaurants?
13    **A   I would say similar.  It's a restaurant,**
14 **takeout, delivery, dine in.  I don't know if they**
15 **have pizza or not on their menu.**
16    **Q**   Under paragraph three under restrictions,
17 do you see that?
18    **A   Uh huh.**
19    **Q**   Paragraph A:  Each party shall not
20 directly or indirectly open, operate or license
21 another for use of the marks in connection with
22 any type of restaurant, carryout or other food
23 service business or provide any consulting
24 services related thereto within a five-mile
25 radius of any already-established business owned

35

1  by the other party, it's licensees or franchisees
2  using any of the marks.
3     The paragraph continues:  PAT shall only
4  use or license others to use the mark in
5  connection with its existing Pudgie's Famous
6  Chicken Restaurants and future locations anywhere
7  in the U.S. except as provided herein and shall
8  not directly or indirectly principally offer,
9  sell or otherwise provide pizza, subs or other
10 similar products using the marks at any existing
11 or future restaurant, carryout or other food
12 service business.
13     If they're similar, why did you need a
14 restriction that prevented them from doing what
15 you considered to be similar?
16    **A   You've got to repeat that.  It's way too**
17 **much.**
18    **Q**   Okay.  Why did you agree to a provision
19 that restricted PAT from operating a pizza
20 restaurant under the Pudgie's name?  Why did you
21 want that provision in this agreement or did you
22 not want the provision in the agreement?
23     MR. ZUCKER:  Within that five-mile
24     radius you're saying?
25     MR. MCGUIRE:  Yes.  Actually, no.

36

1     That second sentence is separate and apart
2     from the five-mile noncompete.
3    **A   So your question is again?**
4    **Q**   Why did you agree to a provision that PAT
5  will only operate and license others to operate
6  using the Pudgie's mark in connection with its
7  Pudgie's Famous Chicken Restaurant and shall not
8  offer it to a restaurant that serves pizza, subs
9  or other similar products?
10    **A   Why did we agree to it is your question?**
11    **Q**   Yes.
12    **A   I'm guessing they wanted it.**
13    **Q**   They wanted it?
14    **A   I don't remember.**
15    **Q**   Okay.  In paragraph 3B:  MP Cleary agreed
16 that it will not directly or indirectly
17 principally offer, sell or otherwise provide
18 skinned or skinless chicken products using the
19 marks at any existing or future restaurant.
20     Do you see that?
21    **A   Yes.**
22    **Q**   And you agreed to that particular
23 provision?
24    **A   Did we agree?  Yes.**
25    **Q**   And have you honored that particular

37

1  provision?

2  A  Yes.

3  Q  So you have not operated a restaurant

4  that serves principally skinned or skinless

5  chicken products and, to the best of your

6  knowledge, PAT has not operated a restaurant,

7  licensed other restaurants to directly or

8  indirectly principally offer pizza, subs or other

9  similar products?

10  A  With each other, yes.

11  Q  Correct?  Has PAT or its successors in

12  interest operated any restaurants that

13  principally offer pizza, subs or similar

14  products?

15  A  I don't know.

16  Q  Oh, you don't know.  Okay.

17  In paragraph four:  MP Cleary paid a

18  one-time fixed fee of $37,500 to PAT upon

19  execution of the agreement?

20  A  Yes.

21  Q  Were there any other fees associated with

22  this agreement?

23  A  Like lawyers's fees?

24  Q  I'm sorry.  Any other royalties or

25  payments by MP Cleary to PAT?

38

1  A  No.

2  Q  It was just that one-time fee?

3  A  I believe so.

4  Q  Under the representations and warranties

5  in paragraph five.

6  A  Okay.

7  Q  To PAT's knowledge, no third party

8  infringes or otherwise violates or has infringed

9  or otherwise violated the trademark, service

10  mark, tradename or any other intellectual

11  property rights related to the marks.

12  Did you -- was PAT aware of all the other

13  Pudgie's restaurants, Pudgie's Pizza restaurants

14  that were in existence as of April 2004?

15  A  I'm not sure.

16  Q  You don't know whether they knew of

17  Horseheads?

18  A  They knew there were other locations.

19  Other Pudgie's locations.  I just don't know to

20  what extent.

21  Q  But they were aware that there were other

22  Pudgie's Pizza locations?

23  A  Yes.

24  Q  Okay.  But they didn't consider any of

25  those to -- they represented and warranted

39

1  anyway -- that none of those infringed the rights

2  that they held in the Pudgie's trademark,

3  correct?

4  A  Say that again.

5  Q  They represented in this agreement that

6  they had no knowledge of any third party

7  infringing or violating any of the Pudgie's

8  trademarks that it held?

9  A  Okay.

10  Q  Under paragraph six under covenants:  PAT

11  shall protect the marks against infringement by

12  policing the marketplace and suing for

13  infringement as it deems appropriate in its

14  commercially reasonable discretion.

15  Where in the agreement does it provide MP

16  Cleary, Inc. with the right to enforce the

17  trademarks?

18  A  I believe it addresses it somewhere in

19  this document.  Do you want me to read the entire

20  thing?

21  Q  Look at paragraph eight.

22  A  And what is your question?

23  Q  What provides MP Cleary, Inc. with the

24  right to enforce the Pudgie's trademark that was

25  licensed under this agreement?

40

1  A  As I understand it --

2  MR. ZUCKER:  He directed you to the

3  paragraph so you can read the whole thing

4  if you want.  You're not in a rush.

5  MR. MCGUIRE:  Not at all.

6  A  Well, the parties agree to do such

7  further action to execute and deliver such

8  additional agreements in instruments from time to

9  time as either may at any time reasonably request

10  in order to assure and confirm as such requesting

11  the rights, powers and remedies conferred in the

12  agreement.  MP Cleary shall cooperate fully in

13  prosecuting any U.S. application for the marks

14  and maintaining any U.S. registrations for the

15  marks at PAT's expense.  MP Cleary shall

16  cooperate fully in connection with a third-party

17  claim, action or suit related to the marks

18  whether filed by or against PAT at PAT's expense.

19  MP Cleary also shall furnish records or

20  information and testimony and attend conferences,

21  discovery proceedings, hearings, trials and

22  appeals as may be reasonably requested by PAT at

23  PAT's expense.

24  In the even that MP Cleary becomes aware

25  of any activity by any third party that may

41

1 constitute an infringement of PAT's ownership
2 rights and the mark or if any third party asserts
3 that MP Cleary's use of the marks constitutes
4 unauthorized use or infringement, MP Cleary shall
5 properly notify PAT in writing. In such a case,
6 PAT in its commercially reasonable discretion may
7 elect to institute litigation with respect to
8 such infringement or defend any infringement
9 claim.
10      In the event that PAT decides not to file
11 or defend such litigation, MP Cleary shall have
12 the right to commence or defend such litigation
13 under its direction and control at its expense.
14      In such a case PAT shall cooperate fully
15 including without limitation furnishing records,
16 information and testimony, attending conferences,
17 discovery proceedings, hearings, trials and
18 appeals as may be reasonably requested by MP
19 Cleary at MP Cleary's expense.
20      Q    Now, in the present case MP Cleary, Inc.
21 has sued Brent Tarntino for trademark
22 infringement, correct?
23      A    Yes.
24      Q    Did you notify PAT of the infringement in
25 writing as required by the agreement?

42

1      A    My attorneys.
2      Q    Did they notify PAT in writing?
3      A    I believe so.
4           MR. MCGUIRE:  We asked for documents
5      like that and you said none in the
6      response.  I'd like to get a copy of that?
7           MR. ZUCKER:  Yeah, my partner Lane
8      actually handled that in the beginning but
9      I believe there's an e-mail or letter so
10      I'll get that to you.
11           MR. MCGUIRE:  Okay.
12           (DOCUMENT REQUEST.)
13      Q    Now, continuing with the paragraph eight.
14 It's only in the event that PAT decides not to
15 file a litigation that MP Cleary has the right,
16 under the agreement, to commence an action.  Did
17 you -- did MP Cleary have discussions with PAT
18 about who would actually bring this litigation?
19      A    I'm sure our attorneys have.
20      Q    Did MP Cleary?
21      A    I'm not sure.
22      Q    So you're not aware of any conversations
23 with anyone at PAT in respect to bringing the
24 litigation?
25      A    I'm not sure if, you know, I know PAT had

43

1 changed ownership, so there was some, I think our
2 attorneys handled that communication with the new
3 owners, so.
4      Q    Have you or anyone from MP Cleary spoken
5 with anyone at TruFoods with regard to this
6 litigation?
7      A    The previous owner of the company I
8 called because I wanted to know what was -- we
9 had heard that they sold maybe.  He told me he
10 had sold his company to this new entity.  I must
11 have talked to somebody at TruFoods to get a name
12 of the owner but that was about it.
13      Q    With respect to this particular
14 litigation and the filing of the lawsuit, did you
15 speak with anyone at TruFoods?
16      A    I don't remember.
17      Q    You don't recall of any conversations?
18      A    Correct.
19      Q    You're aware in this action that Brent
20 Tarntino and Pudgie's Pizza Corporation -
21 Horseheads, Inc., counterclaimed against MP
22 Cleary, Inc. --
23      A    Yes.
24      Q    -- for trademark infringements relative
25 to the allegations that you're now advertising

44

1 delivery services into the Elmira Heights area,
2 correct?
3      A    I don't know -- well, no, I don't know if
4 I ever heard Elmira Heights area.
5      Q    But you are aware that Brent Tarntino and
6 Pudgie's Pizza Corporation - Horseheads, Inc.,
7 did file counter claims against MP Cleary, Inc.
8 for trademark infringement?
9      A    Yes.
10      Q    Under paragraph seven of the agreement
11 with PAT, did you put them on notice of the
12 counterclaim?
13      A    Who, PAT?
14      Q    Yes.  Or TruFoods.
15      A    Well, my attorneys, yes.
16      Q    Are they indemnifying, defending and
17 holding MP Cleary harmless for the costs and
18 liabilities associated with the counterclaims?
19      A    I'm not sure.
20           MR. MCGUIRE:  Let's get that one
21      marked.
22
23           (EXHIBIT NUMBER DC-6 WAS MARKED FOR
24      IDENTIFICATION.)
25

45

1    A   Actually, this would be a good time for a
2  break.
3        (RECESS TAKEN.)
4    Q   David, you've been handed what was marked
5  as DC-6 in your deposition.  This is a copy of a
6  trademark and service mark sublicense and license
7  agreement.  It's not dated, it was sometime in
8  July 2010 between MP Cleary, Inc. and MPC
9  Franchise, LLC.  Are you familiar with this
10  agreement?
11    A   Yes.
12    Q   And on page five of the agreement that's
13  signed by MP Cleary, Inc. or on behalf of MP
14  Cleary, Inc. by David J. Cleary as president.
15  That would be you, correct?
16    A   Yes.
17    Q   And you also signed it as the managing
18  member of MPC Franchise, LLC?
19    A   Yes.
20    Q   Was that a tough negotiation?  That's a
21  joke, you don't have to answer that.
22    A   You'd be amazed.
23    Q   On the first page of the agreement under
24  the recitals and recital B.  It defines the word
25  mark?

46

1    A   Yes.
2    Q   As being the word mark Pudgie's that PAT
3  Franchise Systems, LLC had obtained a federal
4  registration for, correct?
5    A   Correct.
6    Q   And then there's also a design mark
7  referenced in recital D which MP Cleary, Inc. is
8  indicated as being the owner of.  Do you see
9  that?
10    A   Yes.
11    Q   And collectively the word mark and the
12  design mark are referred to as proprietary marks.
13  Do you see that?
14    A   Yes.
15    Q   In paragraph 4.1 on page two.
16    A   Okay.
17    Q   That section is titled Duties of
18  Licensee.  In paragraph 4.1 it says:  Licensee
19  acknowledges the validity of the proprietary
20  marks and the complete ownership by licensor of
21  all right, title and interest in the proprietary
22  marks.  Do you see that?
23    A   Yes.
24    Q   Licensor is MP Cleary, Inc. and
25  proprietary mark includes the word mark that's

47

1  listed as being the Pudgie's mark that was
2  registered by PAT Franchise Systems, LLC, right?
3    A   I'm following you.  Yes.
4    Q   Does MP Cleary, Inc. own the word mark,
5  as that term is defined in the agreement?
6    A   I'm not quite sure what you're asking.
7  Does MP -- can you repeat that?
8        MR. MCGUIRE:  Can you read it back?
9        (PREVIOUS QUESTION READ BACK.)
10    A   Yes, as I understand it.
11    Q   So did PAT Franchise Systems, LLC assign
12  its ownership in the word mark to MP Cleary, Inc.
13  at some point in time?
14    A   Well, it's what it says in the documents.
15  I'm not sure.
16    Q   Do you understand the concept of
17  ownership?
18    A   Most of the time.  Yes.
19    Q   And in this agreement the licensee
20  acknowledged that the licensor had complete
21  ownership of all right, title and interest in the
22  proprietary marks which includes PAT Franchise
23  Systems, LLC's federal registration of the word
24  mark Pudgie's?
25    A   Are you asking me a question?

48

1    Q   Yes.
2    A   Or are you reading off the document?
3    Q   I'm confirming that the document says
4  that MP Cleary, Inc. -- let me rephrase it.
5  Strike it.
6        The document indicates that the licensee,
7  MPC Franchise, LLC, acknowledges that licensor,
8  which is MP Cleary, Inc., has complete ownership of
9  all right, title and interest in the proprietary
10  marks.  And my question is:  Does MP Cleary
11  actually own all right, title and interest in
12  United States trademark registration number
13  2565298?
14    A   I guess I'm not quite sure how to answer
15  your question.  If you tell me if you're reading
16  off something here, I can read it.
17    Q   Nope.
18    A   Okay.  Can you read that back?
19        (PREVIOUS QUESTION READ BACK.)
20    A   No.
21    Q   Okay.  So licensee, MPC franchise, LLC,
22  incorrectly acknowledged the complete ownership
23  by MP Cleary, Inc. of all right, title and
24  interest in the proprietary marks, correct?
25    A   No.

49

1  Q   Okay.  Explain to me how the
2  acknowledgement is correct.
3  A   Again, I don't -- acknowledgement here?
4  Q   Uh huh.
5  A   Can you point that out to me?
6  Q   Paragraph 4.1.
7  A   Okay.  What was your last question?
8         MR. MCGUIRE:  Can you read that back?
9         (PREVIOUS QUESTION READ BACK.)
10  A   Well, MPC Franchise acknowledges the
11  rights of MP Cleary, Inc.
12  Q   The ownership interest in the right,
13  title and interest and to the proprietary marks,
14  correct?
15  A   Yes.
16  Q   And the proprietary marks includes what's
17  defined as the word mark, correct?
18  A   To the word mark, I would say yes.
19  Q   And the word mark is the federal
20  registration that was procured by PAT Franchise
21  Systems, LLC, correct?
22  A   Yes, that's what it refers to.  I'm not
23  saying we owned the federal registration mark.
24  Q   Okay.  I just want to be clear that when
25  this agreement was executed in 2010 there had

50

1  never been an assignment, a conveyance of
2  ownership of what's defined as the word mark to
3  MP Cleary, Inc.  I just want to be clear that MP
4  Cleary, Inc. has never taken ownership of the
5  word mark as defined in this document?
6  A   Well, I'm not sure.  You're saying ever,
7  I'm not sure what happened immediately after my
8  father's death.
9  Q   Okay.  Do you think there might be a
10  document out there that has assigned ownership in
11  the trademark registration 2565298 from PAT
12  Franchise Systems, LLC or any of its successors
13  in interest to MP Cleary, Inc.?
14  A   Oh, no.  No.
15  Q   Okay.  All right.  I just wanted to be --
16  it was a long way around it but I just wanted to
17  be clear that this document contains a mistake
18  and MP Cleary, Inc. doesn't own that federal
19  registration.
20  A   Okay.
21  Q   Okay.  You agree with that?
22  A   I'm agreeing with what you said but I'm
23  not -- I mean, I'm not quite sure, I mean, the
24  registration mark is owned by PAT Systems or
25  TruFoods.

51

1  Q   Okay.  Good enough.  In the grant clause
2  in paragraph 1.1, which begins on page one.
3  A   Okay.
4  Q   The licensor, MP Cleary, Inc., is
5  granting to the licensee, MPC Franchise, LLC, a
6  royalty-free perpetual right to use the
7  proprietary marks subject to the terms and
8  conditions in the agreement.
9         The fact that it's royalty free and I
10  don't see any other payment provisions in the
11  agreement, is there any obligation on behalf of MPC
12  Franchise, LLC to pay any money to MP Cleary, Inc.
13  based on revenues it receives?
14  A   I don't understand.  Could you be a
15  little more specific, I guess?
16  Q   Yes.  The license grant here is one that
17  is royalty free.  In other words, the licensee is
18  not obligated to pay the licensor a royalty for
19  the perpetual right to use the proprietary marks.
20  Okay?
21  A   Okay, correct.
22  Q   I just want to make sure that there's no
23  other agreement that requires MPC Franchise, LLC
24  to pay MP Cleary, Inc. any sums of money based
25  upon MPC Franchise, LLC's operations.

52

1  A   Is there an agreement?  No.
2  Q   Okay.  Does MPC Franchise, LLC file a tax
3  return every year?
4  A   Yes.
5  Q   Did it file one for 2011 tax year?
6  A   Yes.
7  Q   Just recently?
8  A   Very recently.
9  Q   And were the members of the LLC issued
10  K-1s or any other form of tax documentation to
11  show the distributions that the LLC made to the
12  members?
13  A   Yes.
14  Q   And what was the total gross income of
15  MPC Franchise, LLC in 2011?
16  A   I have no idea.
17         MR. ZUCKER:  Objection to form.
18  Really to the terminology you're using.
19  I'm an accountant, I don't think I'd
20  understand that.
21  Q   What was the taxable income?
22         MR. ZUCKER:  Okay.  Thanks.
23  A   I'm not sure.
24  Q   Approximately?
25  A   I have no idea.

53

1    **Q**   Did you see the tax return?
2    **A   Yes.**
3    **Q**   Did you sign the tax return?
4    **A   Yes.**
5    **Q**   How much money was distributed to the
6    members?
7    **A   I'm not sure.  I'm not trying to be**
8    **difficult --**
9    **Q**   No, that's okay.  If you don't remember,
10   you don't remember.
11       Tell me how MPC Franchise, LLC receives
12   money.  How does it take in revenue?
13   **A   Through the franchise system, the**
14   **franchisees are required to pay the franchise**
15   **fees.**
16   **Q**   Okay.  How much are the franchise fees?
17   **A   I'm not sure without looking at our FTD.**
18   **Q**   And to the best of your knowledge all the
19   franchisees are compliant with the payment of the
20   franchise fees?
21   **A   Yes.**
22   **Q**   And those are paid only to MPC Franchise,
23   LLC and not to MP Cleary, Inc.?
24   **A   The fees are paid only to MPC Franchise,**
25   **LLC, correct.**

54

1    **Q**   MPC Franchise, LLC doesn't actually
2    operate any restaurants itself, does it?
3    **A   There are no company-owned pizzerias,**
4    **restaurants in MPC Franchise I believe currently.**
5    **Q**   So it's sole form of revenue is via the
6    franchise fees that the franchisees are paying
7    pursuant to the franchise agreements?
8    **A   No.**
9    **Q**   How else does it receive income?
10   **A   We receive rebates from vendors.**
11   **Q**   Okay.  How else?
12   **A   That's probably about it.**
13   **Q**   MP Cleary, Inc. doesn't offer franchises,
14   correct?
15   **A   Correct.**
16   **Q**   MP Cleary, Inc. operates restaurants,
17   correct?
18   **A   Yes.**
19   **Q**   I think you said, are there two?
20   **A   Two company-owned stores.**
21   **Q**   Two MP Cleary, Inc. owned stores
22   currently?
23   **A   Correct.**
24   **Q**   How does -- MP Cleary, Inc. uses a
25   computerized point-of-sale system for tracking

55

1    revenue received through the sale of goods and
2    services?
3    **A   Yes.**
4    **Q**   What kind of point-of-sale system is it?
5    **A   What do you mean?**
6    **Q**   What point-of-sale system is it?  Do you
7    know?
8    **A   The name of the point-of-sale system is**
9    **called Diamond Touch.**
10   **Q**   And is Diamond Dutch --
11   **A   Touch.**
12   **Q**   Pardon?
13   **A   Touch.**
14   **Q**   Does Diamond Touch allow you, MP Cleary,
15   Inc., to determine the source of revenue?  In
16   other words, can you segregate how much money
17   you've made from deliveries as opposed to how
18   much money you've made through in-store sales?
19   **A   Yes.**
20   **Q**   So you're able to do that?
21   **A   Yes.**
22   **Q**   Does it also track where deliveries go
23   to?
24   **A   I'm not sure.  I mean, yes, when a**
25   **customer places an order you put in their**

56

1    **information or it would already be in the system,**
2    **that's where it tells the driver where to go.**
3    **Q**   So there would be a way of determining
4    how many deliveries went to, for example, Elmira
5    Heights?
6    **A   No.**
7    **Q**   There's no way of determining that?
8    **A   No.**
9    **Q**   Do you keep a delivery log?
10   **A   I guess I would -- there's a printout,**
11   **each driver where he's been.  If that's what you**
12   **mean by delivery log, then yes.**
13   **Q**   Okay.  And is there a sales total
14   associated with each delivery on the delivery
15   log?
16   **A   Well, yes.**
17   **Q**   Okay.  So there is a way to determine how
18   much in sales have been made to a particular
19   delivery location.  So if you wanted to put in
20   addresses, for instance, there would be a way of
21   calculating that?
22   **A   We utilize phone numbers primarily for**
23   **our delivery system.  That'll pull up an address.**
24   **It's not broken out by an area.**
25   **Q**   Okay.  So there is no way of determining

57

1  whether you have or have not delivered to a
2  particular area, say 123 Main Street, Elmira
3  Heights?
4  **A    Without pulling each delivery**
5  **independently or verifying driver's deliveries.**
6  **And, again, I don't -- our system doesn't keep**
7  **track of north, south, east and west, you know,**
8  **Elmira.  It would be primarily a phone number and**
9  **a house address.**
10  Q    Right.  And the house address would
11  include a house number and a street name and
12  probably a town, correct?
13  **A    It does not include the town.  A house**
14  **number, sometimes last but, yes, it keeps track**
15  **of the house address and the street name.**
16  Q    And by correlating a house number and a
17  street name with a map, you could say that that
18  one happens to fall in Big Flats or that one
19  happens to fall in Elmira Heights?
20  **A    Somebody could if they had that much**
21  **time, I believe they could.**
22
23      (EXHIBIT NUMBER DC-7 WAS MARKED FOR
24  IDENTIFICATION.)
25

58

1      MR. MCGUIRE:  For the record, DC-7 is
2      an 18-page exhibit comprising various
3      advertisements of Pudgie's Pizza Southside
4      between the years 2002 and 2011.
5  Q    David, I handed -- well, you've been
6  handed what's been marked as Exhibit DC-7.  If
7  you take a look at, as an example, the second
8  page of the exhibit.  This is a -- at the very
9  top of it there's a Yellow Page advertisement for
10  Southside Elmira Pudgie's.  Do you see that?
11  **A    Yup.**
12  Q    And Southside Elmira Pudgie's is the
13  Southside Pudgie's we've been talking about here
14  today, correct?
15  **A    Sure.**
16  Q    And this one shows an advertisement of
17  Southside Elmira Pudgie's with an indication, we
18  deliver to Elmira Northside, Southside, West
19  Elmira, Eastside and Pine City.  Do you see that?
20  **A    Yes.**
21  Q    And nowhere in there does it indicate
22  that you deliver to Elmira Heights or that
23  Southside Pudgie's delivers to Elmira Heights,
24  correct?
25  **A    Well, no.  I would consider Elmira**

59

1  **Northside to be part of Northside Elmira Heights.**
2  Q    And if we flip through all 18 pages of
3  this exhibit, and take your time to go ahead and
4  do that, all of the pages that contain an ad for
5  Southside Pudgie's indicate delivery to Elmira
6  Northside, Southside, West Elmira and Pine City
7  and none indicate delivery to Elmira Heights, is
8  that correct?
9  **A    You missed Eastside but yes.**
10  Q    Some of them don't contain Eastside?
11  **A    Uh?**
12  Q    Some don't contain Eastside.
13  **A    I'm not perfect.  Is this supposed to be**
14  **the same ad?**
15      MR. ZUCKER:  I think they're from
16      different years.
17  Q    They're from different years.
18      MR. ZUCKER:  If you get them out of
19      order you're going to screw yourself up.
20  **A    Well, it has our copyright on it 2010.  I**
21  **don't think they are.  I'm sorry.  Did you ask me**
22  **to look through these?**
23  Q    Yes, just to confirm that none of them
24  indicate that Southside Elmira Pudgie's have an
25  indication that they deliver to Elmira Heights.

60

1  **A    Like the map says, it's all Elmira in the**
2  **phonebook on the front cover.**
3  Q    But the words Elmira Heights in terms of
4  a delivery area do not appear in any of the
5  Southside Pudgie's ads that appear in Exhibit
6  DC-7, correct?
7  **A    Specifically the Heights -- oh, here it**
8  **is.  Oh, this isn't a shared ad.  I'm sorry, are**
9  **you waiting on me?**
10  Q    I was just asking you to admit or not
11  admit that none of the ads for Elmira Southside
12  contain an indication that Elmira Southside
13  delivers to Elmira Heights specifically, the ads
14  that appear in Exhibit DC-7?
15  **A    In these ads I don't see Elmira Heights**
16  **specifically, correct.**
17  Q    Did there come a time when Elmira
18  Southside started to advertise delivery to Elmira
19  Heights specifically?
20  **A    We've been delivering to Elmira Heights**
21  **since the early '90s.**
22  Q    I'm asking --
23  **A    An ad specifically?**
24  Q    Yes.
25  **A    Yes, I don't know what specific ad we**

61

1  have or where they are if that's what -- I don't
2  remember the exact date.
3      Q   But there did come a time when Southside
4  Pudgie's started to advertise that it delivered
5  to Elmira Heights, correct?
6      A   Yes.  I believe it was right about the
7  time Elmira Heights Pudgie's closed.
8      Q   When did Elmira Heights Pudgie's close?
9      A   I'm not sure.  Probably even before that,
10  now that I think about it.  Early '90s.
11     Q   You think you started advertising the
12  Southside Pudgie's delivered to Elmira Heights
13  sometime in the early '90s --
14     A   We started delivering to Elmira Heights
15  in the early '90s.  When we actually added the
16  word Heights or Pine City I'm not sure.  Or
17  Eastside or --
18
19         (EXHIBIT NUMBER DC-8 WAS MARKED FOR
20     IDENTIFICATION.)
21
22         MR. MCGUIRE:  For the record, DC-8 is
23     a nine-page exhibit of various ads of
24     Pudgie's Southside from 2011 through 2012.
25     Q   If you could take a look, David, at, as

62

1  an example, the second page of the exhibit.  And
2  it's an ad for, number one, Elmira Southside
3  Pudgie's and it contains an indication of
4  delivery to Elmira's Northside, Southside, West
5  Elmira, East Elmira, Pine City and Elmira
6  Heights.  Do you see that?
7      A   Yes.
8      Q   And if we continue to flip through this
9  particular exhibit, these are various ads for
10  Elmira Southside, all of which contain an
11  indication of delivery to, among other places,
12  Elmira Heights, correct?
13     A   Correct.
14     Q   Why did you start advertising -- why did
15  Elmira Southside start advertising delivery to
16  Elmira Heights beginning sometime in 2011?
17     A   Oh, no, we started -- I'm not sure when
18  we started adding Elmira Heights to our
19  advertisements.  Again, I'm thinking sometime in
20  the '90s.  Does that answer your question?
21     Q   No.  I mean, we asked in our
22  documentation request to you for copies of your
23  advertisements.
24     A   Right.
25     Q   And you produced none.

63

1      A   Okay.
2      Q   We produced these advertisements and we
3  were unable to find a single advertisement where
4  Elmira Southside advertised delivery to Elmira
5  Heights prior to sometime in 2011.  Beginning in
6  2011 all of Elmira Southside's ads contained an
7  indication of delivery to Elmira Heights.
8      A   Okay.
9      Q   Based on the documents we've seen,
10  therefore, Elmira Southside only began
11  advertising delivery to Elmira Heights sometime
12  in 2011.
13         Why would we only start seeing those
14  advertisements in 2011 and not before then?
15     A   Well, why you've not seen them, I'm not
16  sure.  We've been delivering to Elmira Heights
17  since the '90s.  We may not have added it into
18  our advertisement until sometime in the '90s,
19  late '90s I'm guessing at the latest.
20     Q   Well --
21     A   Why we deliver to Elmira Heights is
22  because, I mean, a lot of customers have
23  requested our services in Elmira Heights.  They
24  want us to specifically mention Elmira Heights.
25  We always thought that Northside included Elmira

64

1  Heights.  It's no different than, I mean, when
2  you say deliver throughout the City of Elmira, we
3  still have to put north, south, east and west
4  now.  We didn't always do that.
5      Q   If you look at Exhibit DC-7 again and
6  look at the second page of that exhibit.
7      A   Okay.
8      Q   And compare the delivery notice to the
9  delivery notice you see in Exhibit DC-8 on the
10  second page.
11     A   Sorry.  Okay.
12     Q   If you consider Elmira Heights to be
13  encompassed within Elmira's Southside, Northside,
14  West Elmira or Eastside, why did you bother to
15  put Elmira Heights specifically into the ad that
16  exists in Exhibit DC-8 when those same
17  territories are also listed there?
18     A   Well, at one time we added every
19  territory.
20     Q   When was that?
21     A   Going back to the early '90s.
22     Q   Okay.  Again --
23     A   It said we deliver --
24     Q   Again, we asked for documents showing
25  your advertising and you produced zero documents

A0016

65

1  showing your advertising.
2      **A   Okay.**
3      Q   Do you have such advertisements?
4      **A   We do have advertisements.**
5      Q   Did you look for those advertisements
6  when we served you with document requests?
7      **A   I believe we did look for some**
8  **advertisements and -- I'm not sure.**
9      Q   Did you give them to your attorney?
10     **A   I'm not -- I don't remember what**
11 **specifically we gave him other than we advertise**
12 **a great deal and I thought that -- I guess I'm**
13 **not quite sure what specific -- what advertising**
14 **was --**
15     Q   I want to see all of them.
16     **A   We have radio, we have television.  Do**
17 **you want copies of all of that?**
18     Q   Yes.  And we're entitled to it.  We asked
19 for it and we didn't get a single piece of
20 documentation.
21     **A   Okay.**
22         MR. MCGUIRE:  Are you going to
23 produce it?
24         MR. ZUCKER:  Yeah, sure.  If he has
25 something.

66

1         MR. MCGUIRE:  He just said he did.
2         MR. ZUCKER:  Then I would.
3         MR. MCGUIRE:  And we'll recall him as
4  a witness and go over them when he produces
5  them.
6         MR. ZUCKER:  If you need to.
7         MR. MCGUIRE:  I need to.
8         MR. ZUCKER:  Of course.
9         MR. MCGUIRE:  I'll tell you I will
10 need to if they say what he says they say.
11 We were unable to find a single one and we
12 have lots of them as you saw from our
13 production.
14     **A   You want all of our advertisements from**
15 **when?**
16     Q   Yes.  Early 1990s when you represent that
17 you started advertising Elmira Heights.
18     **A   Well, I said we started delivering in**
19 **Elmira Heights in early '90s.  When we added it**
20 **to our advertising I'm not quite sure.  I would**
21 **have thought it would have been later '90s is**
22 **what I thought about.**
23     Q   Okay.  Let's go with the later '90s.
24     **A   I don't know if I have that readily**
25 **available or at our means.  So.**

67

1      Q   Okay.  Produce what you have.
2         MR. ZUCKER:  Yeah, the answer is,
3  you'll go back and see what you have and
4  whatever you have you'll produce.
5         MR. MCGUIRE:  We're not going to
6  close the deposition today.  We'll reserve
7  our right to recall you as a witness at a
8  later date after we receive document
9  production pursuant to our requests.
10        (DOCUMENT REQUEST.)
11     **A   Sure.  Did I answer your question?**
12     Q   Yeah, there's no question pending at this
13 time.
14
15        (EXHIBIT NUMBER DC-9 WAS MARKED FOR
16 IDENTIFICATION.)
17
18     **A   You have one of our advertisements here,**
19 **don't you?**
20     Q   Uh huh.
21     **A   That says delivery to Elmira Heights?**
22     Q   Uh huh.
23     **A   Okay.  At least I think this is ours.**
24        MR. ZUCKER:  Wait until he has a
25 question for you.

68

1      Q   You've been handed what's been marked as
2  Exhibit DC-9 which is a copy of various screen
3  shots of the Southside Pudgie's website at
4  various points in time from August 2nd, 2003
5  through January 2nd, 2008.  Do these pages look
6  familiar to you?
7      **A   I saw this at our settlement conference.**
8  **Some of these look familiar.  Some of them I**
9  **can't say that they do.  This is a --**
10     Q   Okay.  Let's start with the first page of
11 the exhibit which is a screen shot.
12     **A   Okay.**
13     Q   Taken on August 2nd, 2003 and at the top
14 of it it contains a picture of a car logo in the
15 center with map lines extending out in north,
16 east, south and west directions.  To the north we
17 deliver as far as McCanns Boulevard.  Do you see
18 that?
19     **A   Yes.**
20     Q   Is that true today?
21     **A   No.**
22     Q   So you go north of McCanns Boulevard
23 today?
24     **A   Yes.**
25     Q   And is McCanns Boulevard a road that

69

1  essentially distinguishes Elmira proper from
2  Elmira Heights?
3      A   I'm not sure.
4      Q   Is McCanns Boulevard some sort of a
5  landmark?
6      A   Not that I'm aware of.
7      Q   It was simply a demarcation that
8  Southside Pudgie's was using to delineate its
9  territory, correct?
10     A   I'm not sure why it's there.  I don't
11  know.  I just know we deliver to Elmira Heights.
12     Q   On August 2nd, 2003 were you delivering
13  farther north than McCanns Boulevard?
14     A   I would believe so, yes.
15     Q   Okay.  Even though the web shot of
16  Southside Pizza that advertises its delivery
17  locations indicates they deliver only as far
18  north as McCanns Boulevard.  So despite what the
19  advertisement says, you were actually doing it
20  anyway, is that correct?
21     A   Is it correct we were delivering farther
22  north than McCanns Boulevard?
23     Q   Yes.
24     A   I believe so, yes.
25     Q   And this ad says you only deliver as far

70

1  north as McCanns Boulevard?
2      A   I'm not sure this is my ad, I'm not sure
3  why it's on there, but.  What was the date of
4  this?
5      Q   August 2nd, 2003.  Let's look at the
6  third page in.  And there's a screen shot of the
7  Southside Pudgie's web page on February 11th,
8  2004.  And we see the same map, except the driver
9  was moved from the center of the grid down to the
10  southwestern quadrant of the grid?
11     A   Okay.
12     Q   And the delivery territory is still
13  indicated to the north as going as far as McCanns
14  Boulevard.  Do you see that?
15     A   I see that.
16     Q   And do you think this is Southside
17  Pudgie's web page?  A copy of Southside Pudgie's
18  web page on February 11th, 2004?
19     A   I'm sure.
20     Q   Do you remember --
21     A   It says Pudgiespizza.net/delivery.  I
22  believe that was one of our web pages.
23     Q   If we go to the next page, there's a
24  screen shot taken from that same website on March
25  30th, 2005 and we have that same map showing.  It

71

1  says Southside Pudgie's on the top and it says:
2  To the north we deliver as far as McCanns
3  Boulevard.  Does this look familiar to you?
4      A   Only because I just saw it.
5      Q   You don't remember having this ad for
6  Southside Pudgie's?
7      A   I don't.  I believe, there was a time
8  when a Horseheads Pudgie's employee did our ads
9  online.  And I believe this is also incorrect as
10  far as south.
11     Q   Okay.  We'll go to the next page.
12  February 23rd, 2006.  Screen shot of
13  Pudgiespizza.net/delivery has that same map,
14  again, to the north we deliver as far as McCanns
15  Boulevard, correct?
16     A   It says that, yes.
17     Q   If we flip to the next page.  Another
18  screen shot February 21, 2007,
19  pudgiespizza.net/delivery.  Same map again.  To
20  the north we deliver as far as McCanns Boulevard?
21     A   Yes, it's the same image.
22     Q   If we go to the next page, February 7th,
23  2008.  Same map, same delivery bounds listed on
24  the map?
25     A   Yes.  It was never updated.

72

1      Q   Okay.
2      A   I hope I didn't pay much for these ads.
3      Q   Well, you had it for many years
4  apparently.  It went from 2003 through 2008.
5          Okay.  If you look at the next page which
6  is a screen shot on February 5th, 2005.  Here's
7  another page, this is the main page, it's
8  pudgiespizza.net/main.
9      A   Okay.
10     Q   And it's a duplication of the Southside
11  Pudgie's web page at that location on February
12  5th, 2005.  And the second paragraph down:
13  There's always free delivery to Elmira's
14  Northside, Southside, Pine City and West Elmira.
15  Do you see that?
16     A   Yes.
17     Q   And do you see the words Elmira Heights
18  listed anywhere under delivery?
19     A   No.
20     Q   And if we go two more pages in, this is a
21  screen shot, again of pudgiespizza.net/main taken
22  on February 23rd, 2006.  Second paragraph down:
23  There's always free delivery to Elmira's
24  Northside, Southside, Pine City and West Elmira.
25  Do you see an indication of free delivery to

73

1    Elmira Heights anywhere on that page?
2        A    No.
3        Q    If you go to a few more pages in, the
4    page that has TAR-00093 at the bottom.  It's
5    another screen shot of pudgiespizza.net/main on
6    January 2nd, 2008.  And, again, the second
7    paragraph down:  Free delivery to Elmira's
8    Northside, Southside, Pine City and West Elmira.
9    Again, no indication of delivery to Elmira
10   Heights on this page, correct?
11       A    Correct.
12       Q    You testified earlier that you spend a
13   lot of money advertising?
14       A    Yes.
15       Q    How much annually?
16       A    I have no idea.
17           MR. MCGUIRE:  And that was one of the
18   topics that he's not prepared to answer
19   questions on?
20           MR. ZUCKER:  His brother is right
21   here.
22           MR. MCGUIRE:  Okay.  Have him
23   prepared tomorrow.
24           MR. ZUCKER:  Don't give me any
25   threats.  Your client wouldn't even tell me

74

1    how old he was in 1980.  He was evasive.
2    He lied.  Both brothers are here and you'll
3    have a chance to ask either one of them.
4    They know what they know.  I run my
5    business, I don't know how much I spend on
6    advertising to the penny, okay.
7            MR. MCGUIRE:  If you were asked a
8    document request to produce the documents
9    that show that, you would do that.
10           MR. ZUCKER:  That's different.
11           MR. MCGUIRE:  And we did ask for that
12   and you produced nothing.
13           MR. ZUCKER:  Because it's irrelevant
14   to this.  It's irrelevant.
15           MR. MCGUIRE:  Do you want to have a
16   meet and confer now so we can do the motion
17   to compel later in the week?
18           MR. ZUCKER:  You can do any motion
19   you want.  You're going to have to tell me
20   how it's relevant first though.  It doesn't
21   make any sense.  It's got to relate somehow
22   to his counterclaim or our claim against
23   him.
24           MR. MCGUIRE:  Our counterclaim is --
25   this is off the record.

75

1            (OFF-THE-RECORD DISCUSSION.)
2
3            (EXHIBIT NUMBER DC-10 WAS MARKED FOR
4    IDENTIFICATION.)
5
6            CONTINUING EXAMINATION
7    BY MR. MCGUIRE:
8        Q    Dave, you've been handed what's been
9    marked as DC-10.  It's a two-page exhibit.  They
10   are copies of a Facebook page of Brent Tarntino
11   and a Facebook page of Pudgie's Pizza in
12   Horseheads, New York.  Do these look familiar to
13   you?
14       A    Yes.
15       Q    And you've seen them before today?
16       A    Yes.  The first one, yes.  This one, I
17   believe so.
18       Q    And if you refer back to Exhibit DC-4
19   which is, should be in that stack there.
20       A    Okay.
21       Q    And look at the bottom of page six and
22   the response on page seven.  So DC-4 is the
23   plaintiffs and counterclaim defendants responses
24   to defendants and counterclaim plaintiffs first
25   set of interrogatories.

76

1            And interrogatory number seven asks
2    for -- to identify and describe in detail each
3    and every instance where a person or entity was
4    actually confused or mistaken as to the
5    affiliation, connection or association between
6    MPC and/or MPC F and defendant and/or
7    counterclaim plaintiff and identify by name and
8    address the person or entity that was actually
9    confused.
10           Now if you return to your response on
11   page seven.
12       A    Okay.
13       Q    You responded that Brent Tarntino's March
14   2011 Facebook posts, asserting that he is the
15   owner of the name Pudgie's, confused anyone who
16   had viewed Tarntino's or the Pudgie's Horseheads
17   Facebook pages as to the connection between
18   plaintiffs and Tarntino.
19           The two pages in Exhibit DC-10, are those
20   the Facebook pages that you're referring to in
21   your answer to interrogatory number seven?
22       A    I'm not sure how many Facebook pages we
23   looked at or which one this is.
24       Q    Your response to the interrogatory was:
25   Brent Tarntino's March 2011 Facebook post if we

77

1  look at the first page of Exhibit DC-10, it was a
2  post done -- I think a post done on Brent
3  Tarntino's page. I don't know if the date is
4  listed as to when the post was done. But do you
5  think this is the post that you were referring
6  to?
7  **A   He had numerous Facebook postings.**
8  **Sometimes they're even changed in the same day.**
9  **I'm not sure.**
10  Q   Would it help you that this was a
11  document that you produced to us as evidencing
12  confusion?
13  MR. ZUCKER: I think the date is --
14  wait a second.
15  **A   This has a March 23rd for this posting.**
16  MR. ZUCKER: I'm sorry. I thought I
17  saw the date of his posting but I'm sorry,
18  I was mistaken.
19  MR. MCGUIRE: Yeah, I saw the same
20  thing.
21  **A   What was the question?**
22  Q   This is a document that you produced in
23  response to our document requests asking for
24  documents that you indicate evidence of actual
25  confusion.

78

1  **A   Okay.**
2  Q   And then in your response to the
3  interrogatory, you refer to Brent Tarntino's
4  March 2011 Facebook post. And I just want to
5  confirm that it's this particular Facebook post
6  that you're using in your response to that
7  interrogatory and not some other Facebook post?
8  **A   No, I believe this is it.**
9  Q   All right. And can you tell me who was
10  confused upon reading this thinking that Brent
11  Tarntino was somehow affiliated with MP Cleary,
12  Inc. or MPC Franchise, Inc.?
13  **A   Who particularly was confused because of**
14  **his postings is your question?**
15  Q   Yes.
16  **A   I don't remember. Just due to this**
17  **posting?**
18  Q   Yes.
19  **A   I received phone calls. Customers would**
20  **make -- customers informed us. I'm not quite**
21  **sure who all was confused right now.**
22  Q   You don't have a log of who called?
23  **A   No.**
24  Q   You don't have any records indicating who
25  called?

79

1  **A   I'm not sure.**
2  Q   You don't have any written summaries of
3  conversations you had?
4  **A   I'm not sure.**
5
6  (EXHIBIT NUMBER DC-11 WAS MARKED FOR
7  IDENTIFICATION.)
8
9  Q   David, you've been handed what's been
10  marked as DC-11. This appears to be a copy of an
11  e-mail sent from Daniel J. Miller with an e-mail
12  address of danmiller21029@verizon.net to
13  DJC@stny.rr.com and RAC@stny.rr.com. Subject:
14  Brent Tarntino. Sent Monday March 28th, 2011 at
15  11:08 p.m.
16  Do you know whose e-mail address is
17  djc@stny.rr.com?
18  **A   Yes.**
19  Q   Whose is it?
20  **A   Mine.**
21  Q   And who is rac@stny.rr.com?
22  **A   Robert's.**
23  Q   And who is Daniel J. Miller?
24  **A   He's one of our franchisees.**
25  Q   Does Mr. Miller happen to be a personal

80

1  friend of yours?
2  **A   Yes.**
3  Q   And he indicates in this e-mail message
4  to you: Hi, guys. This e-mail is to memorialize
5  my conversation with Brent this afternoon, March
6  28th, 2011. Brent called the store at 4:02 p.m.
7  and asked to speak with me. I picked up the
8  phone. He asked if I knew who I (phonetic) was
9  and I responded yes. He said he was calling to
10  inform me of his recent ownership of the Pudgie's
11  name as of mid February 2011. I responded that
12  this was new information to me. He told me that
13  he would like me to call him when I can so that
14  he can go over the details of his name rights
15  with me and to give me the real story that the
16  Clearys haven't told me. I took his number and
17  told him that I would have to contact him later
18  as I was helping customers. He responded that
19  everything was fine in our location and all
20  existing locations that were opening or opening
21  before his acquisition of the named rights. He
22  also indicated that if I wanted to open further
23  locations, that I would have to contact him since
24  he is claiming rights to any further territories.
25  I thanked him for calling and told him I would

A0025O

81

1  try to get back when I had a chance.  He thanked
2  me and told me that he was contacting all of the
3  Pudgie's with this info as to the name rights.
4  I/we will not contact or respond to Brent unless
5  in the presence of our counsel and/or MP Cleary's
6  counsel.  Sorry to hear the family drama
7  continues.  Let us know what we can do to help.
8  Dan, Jim, Laurie.
9       What's the family drama that he's
10  referring to in the e-mail?
11      A  I'm not sure.
12      Q  Did you respond to Mr. Miller's e-mail?
13      A  I'm not sure.
14      Q  Did you search your e-mail records for
15  any e-mails?
16      A  I don't remember.
17      Q  You don't know whether you searched your
18  e-mail records for anything relating to Brent
19  Tarntino, the Pudgie's mark?
20      A  I don't remember searching.
21      Q  Do you remember if you did -- strike
22  that.
23       Do you have a policy of deleting e-mails
24  from your e-mail?
25      A  Yes.

82

1      Q  How often?
2      A  Periodically.
3      Q  At the outset of this litigation were you
4  told not to delete any records at all that have
5  relevance to this litigation?
6      A  Was I told not to delete?
7      Q  Yes, or destroy any records?
8      A  No.
9      Q  How often have you been deleting records
10  since the start of this litigation?
11      A  Deleting e-mails or records?  I don't
12  know what you're saying.
13      Q  E-mails.
14      A  Can you ask me that question again.
15      Q  How often have you deleted e-mails since
16  the start of this litigation?
17      A  Daily I delete e-mails.
18      Q  And do you know whether any of those
19  e-mails relate at all to aspects of this
20  litigation including Pudgie's trademark?
21      A  Oh, I would doubt it.
22      Q  So on March 28, 2011 do you know -- did
23  you look for any responses that you sent to Mr.
24  Miller in your sent box?
25      A  I don't remember.

83

1      Q  Now, Dan Miller is the one that sent this
2  but it's signed Dan, Jim and Laurie at the bottom
3  of the e-mail.  Do you know who Jim and Laurie
4  are?
5      A  Yes.
6      Q  Who are they?
7      A  Jim is Dan's father and our franchisee.
8  Laurie is Dan's wife.
9      Q  Okay.  And you're indicating that Dan
10  Miller was confused thinking that Brent was
11  somehow now affiliated with MP Cleary or MPC
12  Franchise, Inc. in your interrogatory response?
13      A  Correct.
14      Q  Tell me how this e-mail indicates he was
15  confused into thinking that Brent was actually
16  affiliated with MPC Franchise, Inc. or MP Cleary,
17  Inc.?
18      A  I don't understand.
19      Q  In the last sentence Mr. Miller says:
20  I/we will not contact or respond to Brent unless
21  in the presence of our counsel and/or MP Cleary's
22  counsel.
23       Does that sound like something someone
24  would say who thought there was actually an
25  affiliation between the subject matter of this

84

1  e-mail and the person to whom he's sending the
2  e-mail?
3      A  I don't know.
4      Q  Fair enough.
5
6       (EXHIBIT NUMBER DC-12 WAS MARKED FOR
7       IDENTIFICATION.)
8
9      Q  Now, David, you've been handed what's
10  been marked as Exhibit DC-12.  This is a
11  three-page letter sent to Ms. Bernadette Tarntino
12  on October 7th, 2005 by Steven Tiller, a lawyer
13  at the law firm of Whiteford, Taylor & Preston on
14  behalf of MP Cleary, Inc.  Have you seen this
15  letter before?
16      A  Yes.
17      Q  And did Ms. Tarntino respond to this
18  letter in any way?
19      A  Yes.  I remember her congratulating us
20  over the phone that we were able to re-secure
21  Pudgie's mark.  She was very happy for us.
22      Q  And did Ms. Tarntino enter into any
23  agreements with MP Cleary, Inc. after having
24  received this letter?
25      A  No.

85

1   Q   And Ms. Tarntino was continuing to
2   operate her Horseheads location after having
3   received this letter?
4   A   Yes.
5
6       (EXHIBIT DC-13 WAS MARKED FOR
7       IDENTIFICATION.)
8
9   Q   Okay.  David, you've been handed what's
10  been marked as Exhibit DC-13.  This is a copy of
11  the complaint that was filed in the Western
12  District in New York that instituted the present
13  litigation.
14  A   Okay.
15  Q   Have you reviewed this document in the
16  past?
17  A   I'm sure.  Yes.
18  Q   If we look at the allegations in
19  paragraph 22, it indicates in his -- his is
20  referring to Brent Tarntino -- trademark
21  application:  Tarntino claims that he first began
22  using the mark in commerce in 1980.  In 1980
23  Tarntino was a child and his mother was using the
24  mark pursuant to the franchise agreement to
25  operate with the same Pudgie's restaurant that

86

1   PPC Horseheads continues to operate today in
2   Horseheads, New York.
3       Are you relying on that particular
4   allegation to prove that Mr. Tarntino
5   fraudulently procured his trademark registration?
6   A   No.
7   Q   That's not something you're going to rely
8   on as the basis for proving your cause of action
9   asking -- or the court to cancel Mr. Tarntino's
10  trademark registration on the basis of it having
11  been fraudulently procured?
12      MR. ZUCKER:  I'm just going to object
13      to the extent it asks for a legal
14      conclusion.
15  Q   I'm not asking for a legal conclusion.
16  I'm just asking for the fact that exists, if
17  that's one of the facts that you intend on
18  relying on?
19  A   Can you repeat the question?  I got lost.
20      (PREVIOUS QUESTION READ BACK.)
21  A   One more time.
22      (PREVIOUS QUESTION READ BACK.)
23  A   That is part of what we're relying on.
24  Q   In paragraph 23 in your complaint the
25  allegation states:  In his trademark application,

87

1   Tarntino included a specimen of what Tarntino
2   alleges is his use of the mark defined as the
3   specimen.  The specimen, however, contradicts
4   Tarntino's claim to individual use because the
5   specimen states just below the Pizza man
6   character are in a circle, Pudgie's Pizza
7   Franchising Incorporation 1972.  As a result,
8   Tarntino knew that he did not use the mark in
9   commerce.
10      Is the facts stated or the allegations
11  stated in paragraph 23 one of the bases on which
12  you are trying to prove that Mr. Tarntino's
13  registration was fraudulently procured?
14  A   Yes.
15  Q   PPFC is defined as Pudgie's Pizza
16  Franchising Corporation in paragraph eight of the
17  complaint.  Do you see that?
18  A   Yes.
19  Q   As we discussed earlier, PPFC dissolved
20  sometime in the, we think sometime in the early
21  1990s, correct?
22  A   Yes.
23  Q   In paragraph 24 of the complaint you
24  indicate:  The specimen that Tarntino submitted
25  clearly indicates that the mark is owned by PPFC.

88

1       Do you see that?
2   A   Yes.
3   Q   So you're alleging that the specimen that
4   was used indicates the mark is owned by a company
5   that was dissolved 17 or 18 years prior to the
6   application having been filed and the specimen
7   having been submitted?
8       He submitted the specimen in July of
9   2011.  In July 2011 PPFC had been dissolved for,
10  going on 20 years.  Mr. Tarntino filed his
11  trademark application in July of 2011.  At that
12  point in time PPFC had been dissolved for close
13  to 20 years.  So the specimen that you're
14  indicating, indicates that the mark is owned by
15  PPFC.  Just so I understand the allegation, are
16  you saying that that specimen is a 20-year-old
17  specimen?
18  A   No.
19  Q   It's a current specimen?
20  A   Well, I don't know.
21  Q   You don't know?
22  A   Right.
23  Q   Do you think the boxes that the Pizza
24  goes in at Horseheads Pudgie's contain that
25  statement that are in a circle, Pudgie's Pizza

89

1  Franchising Corporation 1972?
2      A  I don't know.
3      Q  Have you ever looked?
4      A  Have I ever looked?  No.
5      Q  If they said, as an example, copyright
6  1872 Abraham Lincoln, would you think Abraham
7  Lincoln was the owner of the trademark associated
8  with the images on the box?
9      A  Me personally?
10     Q  You personally.
11     A  If it had copyright Abraham Lincoln on
12  it, maybe I would.
13     Q  Okay.
14     A  I liked Abraham Lincoln.  He's a class
15  act.
16     Q  In paragraph 30 of your complaint the
17  allegation reads:  On March 30, 2011, Tarntino
18  sent a letter (the "infringing letter") to all of
19  MPCF franchisees that advised them that he was
20  the registered owner of the mark and that he was
21  entitled to nationwide priority with respect to
22  the mark.  The infringing letter advised the
23  franchisees that they are not entitled to use the
24  mark outside of the geographic area currently
25  served by the franchisees.

90

1      Is Brent Tarntino's act of having sent
2  what's defined as the infringing letter the basis
3  for your count three that he has committed acts of
4  trademark infringement?
5      A  I don't know.  Let me read count three.
6  Is that what you said?
7      Q  Uh huh.
8      A  What page?  Where are we?
9      Q  It starts on page nine.
10     A  Page nine, count three.  What is your
11  question?
12     Q  Is it Brent Tarntino's having sent what's
13  defined in the complaint as the infringing
14  letter, the basis for having sued him for
15  trademark infringement?
16     A  It's part of the lawsuit.
17     Q  What acts did Mr. Tarntino allegedly
18  commit that caused you to sue him for trademark
19  infringement?
20     A  His actions?  I guess I'm not sure how to
21  answer that.  Can you repeat it?
22         MR. MCGUIRE:  Read it back.
23         (PREVIOUS QUESTION READ BACK.)
24     A  His actions of falsifying for his PTO --
25  or for the registration mark.  The fact that he

91

1  used the box is part of it.  The fact that he
2  lied about -- I believe the fact that he lied
3  about his right of use.
4      Q  So the same --
5      A  The fact that he called our franchisees,
6  sent them a letter.
7      Q  The infringing letter as that's defined
8  in the complaint?
9      A  Yes.  That's part of it.
10     Q  Okay.  Anything else?
11     A  I guess that's it for now.  I don't know.
12
13         (EXHIBIT NUMBER DC-14 WAS MARKED FOR
14     IDENTIFICATION.)
15
16     Q  David, you've been handed what's been
17  marked as Exhibit DC-14.  It's a three-page
18  letter from Blaine Fisher on behalf of MP Cleary,
19  Inc. to Ed Owlett, O-W-L-E-T-T, of Putnam Company
20  Acorn Markets, Inc. down in Wellsboro,
21  Pennsylvania.
22     Have you seen this letter before?
23     A  Yes.
24     Q  Who is Ed Owlett?
25     A  He's the owner of Putnam Company, I

92

1  believe.
2      Q  And did you have a lawsuit at any time
3  against Putnam Company?
4      A  We had a countersuit.
5      Q  Were you engaged in litigation at some
6  point in time with Putnam Company?
7      A  Yes.
8      Q  And did that lawsuit involve the Pudgie's
9  trademark in any way?
10     A  I don't -- I'm not sure.
11     Q  Okay.  On page two of the letter it
12  indicates that the court in this litigation
13  between Putnam Company and MP Cleary, Inc. found
14  that MPC was not the successor of Pudgie's Pizza
15  Franchise Corporation and, therefore, lacked
16  standing to enjoin Putnam Company's use of the
17  mark on March 9th, 2004.
18     It then goes on to state that:  MP Cleary
19  obtained the independent right to its mark
20  nationally from TruFoods through a license
21  agreement on July 19th, 2004.  Do you see that?
22     A  Yes.
23     Q  Did the outcome of the litigation in the
24  Putnam Company case cause MP Cleary to seek that
25  license agreement with TruFoods?

93

1    **A**  It may have.
2    **Q**  Do you remember that at all?  Do you
3    remember the circumstances surrounding the Putnam
4    Company case?
5    **A**  Yes.
6    **Q**  And that decision that came out around
7    March 9th, 2004 and then a few months later on
8    July 19th, 2004 is when MP Cleary entered into
9    the license agreement with TruFoods?
10   **A**  Okay.
11   **Q**  I just wanted to know if the outcome of
12   that case, the fact that it was held that MP
13   Cleary was not a successor to Pudgie's Pizza
14   Franchising Corporation caused MP Cleary to seek
15   the license from --
16   **A**  Oh, I'm not sure if it did or it didn't.
17   **Q**  Okay.  Good enough.
18
19         (EXHIBIT NUMBER DC-15 WAS MARKED FOR
20         IDENTIFICATION.)
21
22   **Q**  Okay.  Exhibit DC-15 is a 31-page exhibit
23   comprising various advertising pieces of
24   Horseheads Pudgie's.  Do any of these look
25   familiar to you?

94

1    **A**  Some do.  Some don't.
2    **Q**  And if we look at, just say the first
3    page of the exhibit.  And you see the front of
4    the advertisement on the right-hand side of the
5    page where it talks about Horseheads Pudgie's and
6    the delivery notice.  It says:  Horseheads, Pine
7    Valley, Breesport, Elmira Heights and Big Flats.
8    Do you see that?
9    **A**  Yes.
10   **Q**  Do you think it's been consistent over
11   time for Horseheads Pudgie's to advertise
12   delivery into Elmira Heights?
13   **A**  I don't know.
14   **Q**  We can look at some more of the ads just
15   to look and see.  If you go to the fourth page.
16   This looks like a joint ad between Southside and
17   Horseheads, right?
18   **A**  Yup, yes.
19   **Q**  Okay.  And in the lower left it talks
20   about Horseheads Pudgie's, it says:  Delivery to
21   Horseheads, Big Flats and Elmira Heights.  Do you
22   see that?
23   **A**  Yes.
24   **Q**  And on the lower right-hand corner it
25   talks about Southside's Pudgie's delivery to

95

1    Elmira's Northside, Southside, west Elmira, Pine
2    City.  Do you see that?
3    **A**  Yes.
4    **Q**  If you go two more pages in.
5    **A**  Okay.
6    **Q**  Another ad for Horseheads and Pudgie's
7    and the delivery notice:  We deliver all of
8    Horseheads, all of Elmira Heights, all of Big
9    Flats.  Do you see that?
10   **A**  Yes.
11   **Q**  And they don't indicate that they deliver
12   into Elmira itself, right?  Elmira Southside,
13   Elmira Northside, West Elmira?
14   **A**  No, they don't.
15   **Q**  If we go one more page in, this is a 2009
16   joint ad between Southside and Horseheads
17   Pudgie's.  In the lower left-hand corner again,
18   Horseheads Pudgie's advertises delivery to
19   Horseheads, Big Flats and Elmira Heights.  Lower
20   right-hand corner, Southside Pudgie's indicates
21   delivery to Elmira's Northside, Southside, West
22   Elmira and Pine City, correct?
23   **A**  Yes.  That's right.
24   **Q**  And if we flip through, and feel free to
25   take your time and look at all of these ads of

96

1    Horseheads Pudgie's, they all indicate delivery
2    to Elmira Heights?
3    **A**  Well, it varies.  Here they have
4    Breesport.  They've always delivered to
5    Breesport, they just don't have it in their ads.
6    **Q**  I'm just asking if it says Elmira
7    Heights?
8    **A**  If it says Elmira Heights only?
9    **Q**  Yeah.
10   **A**  Yes, their ads have that.  So does the
11   Elmira Heights Pudgie's.  This one says limited
12   areas Elmira Heights.
13
14         (EXHIBIT NUMBER DC-16 WAS MARKED FOR
15         IDENTIFICATION.)
16
17   **Q**  If you look at Exhibit DC-16.
18   **A**  Okay.
19   **Q**  It's a 12-page exhibit comprising various
20   screen shots of Horseheads Pudgie's web page at
21   various times.  If we look at the first page
22   which is Bates TAR-00036, it's a scene screen
23   shot on October 21st, 2002 of
24   horseheadspudgie's.com/noframes9.
25   **A**  Okay.

97

1    Q   And you see in the top of that that map
2    that looks pretty similar to the map we saw back
3    on Exhibit DC-9?
4    A   Yes.
5    Q   And on this one it's indicating a
6    delivery grid to the south, we deliver as far as
7    McCanns Boulevard.  Do you see that?
8    A   Yes.
9    Q   And then if we compared that to the web
10   pages we saw on Exhibit DC-9, which was the
11   Elmira Southside web page screen shots, that
12   similar looking grid, which is representative of
13   a delivery area, indicates Southside Pudgie's
14   Delivers to the north as far as McCanns
15   Boulevard, correct?
16   A   Yes, that's what it shows.
17   Q   And if we look at all of the screen shots
18   at the various points in time that these were
19   taken from, we see a consistent delivery grid
20   showing delivery by Horseheads Pudgie's south of
21   Horseheads as far as McCanns Boulevard but no
22   further south than McCanns Boulevard, correct?
23   A   On these ones, yes.
24   Q   Do you remember having a phone
25   conversation with Brent concerning his angst over

98

1    Southside Pudgie's advertising delivery into the
2    Horseheads area?
3    A   I'm sorry.  Say that again.
4    Q   Do you recall having a telephone
5    conversation with Brent concerning his being
6    upset over Southside Pudgie's advertising
7    delivery into Horseheads?
8    A   No.
9           MR. MCGUIRE:  Let me just take five
10          minutes and review my notes.  I'll probably
11          be good.
12          (RECESS TAKEN.)
13          MR. MCGUIRE:  We'll end for the day.
14   I'm done with Mr. Cleary subject to the
15   possibility of having to recall him based
16   on subsequent document production.
17
18          (OFF THE RECORD AT 5:35 P.M.)
19
20
21
22
23
24
25

99

1              A F F I D A V I T
2
3    STATE OF NEW YORK
4    COUNTY OF _____
5
6          I have read my deposition, and the
7    same is true and accurate, save and except for
8    changes and/or corrections, if any, as indicated
9    by me on the correction sheet attached hereto.
10
11
12
13   _____
14   DAVID CLEARY
15
16
17          SUBSCRIBED AND SWORN TO before me this
18   _____ day of _____, 20_____.
19
20
21   _____
22   NOTARY PUBLIC
23
24
25   My commission expires on _____.

100

1    STATE OF NEW YORK
2    COUNTY OF CHEMUNG
3          I, Nancy H. Swartz, do hereby certify
4    that before the taking of the deposition, the said
5    witness was by me first duly sworn to testify
6    to the truth, the whole truth and nothing but the
7    truth and that the above deposition was recorded by
8    me in stenotype and reduced to typewriting under my
9    supervision.
10         I further certify that the said
11   deposition constitutes a true record of the
12   testimony given by said witness to the best of my
13   ability.
14         I further certify that the said
15   deposition was taken before me at the time and
16   place specified in the notice.
17         I further certify that I am not a
18   relative or employee or attorney or counsel of any
19   of the parties, or a relative or employee of such
20   attorney or counsel or financially interested
21   directly or indirectly in this action.
22
23   _____
24              Nancy H. Swartz
25

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF NEW YORK
 3           CIVIL ACTION NO. 6:11-cv-6310
 4    _____
 5  MPC FRANCHISE, LLC, and
    MP CLEARY, INC.,
 6                          Plaintiffs,
              vs.
 7
    BRENT TARNTINO,
 8                          Defendant.
 9   _____
    BRENT TARNTINO and PUDGIE'S
10  PIZZA CORPORATION - HORSEHEADS, INC.,
                         Counterclaim Plaintiffs,
11            vs.
12  MPC FRANCHISE, LLC, and
    MP CLEARY, INC.,
13                    Counterclaim Defendants.
14  _____
15      This is the Examination Before Trial of
16              BRENT TARNTINO
17      held on the 17th day of April, 2012
18      held at the law offices of Cooper, Pautz &
19      Weiermiller, LLP, 2854 Westinghouse Road,
20      Horseheads, New York  14845, commencing at
21      12:00 p.m.
22
23      REPORTED BY:   NANCY H. SWARTZ
                        Shorthand Reporter
24                      Notary Public
25                  NHS COURT REPORTING
                      (607)215-2201
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3  FISHER ZUCKER, LLC
        21 South 21st Street
 4      Philadelphia, PA 19103
        (215) 825-3100
 5      Jzucker@fisherzucker.com
        Attorneys for Plaintiffs MPC
 6      Franchise, LLC and MP Cleary, Inc.
        BY: JEFFREY ZUCKER, ESQ.
 7
 8
    BOND, SCHOENECK & KING
 9      One Lincoln Center
        Syracuse, New York 13202-1355
10      (315)218-8515
        gmcguire@bsk.com
11      Attorneys for Brent Tarntino
        BY: GEORGE R. MCGUIRE, ESQ.
12          BLAINE T. BETTINGER, PH.D., ESQ.
13
14       S T I P U L A T I O N S
15
16      It is stipulated by and between the
17  parties hereto that the filing of the
18  deposition is waived; that the deposition
19  may be signed before any Notary Public;
20  and that all objections except as to the
21  form of the question are reserved to the
22  time of the trial.
23
24
25
```

Page 3

```
 1  I N D E X:
 2
 3  W I T N E S S: Brent Tarntino
 4
 5  Examination By                   Pages
 6
 7  Mr. Zucker                       4-61
 8
 9  Affidavit page                    62
10  Certificate page                  63
11
12
13
14
15  E X H I B I T S:
16
17  Number       Description          Page
18
19  BT-1         Map                   43
20  BT-2         Letter to Pudgie's owners   58
21
22
23
24
25
```

Page 4

```
 1          B R E N T   T A R N T I N O,
 2      having been called as a witness,
 3      having been duly sworn, was examined
 4      and testified as follows:
 5
 6          EXAMINATION
 7  BY MR. ZUCKER:
 8      Q   Mr. Tarntino, my name is Jeff Zucker.  We
 9  just met.  I'm here to take your deposition in
10  the case that's currently pending in Federal
11  Court.  My clients brought a complaint and then
12  you and your company brought a counterclaim.  So
13  we're going to discuss issues regarding that
14  case.  All right?
15      A   (Witness nods head).
16      Q   You have to keep all your responses
17  verbal so the court reporter can take them down.
18  You know, sometimes in a conversation you might
19  want to answer, you think where my question is
20  going, you might want to answer but what you
21  should do in this deposition is wait until I get
22  my question out.  That way your lawyer, if he
23  wants to object, he can get his objection in and
24  then you can answer.  It's easier for the court
25  reporter to take down the responses if you talk
```

Page 5

1   and then I talk.
2       If you don't understand my question,
3   please ask me to rephrase it. I'm not here to
4   try and trick you or game you. I'm going to ask
5   you questions about the case and I want to make
6   sure that you're understanding my questions so
7   that the answers are accurate.
8       A   Okay.
9       Q   If you need a break, talk to your lawyer,
10  get a drink, whatever, just say so. Probably be
11  about an hour or two, so if you need a break in
12  the meantime, just say so. Okay?
13      A   Okay.
14      Q   Good. I'm going to start with some
15  questions about your answer to the complaint we
16  filed. It might actually be easier if I give you
17  a copy of both so you have them in front of you.
18          MR. ZUCKER: George, I have a copy
19      for you. We don't need to mark these.
20          MR. MCGUIRE: You're not going to
21      mark them?
22          MR. ZUCKER: No.
23      Q   Let's start with your answer to paragraph
24  17 of the plaintiff's complaint. So if you flip
25  over to page four of the complaint. I'll read

Page 6

1   you the questions and the answers but it might be
2   more helpful if you could just read along.
3       A   This is the complaint?
4       Q   Yeah. If you go to page four, you should
5   be there. And your answer is the other document.
6   And if you go to page three, you'll see your
7   answer to those corresponding questions.
8           All right. So in 17 the plaintiff's
9   allegation was: Tarntino, that's you, knows that
10  TruFoods owns the federal trademark registration
11  for the mark, and that was defined as the mark
12  Pudgie's.
13          And you answered: Defendant denies the
14  allegations in paragraph 17 except admits that
15  plaintiffs allege in the complaint that TruFoods
16  owns the federal trademark registration for
17  Pudgie's in quotes. Do you see that?
18      A   So I'm page three over here?
19      Q   I'm going to ask you a question about it.
20  But you're on page three of your answer. There
21  you go. If you go one more page in. Sorry, two
22  more pages in.
23          And what I did is, I just read the
24  question on paragraph 17 -- or the allegation
25  from the complaint on paragraph 17 and I read

Page 7

1   your answer. So now I'm just going to ask you
2   some questions about these items as we go along.
3   All right?
4       A   Okay.
5       Q   So the question was -- I'll read it
6   again. That Tarntino knows that TruFoods owns
7   the federal trademark registration for the mark,
8   and that is the Pudgie's mark. And you generally
9   denied that allegation except that you admit that
10  plaintiffs allege in the complaint that TruFoods
11  owns the federal trademark registration for the
12  mark.
13          Do you today believe that TruFoods owns
14  the federal trademark registration for the mark
15  Pudgie's?
16      A   Yes.
17      Q   When did you first become aware of that
18  fact?
19      A   Around two years ago.
20      Q   So sometime in 2010?
21      A   Probably.
22      Q   You filed your trademark application on
23  July 2nd, 2010. Do you think you learned about
24  TruFoods owning a trademark registration before
25  that day?

Page 8

1       A   Yes.
2       Q   Yes, before that day. In your trademark
3   application you took a declaration, you signed a
4   declaration, do you remember that?
5       A   Yes.
6       Q   And one of the items that you signed off
7   on in the declaration was that to the best of
8   your knowledge no other person or entity was
9   using that Pudgie's trademark?
10      A   Yes.
11      Q   Do you recall that?
12      A   Yes.
13      Q   If you knew that TruFoods was using the
14  Pudgie's trademark before July 2nd, the date you
15  signed the declaration, why did you sign the
16  declaration stating that no one else was using
17  that trademark?
18      A   Because I was filling the application out
19  for pizza, pasta and subs. And the Pudgie's mark
20  that is registered is under restaurants and his
21  entity, that I found out through website and
22  research, was chicken.
23      Q   So you're reading the declaration to
24  restrict it just to the goods and services you
25  were registering?

NHS Court Reporting

Page 9

1    A   Yes.
2    Q   Did you have a lawyer help you with the
3  registration application?
4    A   Yes.
5    Q   What was his name?
6    A   Aaron Alsheimer.
7    Q   And what law firm is he with?
8    A   Sayles & Evans.
9    Q   Is that in Horseheads?
10   A   Elmira.
11   Q   Elmira.  What parts of the application
12  did you personally complete and what parts did he
13  complete?
14   A   I believe he completed the entire
15  application.
16   Q   And what was your role in his completing
17  the application?
18   A   He received all of the information in the
19  application from me.
20   Q   And did you sit together in his office
21  and go through that?
22   A   Sometimes.
23   Q   And what about on July 2nd, 2010, the
24  date that the application was actually submitted
25  to the U.S. Patent and Trademark Office, were you

Page 10

1  there or were you not there?
2    A   I do not remember.  I was there sometimes
3  and I wasn't there other times.
4    Q   And did -- what was your lawyer's name
5  again?
6    A   Aaron Alsheimer.
7    Q   Did Alsheimer, was he the person that
8  actually submitted the application?
9    A   Yes.
10   Q   He did it online, I guess?
11   A   Yes.
12   Q   Paragraph 18 of the complaint states:
13  Tarntino knows that he never used the mark, which
14  is Pudgie's, in commerce.  And in your answer you
15  deny that allegation.  Do you see that?
16   A   Yes.
17   Q   Why are you denying that allegation?
18   A   Because I used the mark every day in
19  commerce.
20   Q   And where do you use the mark?
21   A   In Horseheads.
22   Q   At the Pudgie's in Horseheads?
23   A   That's correct.
24   Q   And do you operate that business yourself
25  or do you operate it through a corporation?

Page 11

1    A   Through a corporation.
2    Q   And do you see the difference between
3  your personal use of the mark and your
4  corporation's use of the mark?
5    A   Not really.
6    Q   Okay.  Who owns the restaurant?  Is it --
7  first of all, is the restaurant on leased space
8  or does somebody own the real estate?
9    A   We own it.
10   Q   Who's the "we" in that sentence?
11   A   Me, my brother and my sister.
12   Q   And you guys own it personally or through
13  an entity?
14   A   Honestly, I'm not sure.
15   Q   Who operates the restaurant?
16   A   Currently my sister.
17   Q   Kristen?
18   A   Yes.
19   Q   And does she operate it herself or does
20  she operate it through a business, an entity, a
21  corporation?
22   A   Well, we're Pudgie's Pizza Corporation
23  and our business is Pudgie's.
24   Q   The name of the counterclaim plaintiff,
25  one of them is Pudgie's Pizza Corporation -

Page 12

1  Horseheads, Inc.  Is that the company you're
2  referring to?
3    A   Yes.
4    Q   So are you saying that that corporation
5  runs the restaurant or you or your sister or
6  someone else runs the restaurant?
7    A   My sister runs the restaurant.
8    Q   Does -- do you get -- do you receive any
9  profits or cash from your sister's operation from
10  the restaurant?
11   A   Yes.
12   Q   How much?  Is it a percentage, what?
13   A   It varies.
14   Q   It varies.  Can you explain that?
15   A   It depends on the month, how much
16  business, how much profit.
17   Q   And how do you determine how to split the
18  profits at the restaurant?
19   A   How we feel like splitting it at the end
20  of each month.
21   Q   So it just changes from month to month?
22   A   There's no set.
23   Q   And does Pudgie's Pizza Corporation -
24  Horseheads, Inc. file a tax return?
25   A   Yes.

A0028

Page 13

1    Q   Who prepares the tax return?
2    A   Her accountant.
3    Q   Who signs the tax return?
4    A   Probably my sister.
5    Q   Is Pudgie's Pizza Corporation -
6  Horseheads, Inc. a C corporation or an S
7  Corporation?
8    A   I do not know.
9    Q   Do you get a K1 at the end of the year,
10  end of the tax year?
11   A   I do not know.
12   Q   Who does your personal tax returns?
13   A   Steve Benedict.
14   Q   So an accountant prepares your personal
15  1040?
16   A   Yes.
17   Q   You sign it, I guess?
18   A   Yes.
19   Q   Okay.  In paragraph 19 the allegation
20  regards Pudgie's Pizza Corporation - Horseheads,
21  Inc. and it alleges that you're a shareholder and
22  that you own the corporation with your siblings
23  and you admit that?
24   A   Yes.
25   Q   Who are the shareholders of Pudgie's

Page 14

1  Pizza Corporation - Horseheads, Inc.?
2    A   Me, my brother and my sister.
3    Q   What's your brother's name?
4    A   Edward.
5    Q   And how much do each of the three of you
6  own?
7    A   An equal one-third.
8    Q   And you said your sister runs the
9  business right now, the Pudgie's Pizza business
10  in Horseheads now?
11   A   Yes.
12   Q   Does your brother Edward help at all in
13  the business?
14   A   No.
15   Q   Does he live around here?
16   A   No.
17   Q   Where does he live?
18   A   Florida.
19   Q   And you said you are not running the
20  Pudgie's Horseheads business anymore?
21   A   I am not.
22   Q   And had you ever run this business?
23   A   Yes.
24   Q   When did you start?
25   A   I believe I was on the books at 14 years

Page 15

1  old.
2    Q   And what year would that be?
3    A   I'd have to do the math.
4    Q   Go ahead?
5    A   Do the math?
6    Q   Well, tell me what year you were born and
7  I'll figure it out.
8    A   1972.
9    Q   Okay.  So '86?
10   A   Probably the summer of '86.
11   Q   Okay.  You started working for the
12  corporation.  When did you become a shareholder
13  of the corporation?
14   A   After my mother died.
15   Q   And what year was that?
16   A   2007.
17   Q   We were talking about who runs the
18  business on a day-to-day basis and I asked you
19  when did you get started and you said sometime
20  around 1986 when you were 14?
21   A   Yes.
22   Q   You became a shareholder in 2007?
23   A   Yes.
24   Q   And in 2007 were you still involved in
25  the operation of the business?

Page 16

1    A   Yes.
2    Q   And did that continue and then stop at
3  some point?
4    A   Yes.
5    Q   When did it stop?
6    A   Roughly 14 weeks ago, 15 weeks ago.
7  Roughly.
8    Q   15 weeks ago.  Can you put a date on that
9  for me?
10   A   No.
11   Q   15 weeks would be four months, so
12  sometime around December, January?  December
13  2011, January 2012?
14   A   Possibly.
15   Q   Whatever 15 weeks ago from today was?
16   A   Whenever it was.
17   Q   Why did you stop being involved in the
18  operation of the Horseheads Pudgie's business?
19   A   We're working on my sister buying me out.
20   Q   So she's going to buy your shares of the
21  company?
22   A   Working on it.
23   Q   So then if that happens, just your sister
24  and Edward will own the business?
25   A   It's looking that way.

Page 17

1   Q   And you'll be separated from the
2   business?
3   A   Gone.
4   Q   And you won't be involved in -- you won't
5   be working at the Pudgie's Horseheads any longer?
6   A   That's correct.
7   Q   And in effect, today you're not working
8   there?
9   A   That's correct.
10   Q   What caused you to change, to stop
11   working at that business?
12   A   Well, I plan on franchising other
13   Pudgie's.
14   Q   Can you explain to me what you mean by
15   that?
16   A   Sure.  I trademarked Pudgie's to be used
17   with pizza, pasta and submarine sandwiches from
18   the United States Patent and Trademark Office and
19   I've decided to concentrate on forming a
20   corporation and opening up and franchising stores
21   just like the Horseheads location.
22   Q   So you're going to then be competing with
23   Robert and David Cleary's business, their
24   franchise company?
25   A   Well, I own the franchise company so I

Page 18

1   don't know how I'd be competing with them.
2   Q   Let me be more specific.  You're going to
3   be competing then with MPC Franchise, LLC,
4   correct?
5   A   I don't understand.
6   Q   MPC Franchise, LLC sells franchises for
7   Pudgie's Pizza.  Are you aware of that?
8   A   I'm aware that they try, yes.
9   Q   I mean, you guys are cousins, right?
10   A   Yes.
11   Q   And you've known each other your whole
12   lives, right?
13   A   Yes.
14   Q   So you're aware that David and Robert
15   formed a company called MPC Franchise, LLC,
16   right?
17   A   Yes.
18   Q   And you're aware that MPC Franchise LLC
19   sells franchises, right?
20   A   Yes.
21   Q   Now, you say you're leaving the Pudgie's
22   Pizza in Horseheads to start a business selling
23   franchises, right?
24   A   Yes.  That I own.
25   Q   I'm not asking if you own it or not,

Page 19

1   we're going to get to that.
2   A   Okay.
3   Q   But that's your plan now, correct?
4   A   Yes.
5   Q   So you'll be selling franchises for
6   Pudgie's Pizza, just like Robert and David Cleary
7   do through their business, right?
8   A   I don't think they're going to be able
9   to, so, no.
10   Q   And why do you think they're not going to
11   be able to sell franchises anymore?
12   A   Because I own the name.
13   Q   Are you aware that MPC Franchise, LLC has
14   a license to use the trademark Pudgie's?
15   A   No.
16   Q   You didn't know that?
17   A   I haven't seen it.
18   Q   Are you aware of it today?
19   A   Through hearsay.
20   Q   Okay.  But that's being aware.  I didn't
21   ask if you saw anything.
22   A   I'm aware through hearsay.
23   Q   Okay.  And, in fact, in 2005 David and
24   Robert's lawyer sent your mother a letter
25   informing her of this fact, correct?

Page 20

1   A   She told me that, yes.
2   Q   Did you ever see that letter?
3   A   No.  Not then.
4   Q   Did you register the trademark Pudgie's
5   in July 2010 with the goal of opening up this
6   franchise company that you're planning to open?
7   A   Absolutely.
8   Q   Now, your mother -- well, Pudgie's Pizza
9   Corporation - Horseheads, Inc. operated the
10   Pudgie's in Horseheads since what date, do you
11   know?
12   A   Roughly 1972.
13   Q   And did the company operate as a
14   franchisee?
15   A   Yes.
16   Q   And did it sign a franchise agreement for
17   the rights to operate that business?
18   A   Nothing that I've seen but I believe so.
19   Q   And do you know how long that franchisee
20   relationship lasted?
21   A   No.
22   Q   In paragraph 21 of the complaint the
23   plaintiff's allege that Pudgie's Pizza
24   Corporation - Horseheads, Inc. continues to
25   operate the restaurant in Horseheads, New York.

Page 21

1   And you admitted that paragraph, right?
2      A   Yes.
3      Q   It doesn't reference that your sister or
4   you or Edward operates the business, correct?
5      A   It does not.
6      Q   It references that the corporation,
7   Pudgie's Pizza Corporation - Horseheads, Inc.
8   operates the business, right?
9      A   Yes.
10     Q   And you admitted that, correct?
11     A   Yes.
12     Q   In paragraph 22 of the complaint we
13  allege that, quote:  In his trademark
14  application, that's referring to you, Tarntino
15  claims that he first began using the mark in
16  commerce in 1980.  Do you see that?
17     A   22?
18     Q   Uh huh.
19     A   Yes.
20     Q   Okay.  Is that an accurate statement?
21     A   I believe that to be accurate.
22     Q   And how old were you in 1980?
23     A   It's a very difficult question to answer.
24     Q   You can't answer the question how old you
25  were in 1980?

Page 22

1      A   I cannot.
2      Q   Why is that?
3      A   I'd have to do the math.
4      Q   Go ahead.
5      A   Want every day?
6      Q   No, I'm asking how old you were in 1980?
7      A   Okay.
8      Q   What year were you born in?
9      A   1972.
10     Q   So in 1980 you were eight years old.
11  I'll do the math for you.
12     A   I was seven.  I'll do the math for you.
13     Q   Okay.  If you want to say seven, that's
14  fine.  So tell me at seven years old how were you
15  using the mark in commerce, the mark Pudgie's?
16     A   I was not.
17     Q   Now, in your trademark application you
18  say that you were.  Are you aware of that?
19     A   Yes.
20     Q   And today you're saying that's not true,
21  right?
22     A   My mother was using -- I guess I don't
23  understand the question.
24     Q   Okay.  You filed a trademark application
25  in July 2010 with the help of your lawyer, right?

Page 23

1      A   Yes.
2      Q   You, meaning Brent Tarntino, the person
3   sitting here?
4      A   Yes.
5      Q   Under that trademark application you
6   swore under penalty of perjury that you, Brent
7   Tarntino, were using the mark as early as 1980,
8   right?
9      A   Yes.
10     Q   In 1980 you say you were seven years old,
11  right?
12     A   Yes.
13     Q   And you just admitted you weren't doing
14  anything to use the mark in commerce in 1980.
15     A   I was not using the mark in commerce in
16  1980.
17     Q   What have you done to correct the
18  statement in your trademark application?
19         MR. MCGUIRE:  Object to the form.
20     A   Nothing.
21     Q   Do you plan to correct the statement?
22     A   No.
23     Q   And why's that?
24     A   Because in 1980 I was not directly using
25  the mark but my mother was, so I was indirectly

Page 24

1   using the mark in 1980.  When she died, I
2   inherited those years, in my opinion, therefore,
3   I was indirectly using the mark in 1980 and
4   continue to do so today.
5      Q   So you believe that when your mom died in
6   2007 you inherited what?
7      A   Her years.
8      Q   Her years of what?
9      A   Owning the business.
10     Q   Okay.  But you just told me that when she
11  operated the business, she operated it as a
12  franchisee, right?
13     A   Yes.
14     Q   And as a franchisee, she was licensing
15  the mark from someone else, right?
16     A   Yes.
17     Q   So what did you inherit?
18     A   The operation of Pudgie's and the use
19  since 1980.
20     Q   But if she was operating it as a
21  licensee, as a franchisee, explain to me what you
22  think you inherited?
23     A   My mother owned Pudgie's Pizza in
24  Horseheads in 1980.
25     Q   Right.

A0031

Page 25

1    A    When she died in 2007, I believe that I
2  inherited those years that she used it, whether
3  she used -- they didn't ask me if she was using
4  it as a franchisee.
5    Q    Who's the "they" in that sentence?
6    A    United States Patent and Trademark
7  Office.
8    Q    No, they don't ask anything.
9    A    Right.  Exactly.
10   Q    You say you filed it electronically,
11 right, the application?  You didn't sit down with
12 the person and file the application, your lawyer
13 filed it online, correct?
14   A    USPTO.
15   Q    Yes or no?  Answer the question.
16   A    I don't understand the question.
17   Q    Okay.  Your lawyer, you told me 20
18 minutes ago, filed the trademark application in
19 July 2010 online, right?
20   A    Yes.
21   Q    So you weren't sitting with someone at
22 the U.S. Patent and Trademark Office, were you?
23   A    No.
24   Q    And you're saying that you're not going
25 to do anything to correct the misstatement in

Page 26

1  your trademark application, correct?
2         MR. MCGUIRE:  Object to the form of
3    the question.
4    A    Yes.
5    Q    Now, in the trademark application that
6  you submitted in July 2010, you attached a
7  specimen of the trademark.  Do you recall that?
8    A    I do.
9    Q    Who owns that specimen?
10   A    I do.
11   Q    And why do you think you own it?
12   A    Because the United States Patent and
13 Trademark Office granted me the mark.
14   Q    No, no.  You're putting the cart before
15 the horse.  You submitted an application in July
16 2010, right?
17   A    Yes.
18   Q    You didn't get a registration that day,
19 did you?
20   A    I did not.
21   Q    Of course, it takes time for the
22 registration to occur, correct?
23   A    Of course.
24   Q    So when you submitted the application,
25 you attached a specimen of the mark in use in

Page 27

1  commerce, right?
2    A    Yes.
3    Q    The mark Pudgie's, right?
4    A    Yes.
5    Q    And that specimen had at the bottom a
6  designation that said copyright Pudgie's Pizza
7  Franchise Corporation, right?
8    A    Yes.
9    Q    Does that signify to you that someone
10 other than you owned that trademark?
11   A    Along with me.
12   Q    I'm sorry.  What was that?
13   A    Along with me.
14   Q    So someone else owned it with you, is
15 what you're saying?
16   A    I would say have the rights to it.
17   Q    Who has the rights to it?
18   A    Well, I certainly did.  I was using it.
19   Q    You think you have the rights to that,
20 that specimen?
21   A    Well, now I definitely do.
22   Q    Well, because you defrauded the United
23 States Patent and Trademark Office, right?
24        MR. MCGUIRE:  Object to the form.
25   A    I never defrauded anyone.

Page 28

1    Q    Well, you already admitted at least one
2  lie, right?
3         MR. MCGUIRE:  Object to the form.
4         MR. ZUCKER:  I'm sorry.  What part of
5    that question is improper?
6         MR. MCGUIRE:  There's no lie.  He's
7    not admitting anything was incorrect in
8    that application.  You're putting the words
9    in his mouth and that's not fair.
10        MR. ZUCKER:  No, George, he said that
11   when he was seven he wasn't using the mark
12   in commerce.
13        MR. MCGUIRE:  He said he was
14   indirectly using it through the inheritance
15   of the shares in the corporation and he was
16   tagging onto the corporation's use.  And
17   that is an accurate representation of his
18   testimony.
19        MR. ZUCKER:  That's true.
20        MR. MCGUIRE:  Your statement that it
21   was a misstatement is a mischaracterization
22   of the testimony in the formation of your
23   questions.
24        MR. ZUCKER:  Okay.  That's fine.
25        MR. MCGUIRE:  And the fact that

Page 29

1    you're saying he's lying in the formation
2    of your question is also a misstatement of
3    his testimony.
4         MR. ZUCKER: That's fine. I want a
5    to have a clear record. I understand where
6    you're going.
7
8         CONTINUING EXAMINATION
9    BY MR. ZUCKER:
10   Q   Did you get a legal opinion as to your
11   rights on the mark in 1980?
12   A   No.
13   Q   So this is just your belief, you didn't
14   consult an attorney?
15   A   That's correct.
16   Q   Have you since, and you don't have to
17   tell me what you discussed with your attorney,
18   that's private, but have you consulted an
19   attorney with respect to that issue? The issue
20   is whether Brent Tarntino personally had rights
21   in the trademark in 1980?
22   A   Yes.
23   Q   And was that Mr. McGuire? The question
24   is what lawyer did you speak to, was it Mr.
25   McGuire?

Page 30

1    A   I'm trying to think of the answer. If
2    you can give me a moment, I would appreciate it.
3    Q   Oh yeah, sure.
4    A   I believe so.
5    Q   If it wasn't Mr. McGuire, would it be
6    someone from his office or a totally different
7    attorney from a different office?
8    A   Totally different attorney.
9    Q   Now, the specimen that you submitted, you
10   submitted the specimen to show your use of the
11   trademark Pudgie's in commerce, is that correct?
12   A   That's correct.
13   Q   And how is that specimen, that picture,
14   how did it -- explain to me how it showed your
15   use, Brent Tarntino's use of the trademark
16   Pudgie's in commerce?
17   A   I don't understand the question.
18   Q   The purpose of the specimen that you
19   submitted was to show Brent Tarntino's use of the
20   trademark Pudgie's in commerce, correct?
21   A   If I remember correctly, yes.
22   Q   Explain to me how that specimen you
23   submitted shows that Brent Tarntino was using the
24   Pudgie's trademark in commerce?
25   A   If I remember correctly, I sent a pizza

Page 31

1    box in from the shelf in my existing Pudgie's
2    location that I was working at every single day,
3    I grabbed it off of the shelf. I took a picture
4    of it. I sent it in to my attorney's office and
5    then I put the pizza box back on the shelf that I
6    was personally working at, that I personally
7    owned.
8    Q   And, again, the Pudgie's Pizza shop in
9    Horseheads where you were working, that's what
10   you're referring to?
11   A   Yes.
12   Q   And that shop was owned by the Pudgie's
13   Pizza Corporation - Horseheads, Inc., is that
14   correct?
15   A   That I own, yes.
16   Q   Right. But it was operated, just so we
17   have a clear record, by the corporation, correct?
18   A   I own the corporation, correct.
19   Q   Well, I understand that you, your sister
20   and your brother owned it, right?
21   A   Right. Me, my sister and my brother
22   owned the corporation, correct.
23   Q   Paragraph 25 of the complaint states
24   that: Tarntino declared under penalty of perjury
25   and pursuant to 18 USC Section 1001, that he was

Page 32

1    the owner of the mark and that "no other person,
2    firm, corporation or association has the right to
3    use that mark."
4         And you answered that you deny that
5    allegation, except that you admit -- that you
6    submitted a signed declaration with the 861
7    application.
8         So what are you denying?
9    A   Let me read that because I'm not sure. I
10   have no idea what you just said.
11   Q   Okay.
12   A   I really don't understand that. I'm sure
13   that I signed this.
14   Q   Let me break it down for you and then we
15   can move on if you don't understand it.
16        In the complaint the plaintiffs alleged
17   that you declared under penalty of perjury that
18   you owned the mark. And in your answer you deny
19   that. So are you denying that you're the owner
20   of the mark or are you admitting that you're the
21   owner of the mark?
22   A   If I can remember correctly, I think I
23   was admitting that I was using the mark.
24   Q   So is your answer --
25   A   Or association --

Page 33

1    Q   -- inaccurate in paragraph 25?
2        MR. MCGUIRE: Object to form.
3    A   I still don't understand.
4    Q   Okay. We can move on. That's a fine
5    answer.
6        In paragraph 26 the plaintiffs allege that
7    you declare under penalty of perjury that the
8    statements in the trademark application were true.
9    And your answer, you deny that.
10       Are you denying that the statements that
11   you made were true?
12   A   Absolutely not. Everything that I said
13   in my United States Patent and Trademark Office
14   application, under my belief, was 100 percent
15   accurate.
16   Q   Okay.
17   A   And I never intended to defraud or lie to
18   anybody.
19   Q   Well, why are you saying here in
20   paragraph 26 that you deny that?
21   A   I have no answer for that. But I can
22   assure you that I've never lied or defrauded
23   anybody.
24   Q   But this is your answer that you
25   submitted.

Page 34

1    A   I can't answer that. What do you want me
2    to do?
3    Q   I don't know. That's fine. That's a
4    good answer. Let's move on.
5        In your -- look at your interrogatories.
6    In your response to the plaintiff's interrogatory
7    number three -- well, I'll read you the
8    interrogatory first and then we'll get to your
9    response.
10       And where I'm reading from is Defendant
11   Brent Tarntino's response to plaintiff's first set
12   of interrogatories. The interrogatory asks you
13   this question: State the date you became aware
14   that TruFoods, LLC had registered the trademark
15   Pudgie's under the principal register of the United
16   States Patent and Trademark Office.
17       And your answer was: Subject to that
18   waiving and foregoing specific objections, Tarntino
19   provides the following information: Tarntino first
20   became aware that TruFoods, LLC owned a
21   registration for the Pudgie's or for Pudgie's on
22   the principal register on or about June or July
23   2010. Do you see that?
24   A   It sounds correct.
25   Q   I'm sorry, what was that?

Page 35

1    A   I said it sounds correct.
2    Q   Well, these are -- I'm reading from your
3    answers.
4    A   Perfect.
5    Q   You submitted your trademark application
6    on July 2nd, 2010?
7    A   Okay.
8    Q   Do you recall whether you knew about
9    TruFoods' ownership of the registration for the
10   Pudgie's mark before you submitted your
11   application or after?
12   A   Before.
13   Q   You learned before?
14   A   Yes.
15   Q   Looking at -- going on into your answer
16   and your affirmative defenses and counterclaim,
17   I'm on that document now. In your third
18   affirmative defense, that's on page seven at the
19   very top. These are your defenses to the
20   complaint that either you or your lawyer
21   prepared. And this defense says that: The
22   claims made in the complaint are barred in whole
23   or in part because any infringement, if any, was
24   innocent. Do you see that?
25   A   Yes.

Page 36

1    Q   Do you understand that defense?
2    A   Kind of.
3    Q   Can you complain it to me?
4    A   It says: The claims made in the
5    complaint are barred in whole or in part because
6    any infringement, if any, was innocent. Meaning
7    MP Cleary's infringement on --
8    Q   No. They're talking about your
9    infringement. This is one of your defenses to
10   their complaint against you.
11   A   Oh. We're still on --
12   Q   We're still on that part. We're not --
13   A   Yeah, okay. I got confused. So could
14   you ask me again?
15   Q   Yeah. Can you, if you can, can you
16   explain to me why you're defending against this
17   case by saying that any infringement you may have
18   done was innocent?
19       MR. MCGUIRE: For clarity of the
20   record, you're not asking for a legal
21   opinion?
22       MR. ZUCKER: No, no.
23   Q   I'm asking if you understand it, and you
24   can explain to me factually what the defense is
25   about, I would like to know that.

A0034

Page 37

1      A   I guess I don't know what you're really
2   asking me.  If you're asking me if I ever lied,
3   the answer would be no.
4      Q   No, no, no, I'm not asking if you lied.
5      A   Okay.  Because earlier you said I lied
6   and I didn't, so I don't know what you're saying.
7      Q   Do you not understand the question?
8      A   So what they're saying is if I did
9   infringe or if I did do something incorrect, I
10   did them by mistake.  Is that what it's saying?
11      Q   These are your words.
12      A   Okay.  That would be the best way that I
13   could explain that.
14      Q   So that you might have made a mistake?
15      A   I possibly could made a mistake.  I make
16   mistakes every day.
17      Q   Everybody does.  So what would that
18   mistake have been?
19      A   You know, at some point I'm hoping that a
20   judge or some sort of United States Patent and
21   Trademark board might be able to explain to me if
22   I did make a mistake.  And I would certainly ask
23   for those mistakes to be amended.  I don't know
24   what those mistakes are.  I completely agree and
25   would fill out my USPTO application exactly how

Page 38

1   it is now.  I believe all my answers to be
2   accurate.  If they're not accurate, my ultimate
3   goal is to keep the mark Pudgie's, which I
4   believe I will be, to be used with pizza, pasta
5   and subs, submarine sandwiches, excuse me.  And I
6   would certainly ask them to allow me to amend
7   mistakes that are made that are not based on the
8   granting of the mark.
9      Q   Okay.  That's fine.  In the ninth
10   affirmative defense, that's the last one on page
11   seven, you say that plaintiffs -- that's my
12   clients the Clearys and their companies:
13   Plaintiffs claims are barred in whole or in part
14   by the doctrine of unclean hands.
15         Can you explain factually what you're
16   saying here?
17      A   Sure.  I believe that the chicken guy, I
18   don't even know who he is, it's so funny to me,
19   the chicken guy --
20      Q   Help me out.  I don't know who you're
21   talking about.
22      A   I don't either.  I don't know who he is.
23   But his entity registered under the United States
24   Patent and Trademark Office is restaurants --
25      Q   Are you talking about TruFoods?

Page 39

1      A   TruFoods.  Whoever he is.  So the
2   TruFoods guy can't grant marks.  And to me it
3   sounds like, and I've never seen any of this
4   information, nobody has ever showed me anything,
5   but from what they're saying, is that they
6   received permission or, I guess I don't know the
7   real word, some sort of contract with the chicken
8   guy to sell pizza, pasta and subs.  And to me
9   that's not -- that's impossible.  There's nothing
10   that says the chicken guy can grant marks.  I
11   looked through all of the USPTO stuff and it
12   never says the chicken guy can give anybody
13   rights.
14      Q   Okay.
15      A   So I don't understand how these guys are
16   running around saying we have the rights to
17   pizza, pasta and subs.  Show me.  There's no, I
18   looked, there's -- show me pizza, pasta and
19   submarine sandwiches and this can go away.
20      Q   And in your sentence, these guys are
21   running around doing this, are you talking about
22   the Clearys or are you talking about the TruFoods
23   guys?
24      A   The Clearys.  The Clearys are claiming
25   the chicken guy gave them pizza, pasta and

Page 40

1   submarine sandwich rights.
2      Q   Okay.  I understand.
3      A   It's impossible.
4      Q   If you go to the next page, your 12th
5   affirmative defense says:  The claims made in
6   complaint are barred in whole or in part by fraud
7   on the United States Patent and Trademark Office.
8   So --
9      A   What was that?  I'm sorry.
10      Q   This is the 12 affirmative defense, it's
11   in the middle of the page.
12      A   Got it.
13      Q   This is your defense to the complaint
14   that the Cleary companies, the plaintiffs brought
15   against you?
16      A   Okay.
17      Q   And you're saying the claims made in the
18   complaint by the Cleary companies --
19      A   Yes.
20      Q   -- are barred in whole or in part by
21   fraud on the United States Patent and Trademark
22   Office?
23      A   Right.
24      Q   Okay.  So explain to me that defense.
25      A   Okay.  I just explained it to you but

Page 41

1  I'll do it again.
2      Q    Okay.
3      A    I researched the United States Patent and
4  Trademark Office -- rules, regulations, database,
5  whatever you want to call it -- as much
6  information as I could possibly research.
7  Nowhere does it say the chicken guy can grant MP
8  Cleary pizza, pasta and submarine sandwich
9  rights.
10     Q    Okay.  And that's the fraud you're
11 referring to?
12     A    That would be the fraud.
13     Q    If you flip over to page 11.  Now we're
14 going to be in your counterclaim, this is your
15 counterclaim and the corporation's counterclaim
16 against defendants.  Okay?
17     A    Yeah.
18     Q    On page 11 at the very bottom of
19 paragraph 90.  Okay.  Since prior to the
20 registration of the U.S. Trademark registration
21 number 2565298, counterclaim plaintiffs have used
22 the Pudgie's mark.  Counterclaim plaintiffs is
23 you and your company, okay?  Counterclaim
24 plaintiffs have used the Pudgie's mark to
25 advertise and sell restaurant services in and to

Page 42

1  deliver food to geographical areas in and around
2  the Pudgie's restaurant located at 134 West
3  Franklin Street, Horseheads, New York.
4      Can you -- and here's my question:  Tell
5  me what the geographical area that you're
6  referring to.  Give me some boundaries as best
7  you can describe it for me.
8      A    Well, in this case, the boundaries that
9  we're referring to are -- the boundaries
10 that matter are Elmira Heights.
11     Q    I'm sorry.  So your contention is that
12 your boundaries are just Elmira Heights?  I'm
13 sorry --
14     A    The southern most boundaries that matter
15 in this case are the Elmira Heights boundaries.
16     Q    Put aside what matters in the case, I'm
17 just trying to understand --
18     A    I can give you a map.
19     Q    You want to draw a map?
20     A    I can give you one.
21     Q    You have one?
22     A    Yeah, I can give you mine and your
23 client's.  Pretty much sum this whole case up.
24     MR. ZUCKER:  Is this in the documents
25     you gave me already, George?

Page 43

1      MR. MCGUIRE:  Yeah.
2      MR. ZUCKER:  I think I have it too.
3  Can you mark this?
4
5      (EXHIBIT NUMBER BT-1 WAS MARKED FOR
6  IDENTIFICATION.)
7
8      MR. MCGUIRE:  Can we mark this as BT
9  1?
10     Q    My question was, I wanted you to explain
11 for me -- or define for me the geographic area
12 that you have defined in your counterclaim.
13     A    Can we just reference this map?
14     Q    Yeah.
15     A    That's it.
16     Q    The map we're looking at and on the
17 bottom it says TAR-36?
18     A    Yes.
19     Q    So the map we're looking at is on the top
20 of the page and this is the geographical area
21 that you reference in paragraph 90?
22     A    That's correct.
23     Q    Now, when you started to answer the
24 question you said, well, as it relates to this
25 case, it's Elmira Heights?

Page 44

1      A    That's correct.
2      Q    So Elmira Heights is to the south of
3  Horseheads?
4      A    That's correct.
5      Q    And then the Cleary's business is further
6  south than that?
7      A    That's correct.
8      Q    They're actually in the Town of Elmira?
9      A    I'm not sure.  It's the Southside of
10 Elmira, I don't know if it's town or what.  But
11 it's Elmira.
12     Q    So they're in Elmira and then there's
13 Elmira Heights as we move north?
14     A    That's correct.
15     Q    And then there's Horseheads?
16     A    That's correct.
17     Q    And you said as it relates to this case,
18 Elmira Heights is the area of dispute?
19     A    That's correct.
20     Q    Is that fair to say?
21     A    Yes.  That's completely accurate.
22     Q    And does your store, does your business
23 deliver into Elmira Heights?
24     A    Yes.
25     Q    And do you advertise into Elmira Heights?

A0036

Page 45

1   A   Yes.
2   Q   And do you believe that the plaintiffs do
3   the same thing?
4   A   As of the last year and a half to two
5   years, yes.
6   Q   So just a year and a half or two years
7   ago they started to advertise into Elmira
8   Heights?
9   A   Yes.
10   Q   And deliver into Elmira Heights?
11   A   Yes.
12   Q   Before a year and a half or two years ago
13   they didn't do that, is that what you're saying?
14   A   I want to be clear here.
15   Q   Okay.
16   A   Never one time have I ever seen one shred
17   of evidence of the Southside store, the MP Cleary
18   store ever come into Elmira Heights. I've never
19   seen them come into Elmira Heights. I've never
20   seen one shred of evidence in any kind of
21   advertising ever that said the words Elmira
22   Heights on it. Ever once. Now --
23   Q   So would it be surprising to you if I
24   told you I have years and years of receipts
25   proving deliveries and sales into Elmira Heights?

Page 46

1   A   That's the laughable part here. That's
2   what's funny. Okay. Here's the thing. So let
3   me just -- I tried to be clear and I went
4   somewhere wrong. I have no, zero, evidence,
5   proof in any kind of advertising, any phonebooks,
6   never seen one time ever your clients come into
7   Elmira Heights. Now, I know they have this
8   point-of-sale system that's funny. Okay I swear
9   they've snuck deliveries up there as much as they
10   can. The first time -- the second I seen the
11   words Elmira Heights on their first flyer ever,
12   your clients received a phone call from me. So
13   please don't show me receipts. Show me proof.
14   Show me advertising. Show me a phonebook. Show
15   me a radio ad. Show me something besides their
16   stupid point-of-sale system that says, oh, we've
17   been going there but we didn't know. We have
18   zero knowledge. Zero. Or your clients would
19   have had a phone call.
20   Q   And what was the phone call you made to
21   them. You referenced that, what did you say?
22   A   Why are you going to the heights?
23   Q   And what did they say?
24   A   Like, you really want to know?
25   Q   And then what did you say?

Page 47

1   A   No, do you really want to know what he
2   said?
3   Q   Yeah, that's what I'm asking you.
4   A   Like, his words?
5   Q   Yes.
6   A   We're going to the heights, if you don't
7   like it, fuck you.
8   Q   Okay. That's a good answer.
9   A   That's what he said.
10   Q   That's fine. That's the whole point.
11   I'm supposed to ask you the questions. You can
12   answer them, you don't have to hold back.
13   A   I was told not to swear.
14   Q   That's okay. And how long has Pudgie's
15   Pizza Corp - Horseheads, Inc. been selling to the
16   Heights?
17   A   Around 20 years.
18   Q   And then for the other guys it's only
19   been a year and a half or two years, right?
20   A   I need a break.
21   Q   You want to take a break?
22   A   Yeah, because you just --
23   Q   I'm not as smart as you, I can't keep up
24   with you?
25   A   You keep asking me the same question.

Page 48

1       MR. MCGUIRE: Let's take a break.
2       WITNESS: I mean, does he get to keep
3   saying the same question?
4       MR. MCGUIRE: This is his deposition,
5   he can ask the questions. Let's take a
6   break.
7       (RECESS TAKEN.)
8   Q   A follow-up question on the statement you
9   had made about inheriting the trademark rights
10   from your mom. Was that in her will? Is it
11   something written or not?
12   A   I don't believe I said I inherited the
13   trademark rights from my mom.
14   Q   Well, tell me what you said then.
15   A   I believe that I inherited the years that
16   she was using the name Pudgie's.
17   Q   You did say that. And when you say you
18   inherited those years, is that inheritance in
19   writing or was it not in writing?
20   A   In her will she left me, my brother and
21   sister equally everything she had including --
22   included in everything she had was Pudgie's in
23   Horseheads.
24   Q   And does that mean her shares of stock in
25   the corporation when you say Pudgie's in

Page 49

1  Horseheads?
2      A   Her shares in the corporation transferred
3  to me, my brother and sister.
4      Q   Okay.  I have a copy of the Pudgie's
5  Franchise Pizza Corporation franchise agreement
6  between that company and your mother, Bernadette
7  Tarntino that you produced in discovery.  I don't
8  have an extra copy but I'll just -- I want to put
9  on the record what the numbers are.  It's number
10 TAR-137 through TAR-154.
11     And the date on the first page, the date
12 of the contract is July 15th, 1983.  And the
13 first whereas clause on page one references the
14 previous franchise agreement that was entered
15 into between those two parties, Pudgie's Pizza
16 Franchise Corporation and Bernadette M. Tarntino
17 on July 15th, 1973.  And it says that that
18 agreement by its terms terminated on July 14th,
19 1983.  Does that sound accurate to you?
20     A   It sounds accurate.
21     Q   And this contract that's dated July 15th,
22 1983 states that if, on the second, on page two,
23 paragraph two, states that it's for a term of
24 five years with a five-year renewal term.  Okay?
25     So to the best of your knowledge, I asked

Page 50

1  you this question before but I forgot that I had
2  this document, do those dates help you?
3      I'm going to ask you the question again:
4  Do you recall when this agreement terminated?  And,
5  again, it started on July 15th, 1983 and it had two
6  five-year terms?
7      A   So it sounds like 1993.
8      Q   So it went the full ten years?
9      A   I believe so.
10     Q   Okay.  That's fine.  The corporation
11 Pudgie's Pizza Corporation - Horseheads, Inc.,
12 who are the officers of the corporation?
13     A   Myself, my brother and my sister.
14     Q   What's your title and what are their
15 titles?
16     A   My sister is the president.  My brother,
17 I believe is the vice president but I'm not sure
18 and I'm either the secretary or the treasurer.  I
19 really don't remember.
20     Q   Did you discuss the counterclaim with
21 your brother and your sister before you filed it?
22     A   Yes.
23     Q   Did you discuss filing the counterclaim
24 with anyone else other than your brother and your
25 sister?

Page 51

1      A   Possibly in passing.
2      Q   Did you have any discussions with your
3  cousin Billy Cleary about suing Robert and David
4  Cleary?
5      A   Possibly.  I've had a million discussions
6  with Billy about this entire case.
7      Q   Before or after --
8      A   All.
9      Q   All through.  And before you filed your
10 counterclaim let's talk about those discussions.
11 Generally, what were they about?
12     A   We're trying to figure out, you know,
13 we're trying to figure out the boundaries that
14 were orally agreed upon for each store.  The
15 geographic area which we would advertise in and
16 deliver in.
17     Q   And when you said were orally agreed
18 upon, who made that oral agreement?
19     A   You know, it would -- my uncles, so -- I
20 wasn't there.  You know, it was the understanding
21 through the years that they built the stores in
22 the places they built them so those stores would
23 service those areas.  Southside would always stay
24 on the Southside.  The Northside would always do
25 Northside.  There was a Heights store at one

Page 52

1  time.  The Heights would do the Heights and then
2  Horseheads would do Horseheads.
3      Q   But would Horseheads also do -- what was
4  that part of Elmira you said extended down into?
5      A   Elmira Heights.  When the Elmira Heights
6  store was there, of course not.
7      Q   And when was the Elmira Heights store
8  there?
9      A   When was it there, like, started?
10     Q   No, no.  When did it stop?
11     A   About 20 years ago but I really don't
12 know the exact date.
13     Q   Okay.  About 20 years ago?
14     A   About 20 years ago.
15     Q   How did you hear about this oral
16 agreement?
17     A   Well, my Uncle Mike was alive and he was
18 kind of the godfather of, sort of speak, of the
19 family.  And him and my mom were the closest of
20 brother and sister and, you know, she said the
21 stores were splitting up and -- when the stores
22 were corporate stores, obviously they didn't
23 build them there to infringe on each other.  So
24 when they split up, they had agreed, obviously,
25 that Northside would service the Northside,

A0038

Page 14  (Pages 53-56)

Page 53

1   Southside would service the Southside. Heights
2   would do Heights, you know, my mom was the only
3   franchise and she would do Horseheads.
4       Q   And when Heights, the store in Elmira
5   Heights went out of business about 20 years ago,
6   who determined that Horseheads would then service
7   Elmira Heights?
8       A   Well, my uncle and his son Billy Cleary,
9   my uncle's daughter Bernadette took over the
10  North Main Pudgie's. I don't even know who owned
11  it. It was either my Uncle Fran, my cousin Billy
12  or my cousin Bernadette. But she ran it. And
13  Elmira Heights, it's a triangle, so it's very
14  complicated when you're coming from Horseheads
15  Pudgie's south. Going north it's easy because
16  it's one street, McCanns Boulevard. Which your
17  clients have clearly stated on their website year
18  after year after year. But coming south it's
19  very difficult because Horseheads just about
20  passes Elmira -- the entire Village of Elmira
21  Heights. And, obviously, Horseheads is going to
22  go to Horseheads, it's Horseheads. And it became
23  very complicated in Elmira Heights to go past
24  Elmira Heights to deliver to Horseheads but not
25  being able to deliver into Elmira Heights. It

Page 54

1   lasted not even, I would say a couple weeks and
2   it was just such a disaster that Horseheads and
3   North Main had agreed to share Elmira Heights.
4       Q   And remind me again who owned North Main?
5       A   Well, again, I don't know. It was either
6   my Uncle Franny, and it's Uncle Francis, I guess
7   is his name, I don't even know his real name.
8   Uncle Franny, Billy's dad, Billy Cleary who I
9   guess would be William Cleary. I don't know how
10  clear I need to be on these names. And then
11  Bernadette Cleary ran it. I don't know if she
12  owned it or ran it. I don't know.
13      So all through those years you would see
14  in the North Main Pudgie's ads and the Horseheads
15  Pudgie's ads the words Elmira Heights.
16      Q   Have you suffered financial money damages
17  as a result of your claim that the MP Cleary guys
18  are going into Elmira Heights?
19      A   I believe we have. I believe it would be
20  very difficult to show but if I punched in a time
21  clock every time I had to explain it to somebody
22  and then punched out when I was done explaining
23  it and then figured out the amount of money I
24  make per hour, it would be in the tens of
25  thousands already.

Page 55

1       Q   So that's your time gets wasted?
2       A   My time is, oh, wasted?
3       Q   And would there be any --
4       A   Hours. I should record them.
5       Q   And would there be any other damages -- I
6   understand that you have to spend time doing this
7   explaining. Is there any other kind of damages
8   you're suffering as a result of the MP Cleary
9   group coming into Elmira Heights?
10      A   As far as -- very difficult to show. I
11  believe there has been but if I was going to have
12  to show, you know, let's just take two people,
13  like the Elmira Heights Police Department. I can
14  show that they've been going to the Elmira
15  Heights Police Department because me and Rob
16  Cleary have a mutual friend there. And then
17  Horseheads also goes to the Elmira Heights Police
18  Department.
19      Prior to that North Main or College
20  Avenue would never, ever one time, and he's been
21  there for 15 years, can he ever remember them
22  ever going there. So every time MP Cleary would
23  deliver there, that order previously would have
24  been a Horseheads order.
25      And I probably have 15 to 20 of those,

Page 56

1   you know, friends of mine that live in Elmira
2   Heights or those situations that I could actually
3   write out and provide those names.
4       Q   Well, why would your friends not use your
5   store?
6       A   I just explained it to you. Me -- like,
7   the Elmira Police Department, me and Rob have a
8   mutual friend. Okay. I don't pick his friends
9   and he doesn't pick my friends.
10      Q   No, I understand that one example.
11      A   Right. Well, that would be the example
12  for all 15.
13      Q   Oh. Okay.
14      A   Like, I would use another specific name,
15  Wally Gonzalez, one of my best friends, just did
16  a complete remodel at your client, Rob Cleary's
17  house. Mutual friends. He lives in the Village
18  of Elmira Heights. So now that Rob is coming up
19  there, he probably would be splitting between the
20  two of us, where before it would just be
21  Horseheads.
22      Q   Okay.
23      A   And I would have other examples of those.
24  So where we have mutual friends, I can show you
25  that if they ever have, they never did before,

Page 57

1  you know.
2       That specific person is the one that
3  brought in their first flyer that ever said ever
4  the words Elmira Heights on it to me. Wally
5  Gonzalez. He said, dude, how bad are you gettin'
6  screwed? And he heard me call Rob the second I
7  seen it. I couldn't believe it. I couldn't
8  believe it that I was backstabbed the way I was.
9    Q    When you submitted or were working on
10  your trademark application, either you or your
11  lawyer, did either you or your lawyer do a
12  search, did you search to see if there were any
13  other users of the Pudgie's trademark?
14    A    Yes.
15    Q    Who did that?
16    A    I did.
17    Q    And how did you do that search?
18    A    Through the USPTO website.
19    Q    Did you do any other kind of searching?
20    A    No.
21    Q    Like, what's referred to as a common law
22  search?
23            MR. MCGUIRE: Just for clarification,
24        can you explain the common law so he could
25        understand that?

Page 58

1    Q    Okay. I think you answered it. You said
2  you just looked on the USPTO website?
3    A    To my knowledge, my recollection,
4  that's all that I did is the USPTO.
5    Q    Okay. Did the TruFoods application
6  registration show up on that search?
7    A    Yes, it did.
8    Q    Last couple questions. You sent a letter
9  to all Pudgie's Pizza and sub shop owners on
10  March 30th, 2011. Do you recall that?
11    A    I do not believe that letter reached all
12  Pudgie's Pizza and sub shop owners but I know
13  that first line on it says those words.
14            MR. ZUCKER: Can you mark that
15        please?
16
17            (EXHIBIT BT-2 WAS MARKED FOR
18        IDENTIFICATION.)
19
20    Q    I just handed you a copy of the letter.
21  Okay. So you started saying that you don't know
22  if it reached everybody?
23    A    That's correct.
24    Q    Who did you send it to?
25    A    I'd have to guess. Would you like me to

Page 59

1  do that?
2    Q    No, I don't want you to guess. You
3  addressed this to all Pudgie's Pizza and sub shop
4  owners and then you said you didn't know if it
5  got there?
6    A    That's correct. Well, I don't even know
7  if I sent it to all of them.
8    Q    Did you have someone help you, like a
9  secretary?
10    A    No.
11    Q    You did it yourself?
12    A    Yes.
13    Q    But you don't know who you sent it to?
14    A    That's correct.
15    Q    What was the purpose, why did you send
16  this letter?
17    A    I wanted the existing owners to know that
18  the United States Patent and Trademark Office has
19  recognized me as the owner of Pudgie's to be used
20  with pizza, pasta and submarine sandwiches and
21  that they could possibly be restricted to their
22  existing geographic areas. And me being
23  recognized as the owner of Pudgie's to be used
24  with pizza, pasta and submarine sandwiches, to
25  extend their geographic areas or to open up any

Page 60

1  more Pudgie's that under the USPTO guidelines, I
2  would be the person that they would need to
3  contact.
4    Q    So do you think any of these people that
5  you sent the letter to at the current locations
6  are infringing your trademark?
7    A    No. Well, with the exception of MP
8  Cleary on the Southside.
9    Q    Just those guys that --
10    A    They're infringing into the Elmira
11  Heights area.
12    Q    But other than that?
13    A    No, that's correct.
14    Q    But you said in your answer that they
15  possibly might need your permission to expand if
16  they wanted to open up an additional location?
17    A    Yes.
18    Q    And why just possibly?
19    A    Well, because, you know, I'm familiar
20  with junior holder rights. I'm familiar with the
21  rights of any existing Pudgie's owners and, you
22  know. And I would want, if anybody wanted to
23  open up or expand, that by the owner of the name
24  Pudgie's, which would be me, to be used with
25  pizza, pasta and submarine sandwiches gave them

Page 61

1   permission to do so, there could be no
2   repercussions from somebody else.
3       Q   And when you use the word junior user,
4   are you referring to you or to them?
5       A   Everybody.  Everybody has junior user
6   rights.
7       Q   So you're a junior user and they're a
8   junior user.  You're all juniors?
9       A   I believe that, my recollection, I
10  believe that we would all have junior user
11  rights.
12      Q   So there is no senior user in your mind?
13      A   Well, I'm the senior user.
14      Q   So you're the senior and the junior?
15      A   I don't know, would that fall under the
16  same category?
17          MR. ZUCKER:  I'm done.
18
19          (TESTIMONY OF BRENT TARNTINO WAS
20  CONCLUDED AT 1:26 P.M.)
21
22
23
24
25

Page 62

1           A F F I D A V I T
2
3   STATE OF NEW YORK
4   COUNTY OF _____
5
6       I have read my deposition, and the
7   same is true and accurate, save and except for
8   changes and/or corrections, if any, as indicated
9   by me on the correction sheet attached hereto.
10
11
12
13  _____
14  BRENT TARNTINO
15
16
17      SUBSCRIBED AND SWORN TO before me this
18  _____ day of _____, 20_____.
19
20
21  _____
22  NOTARY PUBLIC
23
24
25  My commission expires on _____.

Page 63

1   STATE OF NEW YORK
2   COUNTY OF CHEMUNG
3       I, Nancy H. Swartz, do hereby certify
4   that before the taking of the deposition, the said
5   witness was by me first duly sworn to testify
6   to the truth, the whole truth and nothing but the
7   truth and that the above deposition was recorded by
8   me in stenotype and reduced to typewriting under my
9   supervision.
10      I further certify that the said
11  deposition constitutes a true record of the
12  testimony given by said witness to the best of my
13  ability.
14      I further certify that the said
15  deposition was taken before me at the time and
16  place specified in the notice.
17      I further certify that I am not a
18  relative or employee or attorney or counsel of any
19  of the parties, or a relative or employee of such
20  attorney or counsel or financially interested
21  directly or indirectly in this action.
22
23  _____
24      Nancy H. Swartz
25

A0041



roundings, and friendly atmosphere.

Bake in an oven filled with the warmest affection that we hold for our customer, always watching that this never changes, and surely a PUDGIE'S PIZZA will be created. We at PUDGIES'S thank you for helping us enjoy our work and growing within the community.

We are now at 14 locations with 16 more opening soon!

# THANK YOU!

**1974**

**SAYRE, PA.**
141 S. Keystone Avenue

**1973**

**HORSEHEADS, N.Y.**
134 W. Franklin Street

**1972**

**BATH, N.Y.**
Rt. 54
Hammondsport Rd.

**1970**

**ELMIRA HEIGHTS, N.Y.**
111 E. 14th Street

**1968**

**CORNING, N.Y.**
35 E. Market Street

**ELMIRA SOUTHSIDE**
470 Mt. Zoar Street

**1964**

**ELMIRA NORTHSIDE**
520-28 N. Main Street

**1963**

**PUDGIE'S PIZZA FRANCHISE UNITS NOW AVAILABLE**

For information, inquire at general offices.
520-524 N. Main St., Elmira or call

734-6856 or 734-7419

A0842

APR-2-2012  23:18  FROM:BRENT           16077395227         TO:13152188753        P.3/20

TAR00137

## PUDGIE'S PIZZA FRANCHISING CORPORATION

### FRANCHISE AGREEMENT

THIS AGREEMENT, made and entered into as of this 15th day of July, 1983, by and between PUDGIE'S PIZZA FRANCHISING CORPORATION a New York Corporation having its principal office and place of business at 526-528 North Main Street, Elmira, New York (hereinafter called PUDGIE'S), and BERNADETTE M. TARNTINO, residing at 84 Evergreen Avenue, Elmira, New York (hereinafter called LICENSEE).

### W I T N E S S E T H :

WHEREAS, PUDGIE'S has expended time, effort and money to develop and obtain knowledge in the field of producing, merchandising, distributing, and promoting the sale of pizzas, submarines and related products and has established successfully a reputation, demand and goodwill for such products under the tradenames and style of "PUDGIE'S PIZZA" and "PUDGIE'S SUBS", which signify the highest standards of management, supervision, merchandising and quality of products, and

WHEREAS, LICENSEE has heretofore entered into a Franchise Agreement with Pudgie's dated July 15, 1973, and has done business pursuant to said Agreement under the trade name of Pudgie's and

WHEREAS said Agreement, by its terms, terminated on July 14, 1983, and

WHEREAS, LICENSEE has operated pursuant to said Agreement individually and in connection with Pudgie's Pizza - Horseheads, Inc., a New York Corporation wholey owned by LICENSEE, and

LAW OFFICES
HIDSON & O'MARA. P.C.
ELMIRA N Y

A0043

TAR00138

APR-2-2012  23:18  FROM:BRENT          16077395227          TO:13152188753          P.4/20

-2-

WHEREAS, the LICENSEE desires to continue to obtain the
benefits of the unique form of operation established by PUDGIE'S
and the right to do business under the tradename of PUDGIE'S
as hereinafter provided, and

WHEREAS, LICENSEE desires to operate a high quality pizza
and submarine outlet for the public, using the aforementioned
tradename and style, and the operating methods of PUDGIE'S;

NOW, THEREFORE, in consideration of the promises and
covenants herein contained, the parties hereto agree as follows:

1.  Upon the prompt and faithful performance by LICENSEE
of her obligations hereunder and subject to the terms and condi-
tions hereinafter stated, PUDGIE'S hereby grants to LICENSEE in
consideration of the sum of One Dollar ($1.00), receipt of which
is hereby acknowledged, a personal license to continue to use the
tradenames and service marks and other rights which it holds in
connection with the sale of food in the form of pizzas, sub-
marines and/or other items designated by PUDGIE'S upon, and only,
upon, the following premises:  property commonly known as 136
Franklin Street, Village of Horseheads, New York.  PUDGIE'S fur-
ther grants to LICENSEE the Village of Horseheads as an exclusive
territory.

2.  This license shall continue in full force and effect for
a period of five (5) years from the date hereof with an option
to renew for another five (5) years under the same terms and
conditions provided, however, that in the event the LICENSEE fails
to comply with any of the terms or conditions or provisions of
the entire Franchise Agreement (including all appendixes) and
rules, regulations and directives implementing same and including

LAW OFFICES
JSON & O'HARA, P.C.
ELM●●● N Y

A0044

APR-2-2012 23:19 FROM:BRENT          16077395227          TO:13152188753          P.5/20

TAR00139

—3—

specifically, but not limited to, all requirements as to quality,

standards, methods, and controls, and PUDGIE'S gives notice of

such failure to the LICENSEE, by registered, certified or other

mail, or by personal delivery of said notice to the LICENSEE or

her legal representative, and LICENSEE fails to cure such failure

within ten (10) days after receipt of such notice, PUDGIE'S may,

on the expiration of such ten (10) day period at its option,

forthwith declare this Franchise Agreement cancelled and termi-

nated and thereupon all rights, privileges and licenses herein

(or included in any appendixes hereto) granted to the LICENSEE

shall immediately cease and be at an end.  PUDGIE'S shall not

be required to give any such notice or opportunity to cure when

the failure is fraudulent.  No renewal of this Agreement shall

be valid until a new franchising contract has been executed and

issued, and any continuation of the operations of the LICENSEE

after the expiration of the term shall be only on a month to

month basis.  PUDGIE'S however, agrees to grant to LICENSEE a

first refusal to renew said contract at the termination of this

Agreement.  In addition, following the termination of the renewal

period described above, LICENSEE shall have the option to renew

this Agreement for an additional ten (10) years upon terms and

conditions then generally prevailing for other franchises of

PUDGIE'S.

3.  LICENSEE shall pay PUDGIE'S a monthly service charge

at the rate of 5% of gross sales (which sales shall include

moneys received from the vending machines but exclude sales tax

or proceeds from the sale of alcoholic beverages) made from such

premises, or a minimum monthly service charge of One Hundred

Dollars ($100.00) for each calendar month of the term of the

Agreement, whichever is the larger.  Within thirty (30) days after

the end of each calendar month, LICENSEE shall pay PUDGIE'S the

LAW OFFICES
DRON & O'HARA, P.C.
ELMIRA N Y

A0045

APR-2-2012  23:21  FROM:BRENT          16077395227          TO:13152188753        P.6/20

TAR00140

-4-

service charge for such calendar month. The payment shall be accompanied by LICENSEE's statement of her gross sales during such calendar month.

4.  LICENSEE agrees to report monthly on a report form furnished by PUDGIE'S, the gross amount of sales of all items sold, on or from the premises, along with the profit and loss statement of her reported month's operation and any additional information required by the report form that PUDGIE'S deems necessary to properly evaluate and advise the progress of said LICENSEE.  LICENSEE is to mail said report to PUDGIE'S, together with the payment of each monthly service charge on or before the 30th of each successive month and said report shall be signed by the LICENSEE.  All such reports or other information shall be received and treated confidentially by PUDGIE'S.

5.  LICENSEE shall maintain at her premises adequate records of her business operations at such premises.  Such records shall include, but shall not be limited to, cash register recordings, purchase records, sales records, employment records, profit and loss statements, balance sheets, and other records normally maintained by such a business.  If LICENSEE transacts business at other places of busines, such records shall be kept in such manner that the business transacted by such outlet may be segregated conveniently from the business transacted elsewhere. LICENSEE shall use such accounting methods and procedures as may be prescribed by PUDGIE'S.

LAW OFFICES
JSON & O'HARA, P.C.
ELMIRA, N.Y.

APR-2-2012  23:22  FROM:BRENT                16077395227            TO:13152188753         P.7/20

-5-

   6.   PUDGIE'S, or its Certified Public Accountants, or duly
authorized agents, shall have the right during business hours
to examine, at its own expense, the books, records, and tax returns
of LICENSEE for a period not to exceed the two (2) prior years
and LICENSEE agrees to keep complete and accurate books and
records of the operation of the business at said location.
However, in the event that such an audit discloses an error in the
computation of the total gross sales made from or on the premises
to any extent in excess of two per cent (2%), the LICENSEE shall
bear the expense of the audit.

   7.   PUDGIE'S reserves the right to supervise, determine and
approve the standards of quality and service as pertinent to the
quality and preparation of PUDGIE'S food items and to inspect the
premises, equipment, and food materials and examine the items
offered for sale and served by LICENSEE to insure and maintain
in the quality and standards of such products.  The quality and
standards to be maintained under this paragraph are to be no more
or less than those of others having franchise agreements with
PUDGIE'S.

   8.   LICENSEE agrees to permit PUDGIE'S authorized personnel
to enter her premises at all times during LICENSEE'S business
hours, to inspect and examine her operations and facilities for
the purpose of determining compliance with the quality standards
prescribed and other obligations of this Contract.

   9.   LICENSEE agrees to order, promote and sell such additional
items used in food preparation and such items as PUDGIE'S might
develop from time to time within the product line presently
developed and determined to be necessary for LICENSEE to take

LAW OFFICES
N B O'HARA, P.C.
ELMIRA N Y

TAR00141

A0047

TAR00142

APR-2-2012  23:23  FROM:BRENT                16077395227            TO:13152188753        P.8/20

-6-

fullest advantage of the potential retail market of her location.

10.   In the event that a new building or structure is to be
constructed upon the premises or any existing building or
structure is to be altered or fixtures or equipment are to be
installed or substituted at such premises, such construction,
alteration, installation or substitution shall be approved in
writing by PUDGIE'S and shall conform with plans and specifications
approved by PUDGIE'S.  Such construction, alteration, installation
or substitution shall be performed under the supervision of
PUDGIE'S authorized representative.  PUDGIE'S shall purchase
interior menu signs and exterior lighting fixtures which will be
leased to LICENSEE pursuant to an agreement separate and distinct
from same.  The services of PUDGIE'S authorized representative
shall not be interpreted to mean on-the-job construction supervis-
ion, but shall only apply to determine on behalf of PUDGIE'S
that the construction is being completed in conformance with the
plans and specifications by PUDGIE'S.

11.   The LICENSEE shall at all times maintain the interior
and exterior of the buildings and the surrounding premises
used in connection with such business in the highest degree of
cleanliness, orderliness and sanitation.

12.   The LICENSEE shall repair, alter and paint the exterior
and interior of the premises at her own expense at reasonable
times as reasonably directed by PUDGIE'S.

13.   The LICENSEE shall continuously operate such business
during the same days and hours as those maintained by Pudgie's

LAW OFFICES
OH & O'HARA, P.C.
ELMIRA, N.Y.

A0048

TAR00143

-7-

Pizza & Sub Shops, Inc. and such other days and/or hours as may
be mutually agreed upon by the parties.

14.   LICENSEE shall not install or cause to be installed any
coin-operated amusement devices on his premises without the
written permission of PUDGIE'S except for a jukebox and cigarette,
candy and food vending machines.

15.   The LICENSEE will buy from PUDGIE'S, or from such sources
as shall be approved by PUDGIE'S, all products, raw materials,
and supplies for the conduct of such business, including, but
without limiting the generality of the foregoing: flours, baked
rolls, spice blends, sauces, cheeses, flavorings, canned goods
including but not limited to meat products and fish, and other
non-alcoholic beverages, paper supplies including coffee
containers, cups, paper plates, pizza boxes, bags, napkins, menus,
matches, advertising signs and other advertising media, linens
and uniforms; and PUDGIE'S shall either sell such products to the
LICENSEE when available to PUDGIE'S, or shall provide the
LICENSEE with sources from which such products may be purchased.

16.   The prices to be charged hereunder shall be the prices
in force and effect in respect to the same merchandise purchased
from PUDGIE'S by other licensee of PUDGIE'S in the State in which
the LICENSEE's place of business is located, at the time or times
when any order or orders therefor with similar delivery dates
shall be received by PUDGIE'S from LICENSEE, and shall reflect
net cost of same, with additional allowances for costs of shipping
if any.   With the exception of the original order which shall be

LAW OFFICES
SON & O'HARA, P.C.
ELMIRA N Y

A0049

-8-

paid as agreed upon between the parties, payment for any order
or orders shall be received by PUDGIE'S on or before the Friday
of the week immediately following that week in which such
merchandise is received by the LICENSEE. PUDGIE'S reserves the
right to change these credit terms at any time if, in its opinion
the LICENSEE's financial condition and other circumstances do not
warrant shipment under the terms hereinbefore specified.

17. PUDGIE'S shall not be liable for any delay in manufact-
uring or delivering any of the products or merchandise hereinbefore
mentioned, if such delay shall be due to fires, strikes, disputes
with workmen, delays in transportation, governmental demands or
requirements or any causes whatsoever, whether similar or
dissimilar to those herein enumerated, beyond the reasonable control
of PUDGIE'S. The existence of any such cause or causes of delay
shall extend the time of performance by the time or times
measured by any such cause or causes of delay. The LICENSEE shall
have the authority to obtain necessary products for the ordinary
operation of her business during a delay if caused by the reasons
set forth in this paragraph, from supply sources approved by
PUDGIE'S as more fully set forth in operation manual. Prompt
approval and designation of supply sources shall not be
unreasonably withheld.

18. LICENSEE recognizes that it is essential to the proper
marketing of food items and to the preservation and promotion of
its reputation and acceptance by the public-at-large, that
uniform standards of quality and food appearance be maintained;

LAW OFFICES
LISON & O'MARA, P. C.
ELMIRA, N. Y.

TAR00144

A0050