UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MPC FRANCHISE, LLC, and
MP CLEARY, INC.,
                              Plaintiffs

-vs-

BRENT TARNTINO,
                         Defendant

_____

BRENT TARNTINO and PUDGIE'S PIZZA
CORPORATION - HORSEHEADS, INC.,

                         Counterclaim Plaintiffs

-vs-

MPC FRANCHISE, LLC and
MP CLEARY, INC.,
                         Counterclaim Defendants

_____

DECISION AND ORDER

11-CV-6310 CJS


APPEARANCES

For Plaintiffs/Counterclaim
Defendants:

Jeffrey Zucker, Esq.
Max A. Staplin, Esq.
Maria Jose Morinigo, Esq.
Fisher Zucker LLC
21 South 21st Street
Philadelphia, Pennsylvania 19103

Paul L.Leclair, Esq.
Leclair Korona Giordano Cole LLP
150 State Street, Suite 300
Rochester, New York 14614

For Defendants/Counterclaim
Plaintiffs:

George R. McGuire, Esq.
Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, New York 13202-1355

1

INTRODUCTION

This action involves Pudgie's Pizza, a formerly family-owned pizza business in Elmira, New York, several of whose individual restaurant locations now belong to first cousins, who are descendants of the original owners, and who are challenging each other for the rights to use the Pudgie's name, at least in certain geographic regions, and to franchise others to do so.  Now before the Court are the following motions: 1) Defendant's motion [#32] for summary judgment; 2) Plaintiffs' cross-motion [#46] for partial summary judgment; 3) Defendant's motion [#51] to exclude late-produced documents; and 4) Defendant's motion [#56] to strike Plaintiff's cross-motion for partial summary judgment.  Defendant's motion to exclude [#51] is granted in part and denied in part.  Defendant's motion to strike [#56] is denied.  Defendant's motion for summary judgment [#32] and Plaintiffs' cross-motion for partial summary judgment are each granted in part and denied in part.  Defendant's summary judgment motion is granted as to Plaintiffs' first and third causes of action, but is denied as to Plaintiffs' second cause of action.  Defendant's motion for summary judgment on his counterclaims is also denied.  Plaintiffs' cross-motion for partial summary judgment is denied as to their first cause of action, which is being dismissed for lack of standing, but is granted as to their second cause of action, insofar as it alleges fraud, and Defendant's trademark registration is cancelled.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.  In 1963, brothers Charles "Pudgie" Cleary, Frances Cleary and Michael Cleary, Sr., opened the first of several "Pudgie's" pizza parlors, on the north side of Elmira.  This restaurant became

known as "Northside Pudgie's."[1]  In 1964, the Cleary brothers opened another pizza parlor on Elmira's south side, known as "Southside Pudgie's."[2]  In 1970, the Cleary brothers opened another Pudgie's restaurant in Elmira Heights, known as the "Elmira Heights Pudgie's."[3]  Elmira Heights is a village situated several miles north of the City of Elmira, between Elmira and the Village of Horseheads, New York.

In 1972, the Cleary brothers formed Pudgie's Pizza Franchising Corporation ("PPFC"), for the purpose of licensing the Pudgie's mark.  Subsequently, PPFC entered into numerous franchise agreements, allowing franchisees to use the Pudgie's name in connection with pizza parlors in New York and other states.

In 1973, the Cleary brothers' sister, Bernadette Tarntino ("Bernadette"), entered into a franchise agreement with PPFC to operate a Pudgie's pizza parlor in the Village of Horseheads, which is approximately six miles north of Elmira.  As previously mentioned, the Elmira Heights neighborhood lies between the City of Elmira and the Village of Horseheads.  In connection with Bernadette's operation of the Horseheads Pudgie's, and since at least the "early 1980s," she advertised that she made deliveries to Elmira Heights. Specifically, the advertisements usually stated:  "We deliver to Horseheads, Big Flats and Elmira Heights *Limited Areas*."[4] (italics in original).

As part of Bernadette's franchise agreement between PPFC, she specifically agreed that the Pudgie's mark, and all rights associated with it, "belong[ed] exclusively to Pudgie's

---

[1]See, Docket No. [#46-7] at p. 42.

[2]See, Docket No. [#46-7] at p. 42.

[3]See, Docket No. [#46-7] at p. 42.

[4]*See, e.g.*, Tarntino Aff. [#32-1] at ¶ ¶ 4-5.

3

[PPFC]." (Franchise Agreement, Docket Nos. [#46-8] at p. 4, [#33-7] at p. 14). Consequently, during the term of Bernadette's franchise agreement with PPFC, she did not gain any ownership rights in the Pudgie's mark.[5]

In 1978, PPFC obtained a federal registration of the Pudgie's mark, registration number 1102421.

On July 15, 1983, Bernadette renewed her final franchise agreement with FFPC. The franchise agreement was for a term of five years, with an option to renew for another five years.[6]

In 1985, the U.S. Patent and Trademark Office ("PTO") cancelled PPFC's federal registration of the Pudgie's mark, after PPFC failed to file a required declaration. Nevertheless, PPFC continued to operate its chain of Pudgie's Pizza parlors as before.

In 1990, Michael Cleary, Sr., died, owning 50% of the stock in PPFC. Additionally, at the time of Mr. Cleary's death, it appears that he owned two of the Pudgie's locations – Pudgie's Southside and Pudgie's in Mansfield, Pennsylvania.[7] In that regard, it appears that at all relevant times Michael Cleary owned the intellectual property rights associated with those two restaurants either in his individual capacity or through a corporation he

---

[5]*See also, Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 409 (5th Cir. 1962) ("Of course, the licensee acquires only the right to a limited use of the trademark and the control, right and title to the product remains in the licensor.").

[6]*See*, Docket No. [#33-7] at p. 4.

[7]Defendant's Rule 56.1 Statement [#32-2] at ¶ 17. There is no indication in the record that when M.P. Cleary, Inc. began using the Pudgie's mark in March 1990, it was pursuant to a franchise or license agreement with PPFC. In other words, any rights that arose from M.P. Cleary, Inc.'s use of the Pudgie's mark belonged to M.P. Cleary, Inc.

owned, M.P. Cleary, Inc. ("MP Cleary").[8]  After Michael Cleary, Sr.'s death, his wife, Rosa,

and his sons, David Cleary and Robert Cleary, became the owners of MP Cleary, which

continued to operate the Southside Pudgie's and the Mansfield, Pennsylvania Pudgie's.

In July 1993, Bernadette's franchise agreement terminated.[9]  On September 29,

1993, the PPFC corporation dissolved.[10]  Thereafter, the former PPFC franchisees,

including Bernadette, continued to operate their individual Pudgie's pizza parlors as

previously, though independently, not pursuant to any franchise agreement or licensing

agreement, and without a federal trademark registration.  Plaintiffs agree that *after*

Bernadett'e franchising agreement ended and PPFC was dissolved, her continued use of

---

[8]In 1991, PPFC purchased Michael Cleary's stock in PPFC.  However, it appears from the record that Michael Cleary's ownership of the Southside Pudgie's and Mansfield, Pennsylvania, Pudgie's pre-dated the formation of PPFC.

[9]*See*, Docket No. [#46-7] at p.38, Tarntino Dep. at p. 50 (Brent Tarntino testified at deposition that his mother's franchise agreement ended on July 15, 1993).  At oral argument, Tarntino's attorney argued that Bernadette's franchise agreement actually ended after only five years, in 1988. *See*, Docket No. [#68], transcript of oral argument, at pp. 21-22.  In that regard, it appears that Tarntino is attempting to rely on the fact that the franchise agreement between PPFC and Bernadette indicated that the initial five-year period of the agreement would end in 1988. See, Def. Opposing Stmt. of Facts [#57-1] at ¶ 7.  However, that contention is contradicted by Tarntino's deposition testimony, and is not otherwise supported in the record.  For example, while Defendant's Opposing Stmt. of Facts contends that "no new franchising agreement was 'executed and issued' as was required by ¶ 2 of the Agreement," he cites no evidence in the record for support. Docket No. [#57-1] at ¶ 7.  Regardless, it is well settled that  a party may not attempt to avoid summary judgment by submitting proof that contradicts his earlier sworn testimony. *See, e.g., Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  Moreover, even assuming that Tarntino's deposition testimony was actually incorrect as to the date the franchise agreement ended, which has not been shown, his testimony nevertheless shows that he "believed" as of the date he applied for the trademark registration that the franchise agreement remained in place until 1993.

[10]David Cleary testified that PPFC dissolved in the "early 1990s." Docket No. [#33-2] at p. 11.  The record indicates that PPFC was still in existence at least at late as April 19, 1991. *See*, Docket No. [#34] at p. 6, Docket No. [#58] at p. 5 (The date that PPFC re-purchased Michael P. Cleary, Sr.'s shares of PPFC stock).  The online records of the New York Secretary of State indicate that PPFC was dissolved on September 29, 1993. see, http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=387279&p_corpid= 329870&p_entity_name=pudgie%27s%20pizza%20franchising&p_name_type=%25&p_search_type=BEGINS&p_s rch_results_page=0   The Court takes judicial notice of the Secretary of State's records.

the mark resulted in her obtaining rights in the Pudgie's mark.  However, based on the facts set forth thus far, such use was necessarily junior to Plaintiffs' use of the mark in connection with Southside Pudgie's.[11]

At some point during the "early 1990's," the Elmira Heights Pudgie's closed.[12]  After that, the Horseheads Pudgie's and Northside Pudgie's made a "co-existence agreement," that each would service areas within Elmira Heights.[13]  Neither Horseheads Pudgie's nor Northside Pudgie's had a similar "co-existence agreement" with Southside Pudgie's concerning Elmira Heights.[14]  In fact, Defendant maintains that Southside Pudgie's did not serve the Elmira Heights neighborhood at all.   In that regard, Southside Pudgie's advertisements indicated that it would deliver its products to certain areas around Elmira, which did not include Elmira Heights.[15]  Moreover, Plaintiffs agree that until about 2010 or 2011,[16] they generally[17] did not specifically advertise that they made deliveries to Elmira

---

[11]At the latest, MP Cleary began using the Pudgie's mark at the Southside Pudgie's in 1990.  Defendant did not begin using the Pudgie's mark at the Horseheads Pudgies until after Bernadette's franchise agreement terminated, in 1993.

[12]See, Plaintiffs'/Counterclaim Defendants' Stmt. of Facts [#46-2] at ¶ 9, which the opposing party admitted, see, Docket No. [#57-1] at ¶ 9.)

[13]See, Tarntino Aff. [#32-1] at ¶ 7 ("[A]nother Pudgie's pizza parlor - the location known as 'Northside Pudgie's,' – also delivers and advertises to Elmira Heights.") .

[14]See, Tarntino Aff. [#32-1] at ¶ ¶ 5-7.

[15]The record indicates that for several years, Horseheads Pudgie's and Southside Pudgie's placed their advertisements together, within a single advertisement.  Typically, in those advertisements, Horseheads Pudgie's indicated that it delivered to "Horseheads, Big Flats & Elmira Heights (Limited Areas)", while Southside Pudgie's indicated that it delivered to "Southside, Pine City, West Elmira & Elmira Northside." See, e.g., Docket No. [#32-1] at p. 25; see also, Docket No. [#35] at p. 4.

[16]Defendant/Counterclaim Plaintiffs indicate that Plaintiffs/Counterclaim Defendants began advertising that Southside Pudgie's delivered to Elmira Heights in 2011. See, e.g., Docket No. [#57-1] at ¶ 27.  However,  the record indicates that Plaintiffs/Counterclaim Defendants actually began such advertisements earlier than 2011.  For example, the record contains a copy of an advertisement, containing coupons, for Southside Pudgie's, in which the

Heights. Instead, between 2003 and 2008, Southside Pudgie's advertised that it delivered only as far north as McCann's Boulevard, which lies to the south of Elmira Heights. However, Plaintiffs maintain that they always made deliveries to Elmira Heights, when asked. Specifically, Plaintiffs indicate that Southside Pudgie's delivered food to anyone who telephoned and placed an order, including persons in Elmira Heights.

In any event, for many years after the Elmira Heights Pudgie's closed, the parties co-existed peacefully, and even placed their advertisements together, in such a way that it would appear that their two locations, Horseheads and Southside, were merely two locations of the same Pudgie's "pizzeria & sub shop."[18] Those advertisements indicated, though, that persons seeking deliveries to Elmira Heights should call the Horsehead's Pudgie's telephone number.[19]

In or about 2004, MP Cleary looked into obtaining a new federal registration of the Pudgie's mark.[20] As discussed earlier, PPFC previously registered the mark, but the PTO cancelled the registration in 1985. MP Cleary determined that another company,

---

coupons indicate that they expire on "11-30-10." *See*, Docket No. [#36] at p. 3.

[17]*But see*, Docket No. [#49] at p. 24 (Robert Cleary indicated that between 2000 and 2006, approximately, Plaintiffs' website indicated that they made deliveries to Elmira Heights).

[18]*See*, Docket No. [#32-1] at p. 25, yellow pages advertisement for both the Horseheads and Southside Pudgie's, with the caption at top, "Elmira's First & Finest *Pizzeria & Sub Shop* Since 1963." (emphasis added, showing that the ad represented the locations to be a "pizzeria & sub shop," singular).

[19]*Id*.

[20]Although it does not seem particularly relevant, the record suggests that Plaintiffs decided to obtain a new registration following some unsuccessful litigation. Specifically, in or about 2002, MP Cleary was sued, in the U.S. District Court for the Middle District of Pennsylvania, by Putnam, which was one of PPFC's former franchisees. MP Cleary brought counterclaims, in which it contended that it was the successor to PPFC. The record does note indicate either the nature of Putnam's claims or the nature of MP Cleary's counterclaims. *See*, Docket No. 34 at pp. 2-12; [#58] at pp. 1-11. However, Putnam moved for summary judgment against MP Cleary's counterclaims, on the grounds that MP Cleary was not the successor to PPFC, and therefore lacked standing. The Pennsylvania District Court agreed that MP Cleary was not a successor to PPFC's rights in the Pudgie's mark.

TruFoods, already owned the federal registration for the Pudgie's mark.   Documents

submitted by the parties are not entirely clear as to how TruFoods came to own the mark.

Accordingly, the Court has examined, and takes judicial notice[21] of, the online records of

the PTO, which indicate the following:   On April 9, 1987, an individual named George

Sanders filed an application with the PTO for the service mark "Pudgie's," consisting of a

"design plus words, letters and/or numbers," which he was purportedly using in connection

with a restaurant called "Pudgie's Famous Chicken."   Sanders' application indicated that

he began using the mark in 1982.   On June 13, 1989, the PTO granted Sanders a

registration for the mark "Pudgie's," Registration No. 1543938, for "restaurant carry out

services."[22]   On May 4, 1990, Sanders assigned the Pudgie's mark to Pudgie's Famous

Chicken, LTD.[23]   On June 3, 1998, Pudgie's Famous Chicken, LTD, assigned Registration

No. 1543938 to Pudgie's Acquisition Corp..[24]   On June 5, 1998, Pudgie's Acquisition Corp.

assigned Registration No. 1543938 to Pudgie's Restaurant Corporation.[25]   On August 15,

2000, Pudgie's Restaurant Corporation assigned Registration No. 1543938 to Pudgie's

Famous Chicken, LLC.[26]   On June 20, 2001, Pudgie's Famous Chicken, LLC assigned

---

[21]The Court may take judicial notice of the PTO's website.  *See, Rockland Exposition, Inc. v. Alliance of Automotive Service Providers of New Jersey*, 894 F.Supp.2d 288, 301, n. 6 (S.D.N.Y. 2012) (" Here, the USPTO Trademark Electronic Search System ("TESS") indicates that AASP submitted the application described above, and therefore, the service mark application is part of the USPTO public record.").

[22]See, Docket No. [#46-8] at p. 14.  Contrary to the suggestion of Brent Tarntino at his deposition, Treachers' trademark  registration, number 2565298,  was not limited to a "chicken restaurant."

[23]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

[24]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

[25]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

[26]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

Registration No. 1543938 to Arthur Treacher's Inc.[27]  On July 12, 2001, Arthur Treacher's applied to register the Pudgie's service mark, as a "typed drawing," for "restaurant and carry out restaurant services," and indicated that the mark had been in use since 1982. On April 30, 2002, the PTO issued Arthur Treacher's Registration No. 2565298 for that mark.[28] On May 29, 2002, Arthur Treacher's, Inc., assigned Registration No. 1543938 to PAT Franchise Systems, Inc..[29]   On April 21, 2008, PAT assigned the '938 mark to TruFoods.[30]

On July 19, 2004, TruFoods licensed MP Cleary to use the mark.  Specifically, TruFoods and MP Cleary entered into a Trademark License Agreement, giving MP Cleary a non-exclusive, perpetual and transferable right to use the Pudgie's mark in connection with MP Cleary's existing businesses, which were as "restaurants, carry out and food service businesses that principally offer pizza, subs or other similar products."  The licensing agreement provided that if a third party infringed the Pudgie's mark, and if TruFoods declined to pursue legal action against such third party, that MP Cleary had "the right to commence or defend such litigation."[31]

In 2007, Bernadette Tarntino died, and her three children, Brent Tarntino, Edward Tarntino and Kristen Tarntino, inherited her stock in Pudgie's Pizza Corporation - Horseheads, Inc.,  which owned and operated the Horseheads Pudgie's.  The record

---

[27]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

[28]See, Docket No. [#49] at p. 12.

[29]*See*, http://assignments.uspto.gov/assignments/q?db=tm&rno=1543938

[30]*See*, Docket No. [#46-8] at p. 15.

[31]See, Docket No. [#46-8] at p.18.

indicates that Brent, Edward and Kristen each inherited an equal one-third share of the corporation.[32]

On October 21, 2009, MP Cleary formed a limited liability corporation, MPC Franchise, LLC ("MPC Franchise"), for the purpose of opening Pudgie's pizza parlor franchises.  Specifically, MP Cleary, which had licensed the Pudgie's federal mark from TruFoods, gave MPC Franchise a non-exclusive license to use the Pudgie's mark and to license others to do so.  Subsequently, MPC Franchise began selling new Pudgie's pizzeria franchises.

While all of the events described above were occurring,  the parties maintained their working relationship, and co-existed peacefully.  However, beginning in 2010, the parties' working relationship began to unravel, ultimately leading to this lawsuit.  Specifically, in or about early 2010, MP Cleary began advertising that Southside Pudgie's would make deliveries to Elmira Heights.[33]  As mentioned earlier, Plaintiffs admit that previously, their advertising did not indicate that they delivered to Elmira Heights, though they maintain that they actually delivered to Elmira Heights for many years prior to that.  In April 2010, when Brent Tarntino ("Tarntino") became aware of Southside Pudgie's new advertisement, he called Robert Cleary and complained.[34]  As noted earlier, Tarntino is the son of Bernadette Tarntino, and a one-third owner of the Horseheads Pudgie's.  Tarntino was intimately

---

[32]*See*, Docket No. [#46-7] at p. 28.

[33]Defendant indicates that Plaintiffs began advertising that Southside Pudgie's delivered to Elmira Heights in 2011. See, e.g., Docket No. [#57-1] at ¶ 27.  However,  the record indicates that Plaintiffs/Counterclaim Defendants actually began such advertisements earlier than 2011.  For example, the record contains a copy of an advertisement, containing coupons, for Southside Pudgie's, in which the coupons indicate that they expire on "11-30-10." *See*, Docket No. [#36] at p. 3.

[34]*See*, Docket No. [#33-1], Brent Tarntino Dep. at p. 57 ("[I] call[ed] Rob the second I seen it.").

knowledgeable about the Pudgie's pizzerias around Elmira, including those owned by Plaintiffs, his first cousins, because he had worked in them at different points in his life. Consequently, Tarntino believed that the new Southside Pudgie's advertisements unfairly encroached on the Elmira Heights market, which, he maintains, had previously been serviced by Horseheads Pudgie's and Northside Pudgie's.

On April 2, 2010, Plaintiffs sent an email to Horseheads Pudgie's, referencing a phone conversation the previous day between Robert Cleary and Tarntino, concerning Elmira Heights.  Robert Cleary indicated that Southside Pudgie's had "always delivered to parts of the Heights," even when the Elmira Heights Pudgie's was open, and that Horseheads Pudgie's had not started to deliver to Elmira Heights until after the Elmira Heights Pudgie's closed.[35]

On July 2, 2010, Brent Tarntino, in his individual capacity, and with the assistance of his attorney, filed a federal trademark application for the Pudgie's mark with the PTO.[36] Tarntino sought to register the Pudgie's mark for "pizza parlors; Restaurant services featuring pizza, pasta and subs."[37]

Several aspects of Tarntino's application are significant, for purposes of this Decision and Order.  First, Tarntino indicated on the application that he was the "owner" of the Pudgie's mark, and that he first used the mark "[a]t least as early as 01/01/1980."[38]

---

[35] *See*, Docket No. [#49] at p. 24 ("[W]e have been delivering there when there was a Heights store and you guys came in sometime after the Heights was closed."). This information is included not for the truth of Robert Cleary's statement, but to show the existence and  nature of the dispute between the parties.

[36] See, Docket No. [#46-13] at p. 28.

[37] See, Docket No. [#46-13] at p. 6.

[38] See, Docket No. [#46-13] at p. 6.

However, in 1980, Brent Tarntino was eight years of age, at most, and was not using the Pudgie's mark.   Moreover, at the time he filed the application, Tarntino was not in fact the owner of the mark, or even of the Horsehead's Pudgie's pizzeria.  Rather, he was only a one-third owner of the corporation which owned the Horsehead's Pudgie's.  Nevertheless, as part of the application, Tarntino signed a declaration indicating, in pertinent part, that he believed that he was the owner of the Pudgie's mark.  Tarntino also indicated, in his declaration, that to the best of his knowledge, no other person had "the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive."[39]  In that regard, Tarntino did not inform the PTO of TruFoods' registration, even though he was aware of it, nor did he inform the PTO that Plaintiffs and others were also using the Pudgie's mark in connection with pizzerias.  On February 22, 2011, the PTO issued Brett Tarntino a U.S. Trademark, Registration No. 3,922,745 ("the '745 registration").

Tarntino sought the registration because he intended to begin franchising new Pudgie's pizzeria locations.[40] In that regard, Tarntino was aware, as early as 2005, that his cousins, the Clearys, who had licensed the right to use the Pudgie's name from TruFoods,[41] were already "trying" to sell Pudgie's franchises through MPC Franchise, LLC. Tarntino believed, however, that by obtaining his own registration of the Pudgie's mark, for "pizza, pasta and subs," he could prevent the Cleary's from continuing to sell franchises:

[39]See, Docket No. [#46-13] at p. 10.

[40]See, Docket No. [#46-7] at p.30.

[41]See, Docket No. [#46-7] at p. 30.

"I own the franchise company, so I don't know how I'd be competing with them. . . . I own the name."[42]  Tarntino admittedly believed that he could register the Pudgie's mark for himself, since TruFoods' restaurants sold chicken, while he intended to sell pizza.[43]  On this point, at deposition, Tarntino ridiculed the idea that TruFoods could have validly granted a license to MP Cleary, Inc. with regard to pizza shops, since TruFoods' restaurants primarily serve chicken:

> Q.  In [your] ninth affirmative defense . . . you say [about the] plaintiffs – that's my clients the Clearys and their companies: 'Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.'  Can you explain factually what you're saying here?
>
> A.  Sure.  I believe that the chicken guy, I don't even know who he is, it's so funny to me, the chicken guy –
>
> Q. Help me out.  I don't know who you're talking about.
>
> A. I don't either.  I don't know who he is.  But his entity registered under the United States Patent and Trademark Office is restaurants – [sic]
>
> Q. Are you talking about TruFoods?
>
> A.  TruFoods.  Whoever he is.  So the TruFoods guy can't grant marks.  And to me it sounds like, and I've never seen any of this information, nobody has ever showed me anything, but from what they're saying, is that they received permission or, I guess I don't know the real word, some sort of a contract with the chicken guy to sell pizza, pasta and subs.  And to me that's not – that's impossible.  There's nothing that says the chicken guy can grant marks.  I looked through all of the USPTO stuff and it never says the chicken

---

[42]See, Docket No. [#46-7] at p. 30.  Moreover, when Tarntino was asked if he saw any difference between his personal use of the mark and his family's corporation's use of the mark, he responded, "Not really." See, Docket No. [#46-7] at p. 28.  Tarntino also claimed that he did not know whether he and his siblings owned the Horseheads Pudgies individually, or through a corporation. See, Docket No. [#46-7] at p. 28.

[43]See, Docket No. [#46-7] at p. 27.

guy can give anybody rights.

Q. Okay.

A. So I don't understand how these guys are running around saying we have the rights to pizza, pasta and subs.  Show me.  There's no, I looked, there's – show me pizza, pasta and submarine sandwiches and this can go away.

Q. And in your sentence, these guys are running around doing this, are you talking about the Clearys or are you talking about the TruFoods guys?

A. The Clearys.  The Clearys are claiming the chicken guy gave them pizza, pasta and submarine sandwich rights.

Brent Tarntino Deposition, Docket No. [#46-7] at p. 35.

It is apparent that Tarntino did not intend to pursue his franchising plan with Pudgie's Pizza Corporation - Horseheads, Inc., the corporation in which he was a one-third owner, along with his siblings.  Instead, Tarntino intended to pursue the franchising business on his own.  In fact, shortly after obtaining the registration, Tarntino stopped working at the Horseheads Pudgie's, and offered to allow his siblings to buy his interest in that shop.[44]  Moreover, within one month of receiving his federal registration, as early as March 28, 2011, Tarntino contacted MPC Franchise's franchisees, and informed them that

---

[44]*See*, Docket Nos. [#46-2] at ¶ ¶ 34-36, [#57-1] at ¶ ¶ 34-36.  On this point, Tarntino denies that the record indicates a connection between his decision to obtain the registration and his decision to stop working at the Horseheads Pudgie's and pursue franchising. *See*, Docket No. [#57-1] at ¶ 34.  However,  Tarntino's deposition testimony clearly indicates such a connnection. *See, e.g.*, Docket No. [#46-7] at p. 30, Tarntino Deposition at pp. 16-20; *see also id.* at p. 17 ("Q. What caused you to change, to stop working at that business?  A. Well, I plan on franchising other Pudgie's."); *id*. at p. 20 ("Q. Did you register the trademark Pudgie's in July 2010 with the goal of opening up this franchise company that you're planning to open?  A. Absolutely.").

he was the "true owner" of the Pudgie's mark.[45]  Tarntino further advised MPC Franchise's franchisees that "he [was] claiming rights to any further territories."[46]

On June 21, 2011, MP Cleary and MPC Franchise commenced this action against Brent Tarntino, individually.  The Complaint alleges that Tarntino obtained his Pudgie's trademark registration by defrauding the PTO, and that he is improperly using the mark in a manner that is creating confusion by, for example, contacting MPC Franchise's franchisees and telling them that he owns the Pudgie's mark.  The first cause of action seeks a declaratory judgment that Tarntino has no ownership interest in TruFoods' registered mark.  The second cause of action seeks cancellation of Tarntino's mark based on fraud, pursuant to 15 U.S.C. § 1064(3), and on the fact that the mark is confusingly similar to TruFoods' mark.[47]   The third cause of action seeks a declaration that Tarntino has engaged in trademark infringement and unfair competition, and an injunction.

Tarntino answered [#8] the Complaint and he, along with his two siblings, purport to assert  five counterclaims.[48]  The first counterclaim alleges that Plaintiffs are infringing

---

[45]See, Docket No. [#46-7] at p. 20. For example,  Daniel Miller, a franchisee of MPC Franchise, LLC, who was operating a Pudgie's restaurant,  indicated that on March 28, 2011, Tarntino called him and informed him of "his recent ownership of the Pudgie's name as of mid February 2011." *Id*.; see also, Docket No. [#46-13] at p. 22 (email from Daniel Miller to Plaintiffs describing his telephone conversation with Tarntino).

[46]*Id*.

[47]Plaintiff's Complaint expressly sets forth only the former basis for cancellation, not the latter.  Plaintiffs subsequently moved to amend the Complaint to add, as a grounds for cancellation, that Tarntino's mark is confusingly similar to TruFoods' mark.  However, Magistrate Judge Feldman found that the motion was moot, since the parties agreed that the Complaint, as already drafted, was broad enough to encompass the latter basis for cancellation. See, Docket No. [#64], Transcript, at pp. 3-8.

[48]Except where otherwise necessary, for simplicity, the Court will hereinafter refer to "Defendant/Counterclaim Plaintiffs" as simply "Defendant."

Brent Tarntino's federal trademark registration.[49]

The second counterclaim purports to assert a claim for "federal unfair competition," in violation of 15 U.S.C. § 1125(a), based on the fact that Plaintiffs allegedly advertise that they deliver, and do deliver, their food products in unspecified "geographical areas" in which Horseheads Pudgie's and Northside Pudgie's were already using the Pudgie's mark.[50]

The third counterclaim purports to assert a claim for "common law trademark infringement and unfair competition," again based on the fact that Plaintiffs allegedly advertise that they deliver, and do deliver, their food products in unspecified "geographical areas in and around the [Horseheads] Pudgie's restaurant."  The fourth counterclaim requests a declaratory judgment that Brent Tarntino and Pudgie's Pizza Corporation - Horseheads, Inc., are not infringing TruFoods' or MP Cleary's federal trademark rights. The fifth counterclaim purports to assert a claim for "injury to business reputation" under New York General Business Law § 360-l,  again based on the fact that Plaintiffs allegedly advertise that they deliver, and do deliver, their food products in unspecified "geographical areas in and around the [Horseheads] Pudgie's restaurant."

In response to the Counterclaims, Plaintiffs denied that they have used the Pudgie's

---

[49]The First Counterclaim actually refers to "Counterclaim *Plaintiffs'* federally registered trademark," which makes it sound as if Brent Tarntino and his siblings, and/or their corporation, Pudgie's Pizza Corporation - Horseheads, Inc., own the '745 mark.  However, that is inaccurate, and disconcerting, since Brent Tarntino in his individual capacity is the registrant of the '745 registration, not Pudgie's Pizza Corporation - Horseheads, Inc., and one of Plaintiff's contentions in this action is that Brent Tarntino defrauded the USPTO, in part, by applying for a trademark in his individual capacity.

[50]See Brent Tarntino Affidavit ¶ 7, indicating that Horseheads Pudgie's and Northside Pudgie's had a "long-standing co-existence agreement," pursuant to which both shops delivered food to Elmira Heights.

mark "in any geographical areas 'served only' by Counterclaim Plaintiffs."[51]

On November 17, 2011, the Honorable Jonathan W. Feldman, United States Magistrate Judge, issued a Scheduling Order [#21], which, in pertinent part, directed that all discovery be completed by April 16, 2012, and that "[a]ll motions to compel discovery . . . be filed at least thirty (30) days prior to" that date.   The Scheduling Order further directed that the parties file their dispositive motions by May 30, 2012.

The parties then engaged in pretrial discovery.   For purposes of the pending motions, it is significant that it was not until March 2, 2012, more than three months after the Scheduling Order was issued, that Defendant served his First Set of Interrogatories and First Set of Production of Documents and Things.   As part of those demands, Interrogatory No. 3 stated:

> Describe in detail the factual basis for, and identify any documents relating to, supporting or evidencing your allegation that the Defendant and/or Counterclaim Plaintiff [sic] have not exclusively served any geographical areas outside of Horseheads, New York, 14845.

At that point in time, neither that interrogatory, nor any of the other interrogatories, nor any pleadings, identified the "geographical areas" to which Defendant was referring.   On April 9, 2012, Plaintiffs responded to the interrogatory as follows:

> Objection.   Defendants' Interrogatory is overly broad, unduly burdensome, oppressive, vague and ambiguous.   Additionally, Plaintiffs cannot respond because they do not understand this Interrogatory.   Furthermore, the Interrogatory seeks information which is irrelevant and not reasonably calculated to lead to admissible evidence.

(Docket No. [#51-1] at p. 10).   Defendant's Interrogatory No. 4 stated:

---

[51]*See, e.g.*, Answer to Counterclaims [#13] at ¶ 95.

Describe in detail, and identify any documents relating to, supporting, or evidencing, the manner in which MPC and/or MPCF has promoted or does promote goods or services in connection with the "PUDGIE'S" mark in the United States including, without limitation, the geographical scope of sales or deliveries of such goods or services, the channels of trade through which such goods or services are sold, and the nature and sophistication of the purchasers of such goods or services.

(Docket No. [#51-1] at p. 10).  On April 9, 2012, Plaintiffs answered the interrogatory as follows:

Plaintiffs used the "PUDGIE'S" mark to promote goods and services, both locally and nationally in all forms of media, including newspapers, radio, televisions, phone books, web/internet, bulk mail, and highway signage.

(Docket No. [#51-1] at p. 10).  As for Defendant's demand for documents, his demand no. 8 requests "[a]ll documents and things concerning the geographic scope of advertising, distribution, delivery, and sale of goods or services in connection with the "PUDGIE'S" mark." (Docket No. [#51-1] at p. 20).   On April 9, 2012, Plaintiffs objected to the interrogatory on various grounds, but nevertheless  responded, in pertinent part, "None." (*Id*.).  Defendant also asked Plaintiffs to produce any communications between them and TruFoods concerning the parties' dispute and this lawsuit, and Plaintiffs responded that they were not aware of any such communications. (Docket No. [#51-1] at p. 27).  None of Defendant's document demands specifically referred to Elmira Heights.

On April 16, 2012, the discovery period in this action concluded, pursuant to Magistrate Judge Feldman's Scheduling Order.  As of that date, Defendant had not served Plaintiffs with a deficiency notice, nor had he filed a motion to compel.

On April 17-18, 2012, beyond the discovery cut-off date established by Judge

18

Feldman, the parties conducted depositions.  At that time, Defendant asked questions specifically pertaining to Elmira Heights, including whether Plaintiffs had records of their sales in the Elmira Heights area.  In pertinent part, during David Cleary's deposition, he stated that Southside Pudgie's had been "delivering to Elmira Heights since the early '90s."[52]  Additionally, David Cleary was asked whether Southside Pudgie's computerized point-of-sale system would show, "how many deliveries went to, for example, Elmira Heights[.]"[53]  Cleary indicated that the shop's computer system did not group sales by location, but that someone could go through the records and, based on the delivery address for each sale, compile a list of sales to Elmira Heights, if they "had that much time."[54]

On April 19, 2012, after depositions were completed, Defendant sent a discovery deficiency letter to Plaintiffs that focused, in large part, on Elmira Heights.  For example, with regard to Interrogatory No. 3, the letter asked Plaintiffs to provide their basis for "the allegation that Defendant and/or Counterclaim Plaintiff have not exclusively served any geographical areas outside of Horseheads, New York, 14845, including, for example, the Elmira Heights area."[55]  Similarly, with regard to document demand no. 8, the deficiency letter asked Plaintiffs to provide, *inter alia*, "delivery records, sales records and receipts,"

---

[52]Docket No. [#46-7] at p. 15.

[53]Docket No. [#46-7] at p. 14.

[54]Docket No. [#46-7] at p. 15.

[55]The use of the terms "exclusively served" seems odd, since Defendant/Counterclaim Plaintiffs already admitted that they did not exclusively serve Elmira Heights.  That is, they contend that they and the Northside Pudgie's both made deliveries to Elmira Heights.

apparently pertaining to Elmira Heights.[56]

On May 17, 2012, Plaintiffs advised Defendant that they were working on supplementing the discovery responses:  "We are currently in the process of retrieving documents from our clients, after which we will promptly prepare our responses and send you the requested materials."[57]  The following day, May 18, 2012, Plaintiffs advised Defendant that they intended to ask the Court for an extension of the deadline for dispositive motions, and asked whether Defendant would agree not to oppose such an application.[58]  However, Defendant opposed that request.  Subsequently, though, Magistrate Judge Feldman granted Plaintiffs' application for an extension of time to file their dispositive motion, *nunc pro tunc*.[59]

On May 25, 2012, Plaintiffs served Defendant with supplemental discovery responses.  The supplementary response to Interrogatory No. 3, for example, indicated that Plaintiffs sold their products "in all of Elmira, New York including North, South, and East Elmira, West Pine City and Elmira Heights."[60]

On May 30, 2012, Defendant filed the subject motion [#32] for summary judgment.[61] Defendant maintains that Plaintiffs cannot prevail on their claim seeking a declaratory judgment that TruFoods' owns the registered mark, and cancelling Defendant's mark

---

[56]*See*, Docket No. [#51-1] at p. 36.

[57]Docket No. [#54-1] at p. 10.

[58]Docket No. [#54-1] at p. 12.

[59]Docket  No. [#64] at pp. 7-8.

[60]Docket No. [#51-1] at p. 45.

[61]The Notice of Motion [#32] is incorrectly labeled as a "Notice of Motion to Compel."

based on fraud, because they lack standing and cannot show, as a matter of law, that Defendant committed fraud.   Defendant also maintains that Plaintiffs cannot prevail on their trademark infringement and unfair competition claims, since they lack standing, and since they cannot show that they have senior rights to the mark.   In that regard, Defendant contends that his predecessors were using the Pudgie's mark prior to when TruFoods began doing so.[62]   Defendant further states that Plaintiffs cannot prevail on their common-law claim of unfair competition, since they cannot show that he acted in bad faith. Defendant also seeks summary judgment on all of his counterclaims.

At around the same time Defendant filed his summary judgment motion, the parties were negotiating a confidentiality agreement concerning Plaintiffs' supplemental discovery.[63]   On June 14, 2012, Judge Feldman signed a Stipulated Protective Order [#43]. On June 19, 2012, Plaintiffs served Defendant with further supplemental discovery responses, including 90 pages of documents pertaining to sales/deliveries made by Southside Pudgie's to Elmira Heights.

On June 27, 2012, Plaintiffs filed a motion [#45] to redact customers' personal information from the sales records that were produced.   The same day, Plaintiffs filed their opposition to Defendant's summary judgment motion and their cross-motion for partial summary judgment on their first two causes of action.   In that regard,   MP Cleary indicates that it made deliveries, from the Southside Pudgie's, to the Elmira Heights neighborhood, beginning in the early 1990s (after Northside Pudgie's closed).   M.P.Cleary admits, though,

---

[62]Specifically, Tarntino is referring to his mother's use of the mark in connection with her franchise agreement with PPFC.

[63]Docket No. [#43].

that prior to 2010, Southside Pudgie's did not advertise that it delivered to Elmira Heights.

On July 11, 2012, Defendant filed the subject motion [#51] to preclude Plaintiffs from using the late-produced discovery.

On July 16, 2012, Judge Feldman issued a "Stipulated Consent Order" [#52], pursuant to which the parties agreed that Plaintiffs' customer list would be protected by the aforementioned confidentiality agreement, and that Plaintiff's motion to redact would be withdrawn.  The Stipulated Consent Order specifically indicated that Plaintiffs' customer list was "material evidence" in support of Plaintiffs' opposition to Defendant's summary judgment motion and Plaintiffs' cross-motion for partial summary judgment.  The Stipulated Consent Order did not reference Defendant's motion to have the sales/customer information precluded based on late production.

On March 21, 2013, counsel for the parties appeared before the undersigned for oral argument.  At that time, counsel clarified the nature of their claims for the Court.  For example, counsel agreed that the parties are not contesting each other's common-law rights to do business using the Pudgie's name in their traditional locations.  That is, Plaintiffs are not contesting Defendant's right to use the Pudgie's name in Horseheads, and Defendant is not contesting Plaintiffs' right to use the Pudgie's mark in Elmira.  However, Defendant is contesting Plaintiffs' right to use the Pudgie's mark in advertising in Elmira Heights, though Plaintiffs are not contesting Defendant's right to do so.  On that point, there does not appear to be any dispute that since at least the 1990s, Defendant has consistently advertised that it delivers to Elmira Heights, while Plaintiffs did not begin advertising that they would deliver to Elmira Heights until approximately 2010.

The primary concern of both parties, however, concerns the right to use the

22

Pudgie's name to franchise additional locations.[64]   In that regard, Plaintiffs maintain that Defendant has no right use the Pudgie's name to franchise new locations, since they have already licensed the Pudgie's mark from TruFoods, and since Defendant obtained his registration by fraud.   On the other hand, Defendant seems to maintain that he is the only person entitled to franchise new Pudgie's pizza locations, since his registration is valid and, unlike TruFoods' registration, pertains specifically to pizza parlors.

Following oral argument, the Court reserved decision for a time to allow the parties to further explore settlement.   On April 22, 2013, the parties notified the Court that they had been unable to reach a settlement.

## DISCUSSION

*Rule 37*

Before considering the merits of the subject motions for summary judgment, the Court must consider whether to exclude the supplemental discovery that Plaintiffs produced two months after the close of discovery.   Rule 37(c) provides, in pertinent part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." A district court has discretion whether to grant a Rule 37(c) motion, and in that regard should consider "(1) the [non-moving] party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the

---

[64]See, Docket No. [#68], transcript of oral argument at p. 28.

23

new testimony; and (4) the possibility of a continuance." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (citations and internal quotation marks omitted).  The movant is not required to show that the opposing party acted with bad faith. *Id.*

Defendant has moved to preclude two types of evidence:  Plaintiffs' sales records for Elmira Heights, and documents concerning Plaintiffs' communications with TruFoods. Plaintiffs offer little objection to the motion insofar as it pertains to the records of their communications with TruFoods, and indicate that they do not intend to use such evidence in any event.  Accordingly, the Court will grant the application as to those records. However, Plaintiffs vigorously oppose the motion to preclude their Elmira Heights  sales records.

Defendant argues that the Court should preclude Plaintiffs' supplemental disclosures, in May and June of 2012, as "untimely," since, "[p]ursuant to the Court's Scheduling Order, discovery in this case closed on April 16, 2012."[65]  Such argument is not particularly compelling, however, since neither of the parties obeyed the discovery deadline in that Order.  Instead,  the parties decided to conduct depositions after that date, without obtaining an extension of the deadline.  Moreover, Defendant did not serve the subject discovery demands until one month prior to the discovery deadline, and did not serve his discovery "deficiency notice" until three days after the close of discovery, long after the court-imposed deadline for filing motions to compel.[66]  In short, it does not appear that

---

[65]See, Docket No. [#51-2] at p. 2.

[66]Nor did Defendant make his Rule 37(c) motion returnable before Magistrate Judge Feldman, even though it was clearly the intention of this Court's Referral Order [#9] that motions concerning discovery disputes be made returnable before the Magistrate Judge. *See*, Defendant's Notice of Motion, Docket No. [#51].  If Defendant had done so, this preclusion issue might have been addressed at the same time as the other similar matters that Judge Feldman addressed on August 28, 2012. *See*, Docket No. [#64], Transcript of appearance on August 28, 2012.

discovery in this action was conducted in the most-expeditious manner, as envisioned by Judge Feldman's Scheduling Order, by either side, which weighs against granting Defendant's motion to preclude. *See*, *Gemmink v. Jay Peak, Inc.*, No. 1:12–cv–32–jgm, 2013 WL 3730937 at *2 (D.Vt. Jul. 15, 2013) ("Initially, the Court notes while Jay Peak relies on Rule 37(c), it chose not to employ Rule 37(a) to move the Court for an order compelling disclosure or discovery. *See* Fed.R.Civ.P. 37(a).  Rule 37(a) is the basic motion for enforcing discovery obligations. 8B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2285, at 487 (3d ed.2010). It may be used to compel disclosure when a party fails to make a disclosure required by Rule 26(a), Fed.R.Civ.P. 37(a)(3)(A), and to compel discovery when a party fails to answer an interrogatory, Fed.R.Civ.P. 37(a)(3)(B). The proper remedy for incomplete answers to interrogatories is a motion to compel under Rule 37(a). FEDERAL PRACTICE & PROCEDURE § 2291, at 636."); *Irizarry v. Corknard*, No. 9:10–cv–1022 (MAD/DRH), 2012 WL 2990021 at *3 (N.D.N.Y. Jul. 20, 2012) ("The parties' submissions make clear that neither party is without fault in the many discovery issues that have occurred during the pendency of this matter. Plaintiff should have moved to compel the production of Defendant Davies' medical records pursuant to Rule 37 of the Federal Rules of Civil Procedure if he believed that this information was improperly withheld. See Fed.R.Civ.P. 37(c) (1).").

Completely apart from the manner in which discovery was conducted, however, the Court has considered the *Design Strategy* factors set forth above, and finds that preclusion is not warranted.  For example, Plaintiffs' explanation for the late production of the sales records is reasonable.  In that regard, Plaintiffs attribute their late production to two things:

First, they did not know, until after Brent Tarntino's deposition, which occurred after the court-ordered deadline for discovery, that Defendant was seeking information concerning Elmira Heights; and second, once Plaintiffs knew what Defendant wanted, it took time for them to extract the information from their point-of-sale computer system.   As for the first explanation, Plaintiffs maintain, and the Court agrees, that Defendant's Answer with Counterclaims and discovery demands never mentioned Elmira Heights by name, and never hinted that Elmira Heights was the area in which Plaintiffs were violating his trademark rights.   Rather, they vaguely referenced "geographical areas that have been served only by the Counterclaim Plaintiffs."   It was not until Tarntino's deposition, on April 17, 2012, that he clearly identified Elmira Heights as the "geographical areas" that were mentioned in his pleading and discovery demands.[67]   Defendant could have clearly indicated in his pleading and discovery demands that he was seeking information about Elmira Heights, but he chose not to do so.[68]   As for Plaintiffs' second explanation, they indicate that there was a subsequent delay in producing the Elmira Heights sales records, because they had to hire a computer specialist to extract information from the Southside Pudgie's computer point-of-sale system, and also had to negotiate a confidentiality agreement with Defendant.   Those explanations are reasonable.

---

[67]Docket No. [#46-7] at p. 37, Tarntino Dep. at pp. 42-44.

[68]While it may be true that prior to this lawsuit the Clearys were aware that Brent Tarntino was angry that Southside Pudgie's had begun  including Elmira Heights in its advertisements, *see*, Defendant's Reply Brief [#55] at p. 2, such fact does not suggest that Clearys knew that Defendant's references to "geographical areas that have been served only by the Counterclaim Plaintiffs," in his pleading and discovery demands,  meant Elmira Heights.  To the contrary, the record indicates that Elmira Heights was never "served only" by Horseheads Pudgie's.  Specifically, Defendant agrees that, at the very least,  Northside Pudgie's was also making deliveries to Elmira Heights.  Nor is there any indication in the record that prior to this lawsuit, Tarntino claimed to have the exclusive rights to used the Pudgie's name in Elmira Heights.  Consequently, in the  Court's view there would have been no reason for Plaintiffs to think that "geographical areas that have been served only by the Counterclaim Plaintiffs" meant Elmira Heights.

Additionally, Plaintiffs maintain that the Elmira Heights sales records are important to their defense of Defendant's counterclaims, because they refute the suggestion that Southside Pudgie's only began selling in Elmira Heights in 2010 or 2011.[69]  Plaintiffs' sales records indicate that they were making deliveries to Elmira Heights as early as 2001.[70]

Furthermore, the delay in providing Southside Pudgie's Elmira Heights delivery records is not particularly prejudicial to Defendant.  As to this point, Defendant was aware, well before this action was commenced, that Southside Pudgie's claimed to be making deliveries to Elmira Heights for many years, and in fact, that it claimed to have been doing so even before Horseheads Pudgie's began delivering to Elmira Heights.[71]  Moreover, at deposition, Brent Tarntino scoffed at the mention of the delivery records, and indicated that he was not interested in seeing them.  By way of explanation, Tarntino maintained that the amount of actual deliveries that Southside Pudgie's made to Elmira Heights was irrelevant, and that the real issue was when Southside Pudgie's began including Elmira Heights in its advertisements:

> That's the laughable part here.  That's what's funny.  Okay.  Here's the thing.  So let me just – I tried to be clear and I went somewhere wrong.  I have no, zero, evidence, proof *of any kind of advertising*, any phonebooks, never seen one time ever your clients[' advertisements] come into Elmira Heights.  *Now, I know they have this point-of-sale [computer] system that's funny.  And I'm*

---

[69]Defendant correctly states that the documents are important to Plaintiffs' case, but incorrectly suggests that such fact *favors* preclusion. *See*, Def. Memo in Support of Motion to Preclude [#51-2] at pp. 8-9.  In *Patterson v. Balsamico*, 440 F.3d 104, 117-118 (2d Cir. 2006), the Second Circuit indicated that if the evidence was important to the party opposing preclusion, such fact would weight *against* preclusion.

[70]*See, e.g.*, Docket No. [#46-9] at p. 9. (sale dated 12/07/01).

[71]*See*, Docket No. [#49] at p. 24, email dated April 2, 2010 from Robert Cleary ("We have always delivered to part of the heights . . .  The fact of the matter is three Pudgie's have been delivering to parts of the Heights for years, we have been delivering there where there was a Heights store and you guys came in sometime after the Heights [Pudgie's shop] was closed.").

*sure they've snuck deliveries up there as much as they can.*  The first time – the second I seen the words Elmira Heights on their first flyer ever, your clients received a phone call from me.  *So please don't show me receipts. Show me proof.  Show me a radio ad.  Show me something besides their stupid point-of-sale system   that says, oh, we've been going there but [Horseheads Pudgie's] didn't know.*

(Docket No. [#46-7] at p. 37, Tarntino Dep. at p. 46) (emphasis added).  The late-produced sales receipts merely quantify what Tarntino already claimed to know, namely, that Southside Pudgie's had been making deliveries to Elmira Heights.

Lastly, the possibility of a continuance favors denial of the motion to preclude.  That is to say, the Court could grant Defendant the opportunity to conduct additional limited discovery regarding the late-produced documents prior to trial, if warranted.  However, there does not appear to be any need for such additional discovery at the present time in connection with the pending summary judgment motions.  In that regard, Defendant's papers make only vague references to the possible need to conduct additional discovery.[72] Moreover, at oral argument, Defendant's counsel essentially reiterated the view, expressed by Tarntino at his deposition, that Plaintiffs' sales records are irrelevant, and that the real dispute is with Plaintiffs' advertising.[73]

For all of the foregoing reasons, Defendant's motion to preclude[#51] is granted with regard to the late-produced communications between Plaintiffs and TruFoods, and is denied with regard to Southside Pudgie's delivery records concerning Elmira Heights.

---

[72]See, Def. Reply Memo of Law [#55] at pp. 6-7.

[73]*See*, Docket No. [#68], transcript of oral argument at p. 17 ("The Court:  So, you're saying your problem with the Clearys is their advertising, you don't care if people [in Elmira Heights] call [Southside Pudgie's to order food]?   A.   That's correct.").

*Rule 56*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial.  Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . .  and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

29

*Plaintiffs' Standing*

Plaintiffs are asserting three  claims under the Lanham Act: 1) a claim for a declaratory judgment setting forth the parties' respective rights, including ownership of the Pudgie's mark, in light of TruFoods' and Tarntino's concurrent registration of the marks; 2) a claim to cancel Tarntino's federal registration, because it was obtained by fraud and because it is confusingly similar to TruFoods' mark; and 3) a claim that Tarntino is committing "trademark infringement and unfair competition" with regard to TruFoods' mark, in connection with his use of his registered mark to franchise new restaurants.  Defendant maintains that Plaintiffs have standing to pursue only the second cause of action, and even then, only with regard to the portion of the claim based on fraud.[74]

The Court agrees that Plaintiffs, as non-exclusive licensees, lack standing to pursue claims concerning ownership or infringement of TruFoods' registered mark.  In that regard, the Second Circuit recently clarified that licensees do not have statutory standing to pursue infringement claims under 15 U.S.C. § 1114. *Federal Treasury Enterprise Sojuzplodoimport v. SPI Spirits Limited*, 726 F.3d 62 (2d Cir. 2013).  On this point, the Circuit Court indicated that statutory standing under 15 U.S.C. § 1114 is available "only to 'registrants' of the trademarks at issue, a term the Act defines as embracing the actual registrant's 'legal representatives, predecessors, successors and assigns,'" which terms do not include exclusive licensees, let alone non-exclusive licensees, who lack an ownership interest in the mark. *Id*. at pp. 73-79; *see also, id.* at p. 78 ("A plaintiff therefore must show that its 'license' amounts, in fact, to an assignment to establish entitlement to sue under Section

---

[74]See, Docket No. [#68], transcript of oral argument at pp. 27-28.

32(l).") (citations omitted).

Here, the license agreement between TruFoods and MP Cleary  grants MP Cleary the right to use the mark, but also clearly indicates that TruFoods retains ownership of the mark.[75]  MP Cleary's license, therefore, does not amount to an assignment.   Accordingly, Plaintiffs[76] lack statutory standing to pursue any infringement claims relating to TruFood's registered mark.   Moreover, Plaintiffs do not gain statutory standing merely because TruFoods has agreed, as part of their licensing agreement, that they can pursue this action on TruFoods' behalf. *See, Federal Treasury Enterprise Sojuzplodoimport v. SPI Spirits Limited*, 726 F.3d at 83-84 (Fact that registrant has ratified the suit is not sufficient to bestow statutory standing).[77]  Defendant is therefore entitled to summary judgment on that portion of Plaintiffs' third cause of action which alleges infringement of TruFoods' registered mark.

The Second Circuit further held that those who lack statutory standing to sue for infringement, "also lack standing to seek th[o]se remedies [that amount to] 'ownership-bolstering' relief under the Lanham Act," such as a "declaratory judgment of ownership." *Federal Treasury Enterprise Sojuzplodoimport v. SPI Spirits Limited*, 726 F.3d at 84.  In

---

[75]See, Docket No. [#46-8] at pp. 16-20, [#34-1] at pp. 2-6.  The licensing agreement has other features that illustrate TruFoods' continued ownership of the mark.  For example, the licensing agreement requires MP Cleary to maintain certain quality standards, and gives TruFoods the right to inspect Plaintiffs' restaurants. *Id*.  The licensing agreement also gives TruFoods the right of first refusal to pursue trademark infringement litigation concerning the licensed mark. *Id*., [46-8] at p. 18, [#34-1] at p. 4.

[76]MPC also lacks standing, since MP Cleary could not endow MPC Franchise with any greater rights than it received from TruFoods.

[77]In that regard, the Second Circuit in *Federal Treasury Enterprise Sojuzplodoimport* observed that it had already rejected an analogous argument in *Eden Toys, Inc. v. Florelee Undergarment Co.*, Inc., 697 F.2d 27, 32, n. 3 (2d Cir. 1982), wherein a licensee, who did not otherwise have standing under the Copyright Law, unsuccessfully argued that it had standing to sue pursuant to its licensing agreement with the copyright owner. *See, Federal Treasury Enterprise Sojuzplodoimport*, 726 F.3d at 83-84.

this action, Plaintiffs' first cause of action seeks such a declaratory judgment.  Accordingly, Defendant is also entitled to summary judgment on Plaintiffs' first cause of action.

The Court does not agree, however, that Plaintiffs lack statutory standing with regard to either their second cause of action, which seeks cancellation of Tarntino's mark pursuant to 15 U.S.C. § § 1052(d) & 1064, or that portion of their third cause of action which alleges unfair competition, pursuant to 15 U.S.C. § 1125(a).  In that regard, claims under both 15 U.S.C. § 1064 and 15 U.S.C. § 1125(a) may be brought "by any person" who believes that they are being injured. *See*, 15 U.S.C. § 1064 ("A petition to cancel a registration of a mark ... may ... be filed as follows by any person who believes that he is or will be damaged...."); 15 U.S.C. § 1125(a)(1) (Indicating that action may be brought "by any person who believes that he or she is or is likely to be damaged by such act."); *see also*, *Federal Treasury Enterprise Sojuzplodoimport v. SPI Spirits Limited*, 726 F.3d at 72 (Observing that claims for infringement under 15 U.S.C. § 1114(1) may be brought only by "registrants," which "contrasts with Section 43 of the Act, which allows suits 'by *any person* who believes that he or she is or is likely to be damaged' by the defendant's actions.") (italics in original, citation omitted); *Zip Intern. Group, LLC v. Trilini Imports, Inc.*, No. 09–CV–2437 (JG)(VVP), 2011 WL 2132980 at *3 (E.D.N.Y. May 24, 2011) ("[A]ny plaintiff who can demonstrate that it has the potential for a commercial or competitive injury, or, in other words, that the false designation of defendant's product is likely to cause plaintiff to suffer a loss in sales, has standing to bring a suit under [Lanham Act] Section 43.  Section 43, therefore, conveys standing on trademark licensees.") (citations and internal quotation marks omitted).  Moreover, "[a]ll that is necessary for [an] opposer to have standing to

oppose on the basis of § 2(d) [15 U.S.C. § 1052(d)] is to allege a claim of likelihood of confusion that is plausible and not wholly without merit.  [Courts] routinely find[ ] standing when the Petitioner or Opposer has made a facially supportable allegation of likelihood of confusion."  3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:14 (4th ed. 2005) (footnotes omitted).

## *Cancellation of Tarntino's Registration*

The Court will next consider Tarntino's motion for summary judgment as to Plaintiffs' second cause of action, for cancellation, and Plaintiffs' cross-motion for summary judgment on that same claim.  Plaintiffs maintain that Tarntino's mark should be canceled for two reasons.  First, they contend that pursuant to 15 U.S.C. § 1064, Tarntino's registration should be canceled because he obtained it by defrauding the PTO.  Second, they contend that pursuant to 15 U.S.C. § 1052(d), Tarntino's registration should be canceled because it creates a likelihood of confusion with TruFoods' previously registered mark.[78]

## *Cancellation of Trademark/Service Mark Due to Fraud*

Plaintiffs contend that Tarntino obtained his federal trademark registration by defrauding the PTO.  Specifically, Plaintiffs maintain that Tarntino intentionally lied, in his declaration attached to his Trademark Application, by making the following statements: 1) "the mark was first used at least as early as 01/01/1980"; 2) "he/she believes the applicant[79] to be the owner of the trademark/service mark sought to be registered"; and 3)

---

[78]Pl. Memo of Law [#46-4] at pp. 15, 18.

[79]Tarntino listed himself as the  "applicant" and "owner" of the mark:  "Brent M. Tarntino, a citizen of the United States, having an address of 241 Sawdey Road, Horseheads, New York 14845, United States." See, Docket No. [#49] at pp. 17-23.   The application further indicates that the entity applying for the registration is an "individual." *Id*. at p. 18. Tarntino's application makes no mention of Pudgie's Pizza Corporation - Horseheads, Inc., the entity which actually owns the Horseheads Pudgie's.

"to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive."  On these points, it is undisputed that in 1980, Brent Tarntino was a child, and was not using the Pudgie's mark in commerce.  It is also undisputed that Brent Tarntino does not individually own the Pudgie's mark or the Horseheads Pudgie's, but rather, he is a one-third owner, along with his brother and sister, of a corporation that owns and operates the Horseheads Pudgie's.  And lastly, it is undisputed that at the time he applied for the trademark registration, Tarntino was well aware of the history of the former chain of Pudgie's pizzerias previously owned by his family members, as detailed above, and was also aware that Plaintiffs, and others, were still lawfully using the identical Pudgie's mark, in connection with "pizza parlors" and "restaurant services featuring pizza, pasta and subs," in the Elmira vicinity and elsewhere, and that they had been doing so for years.  Accordingly, Tarntino's statements were, in fact, false.  However, Tarntino maintains that even assuming he lied about the date of first use, such fact was not material to the PTO's determination.  More importantly, Tarntino maintains that there is a triable issue of fact as to whether he subjectively intended to defraud the PTO with regard to any of the misstatements.

15 U.S.C. § 1064 provides that "any person who believes that he is or will be damaged" may file a petition "to cancel a registration of a mark" for which "registration was obtained fraudulently."  The principles applicable to such a claim are well settled:

Generally, a party alleging that a registration was fraudulently obtained must

prove the following elements by clear and convincing evidence: 1. A false representation regarding a material fact[;]   2. The person making the representation knew or should have known that the representation was false ("scienter")[;]   3. An intention to induce the listener to act or refrain from acting in reliance on the misrepresentation[;]   4. Reasonable reliance on the misrepresentation[; and] 5. Damage proximately resulting from such reliance.

*Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 270 -271 (2d Cir. 2011) (citations omitted).

Since direct evidence of deceptive intent is rarely available, subjective intent to deceive can be inferred from indirect and circumstantial evidence. However, a party alleged to have committed fraud may rely on good faith as a defense: Fraud will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true.  The alleged fraudulent misstatements must be more than an error or inadvertence, and instead must show a deliberate attempt to mislead the USPTO.  Indeed, fraud on the USPTO implies some intentional deceitful practice or act designed to obtain something.

A party moving to cancel a trademark based on fraud on the USPTO bears the burden to prove the fraud by clear and convincing evidence.

***

The party alleging fraud carries a heavy burden of proof, and, in deciding whether fraud has been committed, the Court has no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.

*Haggar Intern. Corp. v. United Co. for Food Industry Corp.*, 906 F.Supp.2d 96, 107-108 (E.D.N.Y. 2012) (citations and internal quotation marks omitted).

The Court will first consider Tarntino's misstatement that he began using the Pudgie's mark in 1980.  Obviously, that statement was untrue when it was made, because Tarntino was a young child in 1980, and was not using the Pudgie's mark.  Tarntino contends, however, that he subjectively believed the statement was true, because his

mother was using the mark in 1980, and he thought that he inherited his mother's rights concerning use of the mark.  Plaintiffs contend that Tarntino's misstatement about having used the Pudgie's mark in 1980  was calculated, and fraudulent, because Tarntino selected a date that was prior to TruFoods' date of first use, which was in 1982.  Indeed, Tarntino has not provided any alternative explanation for how he settled on the otherwise seemingly random date of 1980.   However, even assuming *arguendo* that Tarntino intentionally lied to the USPTO about the date of first use of the mark, several courts have held that such a misrepresentation is not a "material represenation" that would support a claim for cancellation based on fraud, where, as in this case, the mark was actually used at some time prior to the registration application.  *See, Pony Exp. Courier Corp. of America v. Pony Exp. Delivery Service*, 872 F.2d 317, 319 (9th Cir. 1989) ("The claim of a date of first use is not a material allegation as long as the first use in fact preceded the application date.") (citations omitted).   On the other hand, the instant case is somewhat unique because, as discussed further below, Tarntino's statement was not only false as to the date of first use, it was also false because it indicated that *he was the person who used the mark* in 1980, when in fact he never personally used the mark.  Rather, he was merely a one-third owner of a corporation that used the mark.

Plaintiffs further maintain that Tarntino's registration application was fraudulent because, in completing it, he intentionally lied both about the ownership of the mark,  and about the existence of other "person[s], firm[s], corporation[s], or association[s] ha[ving] the right to use the [identical] mark in commerce" under circumstances likely to cause confusion.  In the instant case, those two misrepresentations are related, because when

Tarntino misstated that he personally owned the mark, he not only failed to inform the PTO that the true owner was Pudgie's Pizza Corporation - Horseheads, Inc., of which he was only a one-third shareholder, but he also failed to disclose that Pudgie's Pizza Corporation - Horseheads, Inc. had rights to use the mark that were superior to his.[80]   Indeed, Tarntino's application is devoid of *any* reference Pudgie's Pizza Corporation - Horseheads, Inc. or his siblings.  Moreover, in addition to failing to inform the PTO about the ownership interests of his own siblings, he also failed to disclose the fact that Plaintiffs, his cousins, were also using the exact same mark, for the exact same products, in almost the exact same geographic location.  Beyond that, Tarntino also failed to disclose that others, such as Northside Pudgie's, were also using the exact same mark, for the exact same products, in almost the exact same geographic location, with at least an equal right to do so.

In moving for summary judgment on this fraud claim, Tarntino initially attempted to focus the argument on TruFoods, and away from Plaintiffs' use of the mark.  In that regard Tarntino maintained that he subjectively believed he had superior rights to the Pudgie's mark, based on his opinion that TruFoods' registered trademark did not pertain to "pizza, pasta and subs."[81]   Tarntino insisted that he honestly believed that since TruFoods' registration pertained only to "chicken restaurants," he "had a good faith belief that he was the owner of the Pudgie's mark for pizza parlors."[82]   Tarntino further contended that he owns common law rights to the Pudgie's mark that are superior to TruFoods' rights, since

---

[80]Brent Tarntino, in his individual capacity, never used the mark, and therefore could not have rights to the mark that were superior to the rights of Pudgie's Pizza Corporation - Horseheads, Inc..

[81]See, Def. Memo of Law [#32-3] at pp. 6-7.

[82]Def. Memo of Law [#32-3] at p. 7.

he began using the mark in 1973.[83]  Strangely, though, Tarntino did not initially explain why he failed to inform the PTO that Plaintiffs were using the identical mark for identical services.[84]  However, in response to Plaintiffs' cross-motion, Tarntino switched gears, and now maintains that while he knew others had rights to use the mark, he did not disclose that fact to the PTO, because he did not think that the others' use of the mark would result in confusion.[85]  This latter argument by Tarntino is curious, since he also maintains in this action that Plaintiffs' use of the mark, which he failed to disclose to the PTO, was already causing confusion among consumers at the time he filed his trademark application.[86]  Specifically, Tarntino was already engaged in an acrimonious verbal dispute with Plaintiffs over the use of the mark in Elmira Heights when he filed the trademark application.[87]

Nevertheless, Tarntino maintains that despite all of the foregoing, Plaintiffs cannot establish that he intended to defraud the PTO, since he subjectively did not intend to commit fraud.  However, the Court disagrees, since Defendant has not come forward with

---

[83]Def. Memo of Law [#32-3] at pp. 11-12.

[84]*See*, Def. Memo of Law [#32-3] at pp. 4-7.

[85]*See*, Def. Memo of Law [#57] at pp. 7-8 ("Despite the Plaintiffs' misguided arguments, Tarntino did not state in his trademark application that he was the only entity with the right to use the Pudgie's mark, and, more importantly, he was not required to so state.  Instead, Tarntino was only required to declare in his trademark application that, to the best of his knowledge and belief, no other entity had the right to use the mark in commerce in such a way as to cause confusion, mistake or to deceive.").

[86]See, Def. Memo of Law [#32-3] at p. 16 ("[T]heir use of the Pudgie's mark is likely to cause confusion. . . . [I]t is undisputed that several of the Polaroid factors weigh strongly in favor of confusion.  First, the mark being used by the parties are identical and used in connection with identical goods and services.  Second, there have been recent instances of actual confusion.  Third, purchasers of pizza products such as those sold by the parties are ordinary, rather than sophisticated, consumers.").  The record indicates that Tarntino was disputing Plaintiffs' right to advertise in Elmira Heights as early as April 2010, which was several months before he filed his trademark application in July 2010. See, Docket Nos. [#49] at pp. 17, 24.

[87] *Id*.

evidence from which a reasonable inference could be drawn that he had a good-faith belief either that he owned the Pudgie's mark or that there were no other persons entitled to use the mark, whose current use of the mark would result in confusion.  To the contrary, the record indicates that Tarntino had no good faith basis whatsoever to claim that he owned the Pudgie's mark.  Instead, Tarntino was well aware that he was merely a one-third owner of the Horseheads Pudgie's corporation.  Tarntino's misstatement of ownership was not a mistake, but instead, was part of his long-term plan to sell his interest in the Horseheads Pudgie's and begin his own franchising business.  To be clear on that point, Tarntino was not attempting to register the mark on behalf of the corporation in which he was a part owner;  he registered it for himself.  Nor did Tarntino have any good faith basis for failing to disclose that his close family members had been using the Pudgie's mark for decades, or that he was already engaged in a dispute with them over the use of the mark in Elmira Heights.  In that regard, the Court observes that MP Cleary's use of the Pudgie's mark was in fact senior to that of the Horsehead's Pudgie's, and that even if Tarntino did not fully understand that fact, he still had no good faith basis to believe that he had any superior rights to the mark.[88]  Tarntino also knew that Plaintiffs were already franchising pizzerias, using the very same mark that he was attempting to register for that same purpose.  For these reasons, the Court finds that Tarntino has failed to raise a triable issue of fact as to his intent, or to any other element of Plaintiffs' fraud claim.  *See, Melodrama Pub., LLC v.*

---

[88]For example, Defendant argues:  "Tarntino has testified that he has a good faith belief that TruFoods does not have the right to grant use of the Pudgie's mark for pizza, pasta and subs, *and therefore MPC and PMCF could not have pizza, pasta and submarine sandwich rights.*" Def. Memo of Law [#32-3] at p. 6 (emphasis added). Tarntino makes no attempt to explain why, even if TruFoods did not have the right to grant rights with regard to pizza, pasta and subs, his cousins would nevertheless not have common law rights to use the mark at least equal to his, when they had been using the mark even longer than he had been.

*Santiago*, No. 12 Civ. 7830(JSR), 2013 WL 1700929 at *3-6 (S.D.N.Y. Apr. 11, 2013)

(Granting judgment on pleadings, cancelling trademark registration, despite party's

conclusory assertion that she owned mark, where, *inter alia*, uncontroverted facts indicated

that trademark registrant never personally owned or used in commerce the mark that she

registered); *Mears v. Montgomery*, No. 02 Civ. 0407 BSJMHD, 2004 WL 964093 at *19

(S.D.N.Y. May 5, 2004) ("[D]efendants have offered no evidence – i.e., no deposition

testimony or affidavits – to suggest that Montgomery believed, even if mistakenly, that he

owned the [mark] at the time when he signed the declaration.  Thus, the evidentiary record

establishes beyond a triable dispute that Montgomery knowingly misrepresented  his

ownership of the mark.").

Tarntino cannot defeat summary judgment merely by claiming, in conclusory

fashion, that he believed he owned the mark, without offering any evidence to support such

a belief. *See, City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 243 (S.D.N.Y.

2010) ("[T]he Debtors have *adduced no facts which would permit a reasonable fact finder

to conclude* that LeRoy's conduct was anything but a deliberate attempt to mislead the

PTO.") (emphasis added); *Mears v. Montgomery*, 2004 WL 964093 at *19 ("[P]laintiff has

established that Montgomery knowingly misstated the ownership of the Mark, and

defendants have failed to present any evidence that creates a material dispute as to this

fact.").  Similarly, even assuming *arguendo* that Tarntino individually had the right to use

the mark, he has not produced evidence tending to show how he could have honestly

believed that Plaintiffs, or even his siblings, did not have a right to use the mark that was

at least equal to his. *See, City of New York v. Tavern on the Green*, 427 B.R. at 242, 243

("The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark. . . . Even viewing the claim of fraud through the prism of the [plaintiff's] heightened evidentiary burden, the [defendants] have adduced no facts which would permit a reasonable fact finder to conclude that [their] conduct was anything but a deliberate attempt to mislead the PTO."). Accordingly, Tarntino's registration is cancelled based on fraud pursuant to 15 U.S.C. § 1064.

<u>*Cancellation of Service Mark Due to Likelihood of Confusion*</u>

Alternatively, Plaintiffs maintain that the Court should cancel Tarntino's mark pursuant to 15 U.S.C. § 1052(d), due to a likelihood of confusion. At the outset, the Court observes that this claim was not included in Plaintiffs' Complaint [#1]. Subsequently, though, Plaintiffs moved to amend/correct their second cause of action, "to broaden the grounds for cancellation." *See*, Docket No. [#27-1] at p. 1. The Proposed Amended Complaint did not specifically reference § 1052(d), but it did reference 15 U.S.C. § 1064 generally, which itself references § 1052, and alleged that: "Among other things, Tarntino's registration created a likelihood of confusion between Tarntino's registered mark and TruFoods' prior registration of a nearly identical mark." Proposed Amended Complaint [#27-2] at ¶ 48. Magistrate Judge Feldman ruled that amendment was unnecessary, since the original complaint was already broad enough to encompass the claim. Defendant did not file an objection to that ruling. Accordingly, Plaintiff's claim under § 1052(d) is properly before the Court.

Turning to the merits of Plaintiffs' alternate claim for cancellation of Tarntino's mark, the subject statute, 15 U.S.C. § 1052(d), states, in pertinent part:

41

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it  [c]onsists of or comprises *a mark which so resembles a mark registered in the Patent and Trademark Office,* **or** *a mark or trade name previously used in the United States by another and not abandoned,* as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C.A. § 1052(d) (West 2014) (emphasis added).  Under this provision,

cancellation of a registration for a trademark is appropriate if there is a likelihood of confusion between that trademark and another mark registered in the PTO. 15 U.S.C. § 1052(d). To determine whether there is a likelihood of confusion, a court must balance the eight factors set forth by the Second Circuit in *Polaroid Corporation v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961), which are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d 373, 384 (2d Cir.2005).

*Quality Service Group v. LJMJR Corp.*, 831 F.Supp.2d 705, 712-713 (S.D.N.Y. 2011).

Plaintiffs maintain that cancellation of Tarntino's mark is required under this provision, since TruFoods has priority, and since there is a likelihood of confusion between TruFoods' registered mark and Tarntino's registered mark.  Defendant's response to this aspect of Plaintiffs' motion is rather brief, and consists essentially of two arguments.  First, Defendant maintains that there is no likelihood of confusion between the two marks, since

TruFoods' mark is for "chicken restaurants," while his mark is for pizzerias.[89]   Second, Defendant contends that TruFoods is not the senior of the mark, since Horsehead's Pudgie's began using the mark at least as early as 1993, while TruFoods has not shown that it used the mark prior to 2001, when it applied for the '298 registration.[90]

As to the first argument, the Court finds that Defendant has failed to raise a triable issue of fact as to whether there is a likelihood of confusion.   In considering an application to oppose or cancel a registration, a court looks at the nature of the goods or services listed on the parties' registrations.   On this point, the Second Circuit has stated:

> In a proceeding seeking the cancellation of a trademark or opposing an application for registration, "likelihood of confusion is determined only as to the registrability of the applicant's mark exactly as shown in the application *and only as to the goods listed, regardless of actual usage.* Similarly, if [the party contesting the registration] relies on its own federal registration, its rights are determined *as of the format and goods in that registration, regardless of the reality of actual usage*.

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991) (*quoting* 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 32:31, at 737–38 (2d ed. 1984), other citation omitted).   Consequently, the fact that TruFoods actually uses the Pudgie's mark primarily in connection with "chicken restaurants" is irrelevant.   Instead, the

---

[89]*See*, Def. Memo of Law [#32-3] at p. 3 ("Plaintiffs have developed no evidence [disproving] that the two marks can co-exist or that consumers would be confused by the separate uses of the mark for different types of restaurants by Tarntino and TruFoods.").   Defendant admits that there is an obvious likelihood of confusion between Horseheads Pudgie's use of the mark and Plaintiffs' use of the mark. *See*, Def. Memo of Law [#32-3] at pp. 16-17) ("[I]n light of the identical nature of the marks, the fact that the parties are in direct competition in Elmira Heights, the lack of consumer sophistication, and the instances of actual confusion, it is clear that a fair-minded trier of fact could only come to the conclusion that there is a likelihood of confusion.").

[90]*See*, Def. Memo of Law [#57] at pp. 12-14; *id*. at p. 13 ("While Plaintiffs point to the 2001 Arthur Treacher's Trademark Registration as evidence of use of the [mark]  beginning in 1982, the earliest date that the registration can prove prior use [sic] is July 12, 2001, the filing date of the application.") (citation omitted).

43

Court must  compare the services listed in Plaintiffs' and Defendant's registrations, which as already stated, are "restaurant and carry out restaurant services" and "pizza parlors; Restaurant services featuring pizza, pasta and subs," respectively.  Based upon such comparison, for purposes of considering whether a likelihood of confusion exists under 15 U.S.C. § 1052(d), the Court finds that the two identical marks are for essentially the same services, which strongly supports a likelihood of confusion.  Defendant has not otherwise attempted to show the absence of a likelihood of confusion between his mark and TruFoods' mark.

However, the Court finds that on the current record there is an issue of fact with respect to TruFoods' prior use of the mark.  On this point, TruFoods' application indicates that it began using the mark in 1982.  "Allegations in a trademark application of a date of use, however, are not evidence of such use." *Tzu Wei Chen Food Co., Ltd. v. Chia-Chi Enterprises, Inc.*, No. 94-1527, 1995 WL 714589 at *2 (Fed. Cir. 1995) (table) (citing 37 C.F.R. § 2.122(b)(2) (1994)); *see also*, 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:17 (4th ed., updated Mar. 2014) ("The allegation of a date of first use in a use-based application for registration is not evidence of a date of first use on behalf of an applicant or registrant.  This is because an applicant is not required to introduce evidence of the date of first use of the mark or of the date of first use of the specimens submitted with the application.  In *inter partes* proceedings, a trademark registration resulting from a use-based application is proof of use only as of its filing date, not of the date of first use alleged in the application.") (footnotes omitted).

In this action, Plaintiffs initially relied solely on TruFoods' 2001 trademark application

as evidence that TruFoods began using the mark in 1982.[91]  However, Defendant objected,

and indicated that such application was not sufficient "evidence regarding actual use."[92]

Subsequently, Plaintiffs submitted a purported affidavit from TruFoods' Chief Financial

Officer, Bob Bagnell, who indicated that, "to the best of [his] knowledge, Arthur Treacher's

Inc. began using the mark in commerce as least as early as 1982, as claimed in the

application for the Mark, in connection with the opening of the first Pudgie's Famous

Chicken restaurant in Bethpage, New York."[93]   However, Bagnell's statement is not a

proper affidavit, since it does not indicate that he actually has personal knowledge on that

point.   Furthermore, the PTO's records indicate that Arthur Treacher's did not become

involved with the mark until 2001, and that it was actually George Sanders who began

using the Pudgie's mark in 1982, and whose rights were eventually transferred to

TruFoods.  Accordingly, the Court finds that there is a triable issue of fact concerning the

date of TruFoods' first use of the Pudgie's mark.   Plaintiffs' application for summary

judgment on its cancellation claim, based on priority of use and likelihood of confusion, is

therefore denied.

<u>*Plaintiffs' Claim for Unfair Competition*</u>

Plaintiffs' third cause of action alleges that Defendant committed unfair competition

---

[91]*See*, Docket No. [#46-2] at ¶ 16.

[92]See, Docket No. [#57-1] at ¶ 16.  In one of their submissions [#63], Plaintiffs contend that Defendant "has produced no evidence that calls into question the date of first use on TruFoods' trademark registration." *Id*. at p. 16.  However, it is Plaintiffs' burden to prove priority, and Defendant may move for summary judgment by pointing out an absence of evidence to support an element of Plaintiffs' claim.  Here, it appears quite likely that Plaintiffs can prove prior use, but not through Mr. Bagnell.

[93]Docket No. [#63-2] at ¶ 3.

by fraudulently obtaining his registration of the mark and by falsely claiming ownership of the mark, in violation of the Lanham Act, 15 U.S.C. § 1125(a), and common law. Defendant has moved for summary judgment on this claim.[94]  In support of his application, Defendant maintains that Plaintiffs have not demonstrated the elements of an unfair competition claim under either the Lanham Act or New York common law.[95]   Neither Plaintiffs' response [#46-4][96] nor their reply [#63] addresses this aspect of Defendant's motion.[97]   Accordingly, Defendant's unopposed application for summary judgment on Plaintiffs' third cause of action is granted.

### *Defendant's Counterclaim for Federal Trademark Infringement*

Defendant's first counterclaim alleges that Plaintiff's violated his federally-registered trademark, by doing business in Elmira Heights.   However, for the reasons already discussed, Defendant's federal registration is cancelled, because he obtained it by fraud. Consequently, Defendant's first counterclaim is dismissed.

### *Defendant's Counterclaim for a Declaration of "Non-Infringement"*

Defendant's fourth counterclaim seeks a declaratory judgment that Defendant is not

---

[94]See, Def. Memo of Law, Docket No. [#43-3] at pp. 12-14.

[95]*See*, id.

[96] Plaintiffs' memo of law [#46-4]  jumps from explaining why Plaintiffs are entitled to partial summary judgment on their first and second causes of action to explaining why Defendant is not entitled to summary judgment on any of his counterclaims.  It does not address Defendant's motion for summary judgment as to Plaintiffs' third cause of action, on which they did not move for partial summary judgment.

[97]In Defendant's reply memo of law [#50], he correctly observed that "Plaintiffs [had] not even address[ed] the common law unfair competition claim in their response." *Id*. at p. 7.  Despite being alerted to that fact, Plaintiffs still did not address that claim in their reply.  Consequently, it appears to the Court that Plaintiffs intentionally chose not to address that claim, and instead focused their attention on their second cause of action, for cancellation, which they viewed as their most important claim.  Indeed, the bulk of the parties' submissions is concerned with the cancellation claim, while the other claims are given relatively little attention or discussion.

infringing TruFoods' federally registered mark.  The parties' submissions contain scant discussion of this claim.  Moreover, TruFoods is not a party to this action, and the Court has already ruled that Plaintiffs do not have standing to maintain claims relating to infringement of TruFoods' registered mark.  Consequently, while the parties have not addressed the issue, the Court has a concern as to whether it could properly grant judgment in Defendant's favor on this claim, in TruFoods' absence.   In any event, Defendant has not demonstrated that he is entitled to judgment on this claim.  Accordingly, Defendant's motion for summary judgment is denied as to the fourth counterclaim.

### *Defendant's Remaining Counterclaims*

Defendants second, third and fifth counterclaims assert claims for federal unfair competition, common-law trademark infringement and unfair competition and injury to business reputation under New York General Business Law § 360-l, respectively.[98]  All of those claims arise from Defendant's contention that Plaintiffs are improperly doing business in Elmira Heights using the Pudgie's mark, by advertising there.  In that regard, Defendant asserts that Horseheads Pudgie's and Northside Pudgie's have, for years, pursuant to an agreement between themselves, had "dibs" on the Pudgie's pizza business in Elmira Heights, and that Southside Pudgie's has no right to intrude on that territory. Defendant asserts that Plaintiffs' "use of the mark [in Elmira Heights] . . . constitutes false designation of origin, misleading description of fact, and false or misleading representation

---

[98]Some of Defendant's arguments on these claims are based on the existence of his federal registration. *See, e.g.*, Def. Memo of Law [#32-3] at p. 18.  However, since the Court is cancelling Defendant's registration, those particular arguments are now moot.

of origin of goods."[99]   As to some of the claims, Defendant contends that Plaintiffs acted with bad faith, by attempting to "trade on [Horseheads Pudgie's] goodwill in Elmira Heights."[100]

Plaintiffs oppose all of those claims on the grounds that Defendant has never had the exclusive right to use the Pudgie's mark in Elmira Height, since Northside Pudgie's also does business there, and since Plaintiffs have made deliveries there for years.  Plaintiffs indicate that although they did not begin advertising that they delivered to Elmira Heights until 2010-2011, they had in fact been selling pizzas there for years, as shown by their delivery records.

Defendant's claims are all based on the contention that as between Pudgie's Horseheads and Pudgie's Southside, the former was the first to use the Pudgie's mark in Elmira Heights.  On the other hand, Plaintiffs insist that they "have been delivering into Elmira Heights since at least as early as the closing of the Pudgie's Elmira Heights restaurant in the early 1990's (which is the same time that Defendant Pudgie's and Pudgie's Northside began delivering to Elmira Heights)."  Neither party disputes that if Defendant actually had prior rights in Elmira Heights, there would be a likelihood of confusion.  However, there are triable issues of fact as to whether Defendant has senior rights to use the Pudgie's mark in Elmira Heights.  Consequently, Defendant's motion for summary judgment on his second, third and fifth counterclaims is denied.

---

[99]Answer with Counterclaims [#8] at ¶ 105.

[100]*See*, Def. Memo of Law [#32-3] at p. 17.

CONCLUSION

Defendant's motion [#51] to exclude late-produced documents is granted in part and denied in part.  The motion is granted with regard to the TruFoods documents.  The motion is denied with regard to Southside Pudgie's billing records concerning deliveries to Elmira Heights.

Defendant's motion for summary judgment [#32] is granted as to Plaintiffs' first and third causes of action, but is denied as to Plaintiffs' second cause of action. Defendant's motion for summary judgment on his counterclaims is also denied.

Plaintiffs' cross-motion for partial summary judgment [#46] is denied as to their first cause of action, which is being dismissed for lack of standing, but is granted as to their second cause of action, insofar as it alleges fraud, and Defendant's trademark registration is cancelled.  Plaintiff's application for summary judgment on its second cause of action, on the alternate basis of prior use and likelihood of confusion, is denied.

Lastly, Defendant filed a motion [#56] to strike Plaintiffs' cross-motion for summary judgment, as untimely filed.  On August 28, 2012, the Honorable Jonathan W. Feldman, United States Magistrate Judge, denied that application from the bench. *See*, Transcript of Appearance [#64] at p. 8.  The Clerk of the Court is directed to terminate that motion as denied.

SO ORDERED.

Dated:      May 13, 2014
            Rochester, New York

                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge